USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/26/2018

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————x

SERGEANTS BENEVOLENT ASSOCIATION
HEALTH & WELFARE FUND, individually and on
behalf of itself and all others similarly situated,

                 Plaintiff,

   -against-

ACTAVIS, PLC, and FOREST LABORATORIES,
LLC, MERZ PHARMA GMBH & CO. KGAA, MERZ
GMBH & CO. KGAA, MERZ PHARMACEUTICALS
GMBH, AMNEAL PHARMACEUTICALS, LLC,
TEVA PHARMACEUTICAL INDUSTRIES, LTD.,
BARR PHARMACEUTICALS, INC., COBALT
LABORATORIES, INC., UPSHER-SMITH
LABORATORIES, INC., WOCKHARDT LIMITED,
WOCKHARDT USA LLC, SUN PHARMACEUTICALS
INDUSTRIES, LTD., DR. REDDY'S LABORATORIES
LTD., AND DR. REDDY'S LABORATORIES INC.,

                 Defendants.

————————————————————————x

15 Civ. 6549 (CM)

**ORDER**

McMahon, C.J.:

     The Complaint in this action, which was filed following an earlier civil enforcement

action by the New York Attorney General, alleges a two-part scheme to prolong the monopoly of

Defendant Forest Laboratories, LLC ("Forest"), over the blockbuster Alzheimer's drug

memantine hydrochloride, or Namenda®. According to the Complaint, Forest and its patent

licensor Merz[1] first entered into agreements with generic manufacturers to stay out of the market

until the exclusivity period for Forest's existing, twice-a-day Namenda IR formulation had

_____

[1]      "Merz" refers to three entities, all named as Defendants in the Complaint: Merz GmbH & Co. KGaA,
Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH.

nearly expired ("pay for delay").  With this maneuver, Forest bought itself time to gain

regulatory approval for a new, once-a-day Namenda XR formulation and to pull from the market

the old, twice-a-day Namenda IR formulation (the "product hop" or "hard switch").  Although a

preliminary injunction prevented Forest from withdrawing the old formulation, a successful

switch would have effectively forestalled generic competition until the year 2029.

Under the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431

U.S. 720, 745–46 (1977), indirect purchasers of products sold at supra-competitive prices lack

standing to sue under federal antitrust statutes.  However, under its later decision in *California v.

ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989), indirect purchasers may still bring suit under state

antitrust laws, if a state permits such claims.  Therefore, it is common in private antitrust

litigation for two groups of purchasers, direct and indirect, to file separate cases arising out of the

same nucleus of operative fact, but to allege different causes of action—direct purchasers under

federal law and indirect purchasers under state laws.

That is precisely what happened here.  In a parallel "direct purchaser" case, drug

wholesaler plaintiffs, which bought Namenda directly from Forest, brought a suit alleging five

counts under the federal antitrust laws against Forest, Merz, and Forest's parent company

Actavis, plc ("Actavis").  That case, captioned *In re Namenda Direct Purchaser Antitrust

Litigation*, No. 15-cv-7488 (S.D.N.Y.), is currently pending before this Court.  I refer to the drug

wholesaler plaintiffs in that case as the Direct Purchaser Plaintiffs, or "DPPs," and I refer to that

case as the "DP Action."

In the instant case, employee health plan Sergeants Benevolent Association Health &

Welfare Fund, which purchased Namenda indirectly, separately brought a suit alleging 123

2

claims under state antitrust, consumer protection, and restitution laws.[2]  This case, captioned

*Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc*, No. 15-cv-6549

(S.D.N.Y.), names Actavis, Forest, Merz, and eight generic drug manufacturers[3] (the "Generic

Defendants"), which were not named in the DP Action.  I refer to the Plaintiff here, Sergeants

Benevolent Association Health & Welfare Fund, as the Indirect Purchaser Plaintiff, or "IPP," and

I refer to this case as the "IP Action."

     The complaints in the DP and IP Actions were filed around the same time.  The parties,

with the exception of Merz, sought consolidated briefing on motions to dismiss, (Dkt. No. 63),

which was granted, (Dkt. No. 64).  Merz eventually joined the consolidated briefing.  (*See, e.g.*,

Dkt. No. 85.)

     Ruling on the motions to dismiss both the DPPs' and IPP's complaints, this Court held

that most of the federal antitrust counts in the DPPs' complaint survived.  *Sergeants Benevolent*

*Association Health & Welfare Fund v. Actavis, plc*, Nos. 15-cv-6549, 15-cv-7488, 2016 WL

4992690, at *16–*17 (S.D.N.Y. Sept. 13, 2016).  In the interest of efficiently resolving common

factual and legal issues, it then denied without prejudice the motions to dismiss the IPP

complaint, and placed all 123 state law claims on its suspense calendar while the federal antitrust

claims in the DP Action were pending.  *Id.* at *17.

---

[2]    The IPP's Complaint includes four counts, with dozens of state law claims under each count.  I recognize that plaintiffs will sometimes style their complaints this way.  Frankly, however, each of these state law claims should be its own cause of action, such that the IPP Complaint would properly contain 123 separate counts.

[3]    These are:  Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal"); Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's").

The DP Action proceeded through class certification and denial of Defendants' motion for summary judgment before the parties expressed interest in mediation. (*See* Dkt. No. 122.)[4] However, it was determined that mediation would be successful only if the IP Action came off of the suspense calendar and the IPP came back into the proceedings. (*Id.*)

As a result, the IPP's 123 state law claims are presently before the Court on separate motions to dismiss by (1) Actavis, Forest, and Merz and (2) the Generic Defendants. The parties have also recently submitted supplemental briefing. (*See* Dkt. Nos. 129–33, 146, 149–56.)

For the reasons below, the motions to dismiss the IP Action are **GRANTED IN PART** and **DENIED IN PART**.

---

[4]     Unless otherwise noted, all references herein are to the docket in *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc*, No. 15-cv-6549 (S.D.N.Y.).

## Table of Contents

I.   Overview of Claims and Jurisdiction ................................................................. 9

II.   Factual Background ...................................................................................... 10

   A.   The Parties ............................................................................................ 11

   B.   The Regulatory Scheme ......................................................................... 12

   C.   Drug Substitution Laws and Product Hopping ............................................ 17

   D.   The Namenda Settlement Agreements ...................................................... 18

   E.   The "Hard Switch" ................................................................................ 20

III.   Procedural History ..................................................................................... 21

IV.   Standard of Review ..................................................................................... 24

V.   Count One:  Monopolization Under the Laws of 27 States Against Actavis, Forest, and Merz ........................................................................................................... 24

   A.   The IPP's Underlying Factual Allegations State a Claim for Monopolization ............. 26

      1.   The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR ......................................................................... 26

      2.   The IPP States a Claim for Monopolization Based on the Settlement Agreements ... 32

      3.   The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One ...................................................................... 38

      4.   The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action ....................................................................................................... 40

   B.   The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others 41

      1.   The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States ............................... 42

      2.   The IPP Fails to State a Claim for Monopolization in Three States That Follow *Illinois Brick* (Florida, Massachusetts, and Utah) ............................................... 45

      3.   The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada) ..................... 49

      4.   The IPP Fails To State a Claim for Monopolization Under the Law of Kansas ........ 55

   C.   In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States ......................................................................... 59

VI.   Count Two:  Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants .......................................................... 59

   A.   The IPP States a Claim for Conspiracy To Monopolize ................................... 62

   B.   Illinois .................................................................................................. 65

C.     Oregon ............................................................................................................ 66

D.     In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States ........................................................... 67

VII.   Count Three:  Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants ......................... 67

A.     The IPP Adequately Pleads Its State Law Claims Under *Twombly* and *Iqbal* .............. 69

B.     The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b) ....................................................................................................... 71

C.     *Illinois Brick* Does Not Bar the IPP's Consumer Protection Claims ............................ 72

D.     The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others 73

1.     Alabama ........................................................................................................ 73

2.     Arizona ......................................................................................................... 75

3.     California ...................................................................................................... 75

4.     District of Columbia ..................................................................................... 77

5.     Florida .......................................................................................................... 79

6.     Hawaii .......................................................................................................... 80

7.     Idaho ............................................................................................................ 81

8.     Illinois .......................................................................................................... 82

9.     Kansas .......................................................................................................... 85

10.    Maine ............................................................................................................ 86

11.    Massachusetts ............................................................................................... 87

12.    Michigan ....................................................................................................... 88

13.    Missouri ........................................................................................................ 90

14.    Montana ........................................................................................................ 90

15.    Nebraska ....................................................................................................... 91

16.    Nevada .......................................................................................................... 92

17.    New Hampshire ............................................................................................ 93

18.    New Mexico .................................................................................................. 94

19.    New York ...................................................................................................... 95

20.    North Carolina .............................................................................................. 96

21.    Rhode Island ................................................................................................ 96

22.    Tennessee ..................................................................................................... 97

23.   Utah ............................................................................................................. 98

24.   Vermont ..................................................................................................... 102

25.   West Virginia.............................................................................................. 103

E.   In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States ...................................... 105

VIII.   Count Four:  Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants.................................................................. 105

A.   Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State............................................................................................. 107

B.   The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington) ........................................................ 110

C.   Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming) .................................................................. 112

D.   The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others114

1.   Alabama........................................................................................................ 114

2.   Arizona ......................................................................................................... 115

3.   California ...................................................................................................... 116

4.   District of Columbia ..................................................................................... 117

5.   Florida........................................................................................................... 117

6.   Idaho ............................................................................................................. 118

7.   Illinois ........................................................................................................... 119

8.   Kansas ........................................................................................................... 120

9.   Maine ............................................................................................................ 121

10.   Massachusetts ............................................................................................... 122

11.   Michigan ....................................................................................................... 122

12.   Mississippi .................................................................................................... 123

13.   New York ...................................................................................................... 124

14.   North Carolina .............................................................................................. 126

15.   North Dakota ................................................................................................ 127

16.   Rhode Island ................................................................................................. 128

17.   Tennessee...................................................................................................... 129

18.   Utah ............................................................................................................... 130

19. Washington ................................................................................................. 131

20. West Virginia and Wisconsin ..................................................................... 132

21. Wyoming ...................................................................................................... 133

E. In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States ............................ 134

IX. Conclusion ............................................................................................................. 134

# BACKGROUND

## I.   Overview of Claims and Jurisdiction

This case, *Sergeants Benevolent Association Health & Welfare Fund v. Actavis*, No. 15-cv-6549 (S.D.N.Y.) (the "IP Action"), proceeds in parallel with the factually similar case, *In re Namenda Direct Purchaser Antitrust Litigation*, No. 15-cv-7488 (S.D.N.Y.) (the "DP Action").

Although this Court accepted these two cases on its docket as related cases pursuant to Local Rule 13, (*see* 15-cv-7488, entry of Oct. 6, 2015), and although this Court granted certain Defendants' motion for consolidated briefing on the motions to dismiss pursuant to its individual rules, (15-cv-6549, Dkt. No. 64), it never consolidated the cases under Federal Rule of Civil Procedure 42(a), nor joined the claims and parties under Federal Rules of Civil Procedure 18 and 19, respectively.

As a result, the IP Action proceeds as an entirely separate action composed solely of state law claims. The complaint in the IP Action alleges a total of 123 state law claims, under the law of 44 states, aggregated as four "counts":  (1) monopolization (27 state law claims); (2) conspiracy to monopolize (27 state law claims); (3) violation of consumer protection and unfair and deceptive trade practices statutes (25 state law claims); and (4) unjust enrichment (44 state law claims).

Since not a single federal interest is implicated in the IP Action, the Court exercises jurisdiction over these 123 state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). CAFA's prerequisites are met. The IPP's Consolidated Amended Complaint ("CAC") alleges that the aggregate amount in controversy exceeds $5,000,000.00. (CAC ¶ 31.) In addition, the IPP, a New York trust, is diverse from several of the Defendants, including Actavis, Merz, and the majority of the Generic Defendants. (CAC ¶¶ 15–29.)

## II.      Factual Background

The factual nucleus from which the IP Action arises has been described exhaustively in several published opinions, including those of Judge Sweet and the Second Circuit in the earlier civil enforcement action by the New York Attorney General, and those of this Court in the parallel DP Action.

The relevant opinions are:  (i) *New York v. Actavis, plc*, No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) (*Namenda I*), in which the district court (Sweet, J.) preliminarily enjoined Actavis and Forest from withdrawing Namenda IR, the twice-a-day or "immediate release" formulation, from the market; (ii) *Schneiderman ex rel. New York v. Actavis plc*, 787 F.3d 638 (2d Cir. 2015) (*Namenda II*), in which the Second Circuit upheld the preliminary injunction granted in *Namenda I*; and (iii) three opinions from the private, follow-on litigation before this Court.

The first opinion, on which the Court granted consolidated briefing, denied Actavis, Forest, and Merz's motion to dismiss the DP Action; denied all Defendants' motions to dismiss the IP Action without prejudice; and placed the 123 state law claims in the IP Action on the Court's suspense calendar.  *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, PLC*, Nos. 15-cv-7488, 15-cv-6549, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) (*Namenda III*).

The second opinion of this Court granted in part and denied in part the DPPs' motion for collateral estoppel and partial summary judgment against Actavis and Forest, on the basis of facts established about the product hop in *Namenda I* and *Namenda II*.  *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 WL 4358244 (S.D.N.Y. May 23, 2017) (*Namenda IV*).

The third opinion denied Actavis's and Forest's post-discovery motion for summary judgment and granted the DPPs' motion for class certification. *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018) (*Namenda V*).

In light of the detailed factual history discussed in these opinions, the Court provides only an abridged summary of the relevant facts here.

### A.     The Parties

Defendant Forest Laboratories, LLC ("Forest") is a limited liability company incorporated in Delaware with offices in New York and New Jersey. *Namenda III*, 2016 WL 4992690, at *2. It is wholly owned by Defendant Actavis, plc ("Actavis").[5]  *Id.*; (CAC ¶ 16.) The IPP also describes Actavis as Forest's successor-in-interest. (*See* CAC ¶ 192.)

In 2000, Forest entered into a patent licensing and cooperation agreement with Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH (collectively, "Merz")[6] to develop a memantine hydrochloride-based drug for the treatment of moderate-to-severe forms of Alzheimer's disease. *Namenda III*, 2016 WL 4992690, at *2; *Namenda IV*, 2017 WL 4358244, at *2.

The resulting drug was launched in 2004 as a twice-daily immediate release formula ("Namenda IR"), generating $1.5 billion in annual sales for Forest in 2012 and 2013. *Namenda II*, 787 F.3d at 646–47.

Defendants Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt");

---

[5]     Allergan plc was formerly known as Actavis, plc. (*See In re Namenda Direct Purchaser Antitrust Litig.*, No. 18-2421 (2d Cir.), Dkt. No. 1 at 2 (corporate disclosure statement).) This opinion uses "Actavis" throughout to reflect the fact that the IPP has not moved for a substitution of parties in the IP Action.

[6]     The DPPs subsequently dismissed all three Merz entities from the DP Action on April 20, 2017. (15-cv-7488, Dkt. No. 207.) They remain parties to the IP Action, however.

Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal");

Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India

Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's

Laboratories, Inc. (jointly, "Dr. Reddy's") (collectively, the "Generic Defendants" and, together

with Actavis, Forest, and Merz, the "Defendants") each developed generic formulations of

Namenda IR and sought approval from the FDA to take these generic formulations to market.

*Namenda III*, 2016 WL 4992690, at *2.

Plaintiff Sergeants Benevolent Association Health & Welfare Fund (the "IPP," or, where

appropriate, the "Named Plaintiff") is a New York trust that provides prescription drug benefits

for active and retired New York City Police Department sergeants and their dependents through

its participant plans. *Id.*; (CAC ¶ 15). As a third-party payor of pharmaceutical claims for

members of its plans, the IPP alleges that it was an indirect purchaser of branded Namenda IR

during the relevant period. (CAC ¶ 15.) The IPP alleges that, beginning in April 14, 2010 and

continuing through the present day (the "Class Period"), it indirectly purchased branded

Namenda IR in 11 states[7] at prices higher than it would have otherwise paid absent Defendants'

unlawful anticompetitive conduct. (*Id.* ¶¶ 15, 146)

The IPP also alleges that it purchased (*i.e.* paid for) branded Namenda XR indirectly

during the Class Period, when it would otherwise have purchased low-cost, generic Namenda IR

absent Defendants' unlawful competitive conduct. (*Id.* ¶ 202.)

**B.      The Regulatory Scheme**

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, governs

the manufacture, sale, and marketing of prescription pharmaceuticals in the United States.

---

[7]      The IPP does not, however, bring claims under the laws of all 11 states. (*Compare* CAC ¶ 15 *with* CAC ¶¶ 201, 207, 215, 226.)

*Namenda III*, 2016 WL 4992690, at \*2.  The FDCA requires a pharmaceutical company to submit a New Drug Application ("NDA") to the FDA before it can bring a new drug to market. *Id.*

The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585, was enacted to serve the "dual purposes of incentivizing innovation," by rewarding brand-name drug manufacturers for bringing new therapies to market, and "lowering drug prices for consumers," by rewarding generic drug manufacturers who attempt to compete with costly branded drugs.  *Id.* at \*3.

Rewards under the Hatch-Waxman Act take the form of granting an exclusive share of the prescription pharmaceutical market through one of two legal regimes:  patents and exclusivities.  *See Frequently Asked Questions on Patents and Exclusivity*, FDA (last updated May 2, 2018), https://www.fda.gov/drugs/developmentapprovalprocess/ucm079031.htm ("FAQs").  Patents are property interests granted by the U.S. Patent and Trademark Office ("PTO"), while exclusivities are statutory protections granted by the Food and Drug Administration ("FDA").  *See Namenda IV*, 2017 WL 4358244, at \*3; *see also* FAQs at 1.

***Patents.***  Manufacturers may claim patents for new drug compounds, drug products, and methods of use.  *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 94 (2d Cir. 2017) (*Actos II*).  Patents vary in duration but typically last for twenty years.  *See* FAQs at 2.  During the lifetime of the patent, brand manufacturers are provided a legal monopoly on their invention, which can enable favorable price-setting.  *Id.* at 1.

Patent protection is so valuable to pharmaceutical companies that entering the period following patent expiration is known as going off the "patent cliff."  *Namenda III*, 2016 WL 4992690, at \*3.  In 2012, patent cliffs collectively caused the entire U.S. pharmaceutical market

to shrink by 1%.  Eric Sagonowsky, *Big Pharma faces $26.5B in losses this year as next big patent cliff looms, analyst says*, FiercePharma, Apr. 21, 2017, https://www.fiercepharma.com/pharma/big-pharma-faces-26-5b-patent-loss-threats-year-analyst-says.

The Hatch-Waxman Act allows a brand-name drug manufacturer to extend any patent submitted as part of an NDA for an additional five years, to compensate for the time elapsed during the FDA's approval process.  35 U.S.C. § 156; *Namenda III*, 2016 WL 4992690, at *3.

*Exclusivity.*  Both the FFDCA and the Hatch-Waxman Act also provide for statutory periods of "marketing exclusivity" in connection with the approval of certain NDAs.  *Otsuka Pharm. Co., Ltd. v. Price*, 869 F.3d 987, 988 (D.C. Cir. 2017); *see also* FAQs at 3.  "When a drug earns a period of exclusivity, the Food and Drug Administration must withhold approval of certain competing drugs," including generics, "if various conditions are satisfied."  *Otsuka Pharm.*, 869 F.3d at 988.

Not all NDAs will qualify for statutory exclusivities.  For example, the FDA may grant exclusivities for, among other things, a new chemical entity (five years), 21 C.F.R. § 314.108; or an "orphan" drug intended to treat rare diseases (seven years), 21 C.F.R. § 316.31.  *See* FAQs at 3.  The FDA may also grant additional exclusivities later in the life of a drug, well after submission of the initial NDA.  For instance, the FDA may grant a six-month period of exclusivity for studying the drug's efficacy in children ("pediatric exclusivity").  21 U.S.C. § 355a; *Namenda II*, 787 F.3d at 644.

*Interaction.*  To a degree, exclusivity interacts with patent protection.  *See* FAQs at 4.  For example, when a brand manufacturer submits an NDA to the FDA, it must list any patents that claim drugs, drug products, or methods of use that are the subject of that NDA.  *See In re*

14

*Actos End Payor Antitrust Litig.*, No. 13-cv-9244, 2015 WL 5610752, at *1 (S.D.N.Y. 2015)

(*Actos I*). The FDA lists all existing patents and exclusivities in the "Orange Book." *Id.*; FAQs

at 5.

Patent protection also interacts with exclusivity when a generic manufacturer seeks FDA

approval to market a generic version of a branded drug that is still "on patent." Specifically, the

Hatch-Waxman Act provides for a 180-day period of "patent challenge" exclusivity for the first

generic manufacturer to file a certification with the FDA that contests the validity of the brand

manufacturer's patent. *Namenda III*, 2016 WL 4992690, at *3; *see also* FAQs at 3. This period

of exclusivity is valid against other generic manufacturers, although multiple filers may share the

exclusivity period if they file on the same day. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 174–75

(2013) (Roberts, J., dissenting) (citing 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb); FDA, Guidance for

Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day 4 (July

2003)). Patent challenge exclusivity is highly valuable, "possibly worth several hundred million

dollars." *Actavis*, 570 U.S. at 144 (citing C. Scott. Hemphill, *Paying for Delay: Pharmaceutical

Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).

To win the 180-day period of patent challenge exclusivity, a generic manufacturer must

file an Abbreviated New Drug Application ("ANDA") with the FDA, which relies on the NDA

submitted by the brand manufacturer to show the drug is safe and effective. *Actavis*, 570 U.S. at

142. As part of this process, a generic manufacturer must certify that the generic drug "has the

same active ingredients as, and is biologically equivalent" to the brand drug. *Id.* (internal

citations omitted). In addition, and critical to gaining the 180-day exclusivity period, the first-

filer generic manufacturer must also certify that the brand name drug is patented, but that the

patent is invalid or the generic will not infringe it, a so-called "Paragraph IV" certification. *Id.* at 143.

The Hatch-Waxman Act allows a brand manufacturer to treat the filing of a Paragraph IV certification as an infringing action and to sue the generic filer for patent infringement. *Id.* The filing of a patent infringement action triggers an automatic, 30-month stay on the FDA's approval of the generic manufacturer's ANDA. *Id.* During this time, however, the FDA may tentatively approve the ANDA, such that the generic drug is set for final approval and launch after the 30-month stay expires. *Namenda IV*, 2017 WL 4358244, at *4.

At this point, a generic manufacturer defending a patent infringement action based on its Paragraph IV certification has several options. First, it may defend the patent infringement action by arguing that the underlying patent is invalid or that its generic drug does not otherwise infringe the patent. If successful, a judgment in the infringement action results not only in the invalidation of the underlying patent or a finding of non-infringement but also entitles the generic manufacturer to the coveted 180-day exclusivity period. *See* Shashank Upadhye, *Generic Pharmaceutical Patent and FDA Law* §§ 28:9.50, 29:5 (2018–19 ed.).

Second, a generic manufacturer may launch its generic product "at risk," once it has gained FDA approval and the 30-month stay has expired, but while the litigation is ongoing. *Id.* § 32.

Third, the brand manufacturer and generic manufacturer may enter into a settlement agreement to resolve the litigation, which allows the generic manufacturer to extract certain concessions from the brand manufacturer ("reverse payments"). *See* Hemphill, *supra*, at 1568; *see also Actavis*, 570 U.S. at 140–41. Settlement agreements containing reverse payments may raise antitrust scrutiny if the payments flowing from the brand manufacturer to the generic

manufacturer are "large and unjustified." *Actavis*, 570 U.S. at 158. Brand manufacturers are particularly incentivized to settle with first-filer generics because, under the Hatch-Waxman Act, no later-filing generic is eligible for the 180-day period of patent challenge exclusivity, thereby minimizing such "Paragraph IV" challenges.

### C.   Drug Substitution Laws and Product Hopping

Apart from the federal Hatch-Waxman Act, state law regimes also facilitate generic competition and the provision of cheaper prescription drugs to consumers by allowing, or in some cases requiring, pharmacists to fill a prescription for a branded drug with a "therapeutically equivalent" generic drug. *Namenda IV*, 2017 WL 4358244, at \*4. States define therapeutic equivalence differently, but most use the comparatively strict definition adopted by the FDA. *Id.* at \*4–\*5. This definition only allows a pharmacist to substitute a generic drug if the FDA designates the generic as "AB-rated" in the Orange Book. *Namenda III*, 2016 WL 4992690, at \*3.

As this Court has previously observed, "The requirement that substituted drugs meet therapeutic equivalence standards, although intended to protect patients, allows brand-name drug manufacturers to 'game the system' through a practice known as 'product hopping.'" *Namenda IV*, 2017 WL 4358244, at \*5.

In a product hop, a brand manufacturer re-patents a slightly different formulation of the drug shortly before any generic competitors are legally allowed to enter the market. *Namenda II*, 787 F.3d at 643 & n.2 (citing Alan Devlin, *Exclusionary Strategies in the Hatch-Waxman Context*, 2007 Mich. St. L. Rev. 631, 658 (2007)). At its core, product hopping is regulatory arbitrage—taking advantage of the comparatively forgiving "improvement" standard under the federal patent laws and the relatively strict "therapeutically equivalent" standard under state drug

substitution laws. *See* Devlin, *supra*, at 657 n.139.  Examples of product hops have included

embedding the drug's active ingredient in a different inactive substrate, *In re Asacol Antitrust*

*Litig.*, 323 F.R.D. 451, 462 (D. Mass. 2017) (*Asacol II*); introducing a tablet in place of a

capsule, *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 429 (3d Cir. 2016); or

re-apportioning the "scoring" lines on a tablet that allow patients to break the pill into smaller

dosages, *id.* at 429–30.

Once the re-formulated product is re-patented, but before generic versions of the old

formulation can legally enter the market and gain a foothold through state drug substitution laws,

a brand manufacturer may try to persuade physicians to prescribe their patients the new

formulation (a "soft switch").  *Namenda II*, 787 F.3d at 648.  In the alternative, a brand

manufacturer might withdraw the old formulation from the market altogether or severely restrict

access, forcing physicians to adopt the new formulation in order to avoid interruptions to their

patients' medication regimens ("hard switch").  *Id.*

A product hop raises antitrust scrutiny when it "coerces consumers and impedes

competition." *Id.* at 652.

### D.      The Namenda Settlement Agreements

After entering into the June 2000 patent licensing and cooperation agreement with Merz,

in December 2002 Forest submitted an NDA to the FDA for 5 mg and 10 mg memantine

hydrochloride tablets for the treatment of Alzheimer's disease.  (CAC ¶ 63.)  The drug was based

on Patent No. 5,061,703 (the "'703 patent"), which was obtained in 1991 and was set to expire

on April 11, 2010.  (*Id.* ¶¶ 4, 64.)

In October 2003, the FDA approved Forest's NDA for Namenda IR tablets and listed the

'703 patent in the Orange Book.  (*Id.* ¶¶ 64–65.)

18

On October 16, 2007, at least fourteen generic manufacturers filed ANDAs with Paragraph IV certifications for AB-rated generic formulations of Namenda IR. (*Id.* ¶ 69.) Beginning in January 2008, Forest and Merz filed patent infringement lawsuits against these generic manufacturers, including the Generic Defendants, in the U.S. District Court for the District of Delaware. (*Id.* ¶¶ 70–71.) This triggered 30-month stays on these first-to-file ANDAs, which the IPP alleges would have begun to expire in April 2010. (*Id.* ¶ 72.)

Forest and Merz then obtained a patent extension on the '703 patent under the Hatch-Waxman Act. In March 2009, the '703 patent was extended for five years based on the duration of the FDA's approval process for the NDA. (*Id.* ¶ 67.)[8] This extended the '703 patent's expiration date from April 11, 2010 to April 11, 2015. (*Id.*)

Between July 2009 and December 2009, while the 30-month ANDA stays were in effect, Forest and Merz entered into settlement agreements with the Generic Defendants. (*Id.* ¶ 75.) Pursuant to these settlement agreements, the Generic Defendants agreed to delay market entry until as late as July 11, 2015. (*Id.* ¶ 76.)

All of the Generic Defendants received tentative approval of their ANDAs from the FDA between January 2010 and April 2010, and all had received final approval of their ANDAs by October 2011. (*Id.* ¶ 82–83.)

In 2014, Forest was granted an additional six months of pediatric exclusivity for Namenda IR based on studies of the drug's efficacy in children with autism. (*Id.* ¶ 68.) This tacked an additional six months of statutory market exclusivity for Namenda IR onto the end of the '703 patent protection period. (*Id.*)

---

[8]     It is not clear from the face of the IPP Complaint how Forest was able to obtain a five-year patent extension, the maximum permitted, when the FDA approval process for the Namenda IR NDA allegedly took only one year.

### E.      The "Hard Switch"

On August 21, 2009, "less than a month after it had announced the first wave of settlements with generics challenging the Namenda IR patent," Forest submitted an NDA for a once-a-day, extended release formulation of memantine hydrochloride, Namenda XR. (*Id.* ¶ 98.) The IPP alleges that the NDA did not demonstrate that Namenda XR was more efficacious than Namenda IR. (*Id.*)

The FDA approved the NDA for Namenda XR on June 21, 2010, but Forest did not launch the drug until June 2013. (*Id.* ¶¶ 99, 102.)

After the launch of Namenda XR, Forest used aggressive marketing to begin encouraging patients and physicians to switch from Namenda IR to Namenda XR. (*Id.* ¶ 105.) The IPP alleges that, when that "soft switch" strategy failed, Forest began implementing a strategy in February 2014 that involved discontinuing and/or severely limiting the distribution of Namenda IR. (*Id.* ¶ 95, 127–28.) This "hard switch" strategy included: (i) seeking to have the Centers for Medicare and Medicaid Services ("CMS") remove Namenda IR from its reference list; (ii) signing an exclusive distribution agreement with a mail-order only pharmacy; and (iii) requiring physicians to certify that it was medically necessary for patients to take Namenda IR rather than Namenda XR. (*Id.* ¶ 95.) Forest planned to discontinue retail sales of Namenda IR in January 2015. (*Id.*)

In September 2014, New York State filed a complaint against Actavis and Forest alleging violations of the federal Sherman Antitrust Act and New York's Donnelly Act on the basis of the hard switch, and seeking to preliminarily enjoin the defendants from withdrawing Namenda IR from the market. *Namenda II*, 787 F.3d at 649.

In December of 2014, the U.S. District Court for the Southern District of New York (Sweet, J.) entered an order preliminarily enjoining Actavis and Forest from withdrawing

Namenda IR from retail shelves. *Namenda I*, 2014 WL 7015198, at *46. The Second Circuit

upheld the injunction. *Namenda II*, 787 F.3d at 663.

The enforcement action was followed by several private, follow-on suits seeking treble

damages under federal and state antitrust laws, which are described below.

## III.   Procedural History

The IP Action was filed in August of 2015 as a putative class action on behalf of:

> All persons or entities in the United States and its territories who
> indirectly purchased, paid and/or provided reimbursement for some
> or all of the purchase price for branded Namenda IR 5 or 10 mg
> tablets, or Namenda XR capsules, for consumption by themselves,
> their families, or their members, employees, insureds, participants,
> or beneficiaries, other than for resale, at any time during the period
> from April 14, 2010 and continuing until the anticompetitive effects
> of Defendants' unlawful conduct ceases (the "Class Period").

(CAC ¶ 146.)

The DP Action was filed the following month.[9]  Both the IP Action and the DP Action

were placed on this Court's docket as related actions shortly thereafter. (*See* 15-cv-7488, entry

of Oct. 6, 2015.)

Like the enforcement action, the private plaintiffs sought damages on the basis of the

"hard switch," but they also alleged damages stemming from the settlement agreements entered

into with generic manufacturers. (*See, e.g.*, CAC ¶¶ 84–86.)

Early in the litigation, this Court granted the parties' request for consolidated briefing on

the motions to dismiss both the DP and IP Actions. (Dkt. No. 64.)[10]  Thereafter, Actavis, Forest,

---

[9]       Plaintiff Rochester Drug Co-Operative, Inc., also filed a complaint on behalf of direct purchasers that did
not name the Generic Defendants. (15-cv-10083, Dkt. No. 1.) On January 26, 2016, Plaintiffs JM Smith
Corporation and Rochester Drug Co-Operative, Inc. stipulated to consolidating the cases. (15-cv-7488, Dkt. No.
65.)

[10]      As discussed, Merz did not join the motion for consolidated briefing, (Dkt. No. 63 at 2 n.1), but later joined
Actavis and Forest's brief, (Dkt. No. 85).

and Merz submitted a single memorandum of law in support of their motion to dismiss the DP and IP Actions. (Dkt. No. 85 or "Forest Br.".) The Generic Defendants, who had not been named in the DP Action, submitted a separate memorandum of law in support of their motion to dismiss the IP Action. (Dkt. No. 81 or "Gen. Defs. Br.".)

Roughly speaking, Actavis, Forest, and Merz's briefing challenged the sufficiency of the facts alleged in the DPPS' and IPP's Complaints as a whole, while the Generic Defendants' briefing challenged the IPP's ability to bring individual claims as a matter of state law. Each group of Defendants expressly adopted the arguments of the other group, to the extent applicable, in full.

In the IP Action, the IPP filed two separate memoranda of law in opposition to (i) Actavis, Forest, and Merz's motion and (ii) the Generic Defendants' motion. (Dkt. No. 87 or "IPP Resp. to Forest Br."; Dkt. No. 88 or "IPP Resp. to Gen. Defs. Br.".) Actavis, Forest, and Merz filed one reply, and the Generic Defendants filed another. (Dkt No. 90 or "Forest Reply"; Dkt. No. 89 or "Gen. Defs. Reply.")

On September 13, 2016, this Court issued an order (i) denying in part and granting in part Actavis, Forest, and Merz's motion to dismiss the DP Action; (ii) denying without prejudice Actavis, Forest, and Merz's and the Generic Defendants' motions to dismiss the IP Action; and (iii) placing the 123 state law claims from the IP Action on the Court's suspense calendar pending resolution of the federal antitrust claims in the DP Action.[11] *Namenda III*, 2016 WL 4992690, at *16–*17.

---

[11]   This Court had previously ordered that "the Indirect Purchaser Plaintiff's claims are *severed* and placed on the Court's suspense calendar." *Namenda III*, 2016 WL 49992690, at *17 (emphasis added). The use of the word "sever," however, did not connote that the cases had been consolidated under Rule 42(a) or joined for purposes of Rules 18 and 19.

The DP Action proceeded through discovery, summary judgment, and class certification. *See Namenda IV*, 2017 WL 4358244; *Namenda V*, 2018 WL 3970674. Defendants in the DP Action recently sought and were denied leave to appeal this Court's grant of class certification. (15-cv-7488, Dkt. No. 600.)

On September 10, 2018, after the parties to the DP Action expressed interest in mediation, this Court lifted its stay of the IP Action and referred the parties to Magistrate Judge Lehrburger for supervision of "such non-duplicative discovery as is necessary to get the parties to the IPP case up to speed[.]" (Dkt. No. 122 at 2.) The order of September 10, 2018 acknowledged that the 123 state law claims in the IP Action were the subject of a pending motion to dismiss and had yet to be addressed. (*Id.*)

Subsequently, Actavis, Forest, Merz, and the Generic Defendants filed renewed motions to dismiss the IP Action, along with supplemental briefing. (Dkt. No. 131-1 or "Gen. Defs. Suppl. Br."; Dkt. No. 133 or "Forest Suppl. Br."; Dkt. No. 152 or "IPP Resp. to Forest Suppl. Br."; Dkt. No. 158 or "IPP Resp. to Gen. Defs. Suppl. Br."; Dkt. No. 159 or "Forest Suppl. Reply"; and Dkt. No. 160 or "Gen. Defs. Suppl. Reply.") Defendants again divided the briefing, with Actavis, Forest, and Merz focusing on the sufficiency of the factual allegations regarding the underlying anticompetitive conduct, and the Generic Defendants briefing the requirements of each state's laws in detail.

Presently before the Court are the motions of (1) Actavis, Forest, and Merz and (2) the Generic Defendants to dismiss all 123 state law claims in the IP Action.

## DISCUSSION

### IV.   Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Finally, a motion to dismiss must be supported by "information contained in the 'four corners' of the complaint." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). This principally includes facts alleged in the complaint and materials attached to or incorporated by reference into the complaint. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). It also includes information of which the court takes judicial notice. *Id.*

### V.   Count One:  Monopolization Under the Laws of 27 States Against Actavis, Forest, and Merz

The IPP first brings 27 separate state law claims grouped under the heading "Count One: Monopolization Under State Law." (CAC at 46.)  These 27 state laws are all state antitrust or fair competition laws. (CAC ¶ 201.)  The IPP asserts these claims against Actavis, Forest, and Merz, but not against the Generic Defendants. (CAC ¶ 201.)

24

Count One alleges unlawful monopolization based on two separate, anticompetitive acts: (i) the "hard switch" from Namenda IR to Namenda XR and (ii) the "pay to delay" settlement agreements with generic competitors.  (CAC ¶¶ 193–96.)

The IPP alleges that both of these acts were part of an "overall scheme," (CAC ¶ 195), perpetuated to "maintain and extend [Forest's] monopoly power in the memantine hydrochloride market," (CAC ¶ 197).  In turn, "Forest's unlawful anticompetitive scheme to prevent, delay, and or minimize the success of the introduction into the United States marketplace of any generic versions of Namenda IR enabled Forest to continue charging supra-competitive prices for memantine hydrochloride without a substantial loss of sales."  (*Id.*)

The bulk of the parties' briefing is directed to this Count and to Count Two, for conspiracy to monopolize.

Actavis, Forest, and Merz bring a full arsenal of arguments to dismiss Count One, *viz.*:

- Judge Sweet's preliminary injunction in the earlier enforcement action prevented any "hard switch" from Namenda IR to Namenda XR from occurring, and in any case the IPP will be unable to offer any evidence that its plan participants or any member of the Class switched to Namenda XR as a result of the withdrawal announcement, (Forest Br. at 15–34);

- The IPP has expressly disclaimed that it is relying on a theory of unlawful "reverse payments" under *Actavis*, 570 U.S. at 158, to show anticompetitive conduct with respect to the settlement agreements, and, even if the IPP were to rely on such a theory, it cannot plausibly allege that any of the reverse payments made pursuant to the agreements were improper, (Forest Br. at 34–60);

- The IPP's "injuries" caused by the settlement agreements are purely speculative, (Gen. Defs. Br. at 26);

- Because this Court previously dismissed the DPPs' claim for an "overarching scheme," and because the IPP has failed to plead any independently anticompetitive conduct with respect to either the hard switch or the settlement agreements, this Count must be dismissed, (Forest Br. at 60–62); and

25

- The antitrust laws of 26 states have limitations periods of five years or fewer, making it "likely" that all of the state law claims asserted under Count One are time-barred, (*id.* at 65 n.42).

Actavis, Forest, Merz, and the Generic Defendants also argue for the dismissal of particular state law claims that are part of Count One, *viz.*:

- The IPP lacks Article III standing to assert claim in states where it has not made purchases and thereby suffered injury-in-fact, which are all but nine states, (Forest Br. at 65–66);

- *Illinois Brick* bars the IPP's claims in five states[12] that have not enacted so-called "*Illinois Brick* repealer statutes," (Gen. Defs. Suppl. Br. at 10–11);

- The IPP has failed to satisfy statutory requirements in four states that any plaintiff first notify the state's attorney general before filing a private damages suit, (Gen. Defs. Suppl. Br. at 11–13); and

- Claims for unilateral monopolization are inactionable under the laws of three states, (Forest Br. at 82).

## A.   The IPP's Underlying Factual Allegations State a Claim for Monopolization

### 1.   The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR

"Well-established case law makes clear that product redesign is anticompetitive when it coerces consumers and impedes competition." *Namenda II*, 787 F.3d at 652.  While withdrawing an old product and substituting a new product does not constitute anticompetitive conduct *per se*, "when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive[.]" *Id.* at 654 (internal citations omitted).

---

[12]   Generic Defendants also argue that *Illinois Brick* bars the IPP's claims under two additional states—Illinois and Oregon—under Count One. (Gen. Defs. Suppl. Br. at 10–11.) However, the IPP Complaint does not allege Illinois and Oregon claims under Count One; instead, it alleges them only under Count Two. (*See* CAC ¶ 201.) This Court therefore addresses the Illinois and Oregon arguments in the portion of the opinion that discusses Count Two.

26

As part of Count One, the IPP alleges that the IPP "unlawfully switched the conversion of the memantine hydrochloride market from Namenda IR to Namenda XR" through a variety of anticompetitive measures, including "(i) publicizing to doctors, caregivers and the general public that the discontinuation of Namenda IR was imminent; (ii) significantly limiting or attempting to limit the distribution of Namenda IR; and (iii) requesting that CMS remove Namenda IR tablets from the 2015 Formulary Reference File," all while knowing that Namenda XR was neither safer nor more effective than Namenda IR.  (CAC ¶ 195.)

In its original, consolidated briefing, Actavis, Forest, and Merz argued that both the DPPs and the IPP had failed to state claims for the hard switch because Judge Sweet's preliminary injunction in the earlier enforcement action, *Namenda I*, had prevented the withdrawal of Namenda IR and therefore any alleged exclusionary conduct from occurring.  (Forest Br. at 15.) Defendants also argued that both the DPPs and the IPP had failed to allege injury in fact and to adequately plead antitrust injury resulting from the announcement that Forest was discontinuing Namenda IR.  (*Id.* at 30.)  Defendants have renewed these arguments in supplemental briefing. (Forest Suppl. Br. at 10.)

> a)     ***Actavis and Forest Are Collaterally Estopped From Arguing That the Anticompetitive Hard Switch Took Place***

"Collateral estoppel, or issue preclusion, prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991).  In order to establish that an issue was determined in a former adjudication, a party asserting collateral estoppel must establish four things:  (1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was in fact actually decided in the prior proceeding; (3) there was full and fair opportunity to litigate the issue in the prior proceeding; and (4) the

issue previously litigated and decided was necessary to support a valid and final judgment on the merits. *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991).

After discovery in the parallel DP Action had closed, the DPPs sought partial summary judgment on the first count of their Complaint, which alleged that the Defendants' February 2014 announcement of the upcoming withdrawal of Namenda IR from the market constituted unlawful monopolization in violation of Section 2 of the Sherman Act. *Namenda IV*, 2017 WL 4358244, at *9.

In *Namenda IV*, this Court ruled, as against Actavis and Forest, that they were collaterally estopped from "relitigating the questions of (1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its illegal conduct." 2017 WL 4358244, at *9–*16. However, this Court denied the DPPs' motion for collateral estoppel with respect to the issue of whether plaintiffs had suffered an antitrust injury, *i.e.*, been forced to switch from Namenda IR to Namenda XR as a result of Forest's withdrawal announcement. *Id.* at *16.[13]

The IPP sought the same relief in connection with the IP Action, (Dkt. Nos. 112, 113), which the Court stayed, (Dkt. No. 120 at 1).

The stay has now been lifted, and the motion is ripe for decision.

---

[13]      Later, in *Namenda V*, this Court ultimately found that the DPPs, which were drug wholesalers, could rely on classwide economic models at trial to show that they had suffered antitrust injury. *Namenda V*, 331 F. Supp. 3d at 177. In addition, although the DPPs had originally moved for collateral estoppel on Count One against Actavis, Forest, and Merz, (15-cv-7488, Dkt. No. 134), the parties subsequently stipulated to the dismissal of Merz from the action, (15-cv-7488, Dkt. No. 207). In an accident of timing, therefore, Merz was dismissed after the parties had submitted briefing on the collateral estoppel motion but before this Court had ruled on that motion.

The Court grants the motion. For the reasons discussed in *Namenda IV*, 2017 WL 4358244, at *9–*16, Actavis and Forest are collaterally estopped from relitigating the issues of "(1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its illegal conduct." *Id.* at *16. The same findings with respect to *Namenda I* and *II* that created estoppel in that case apply equally here.

By the same token, Actavis and Forest are not estopped from making arguments related to the IPP's injury. Their injury argument is addressed in subpart c), *infra*.

> **b)** **Even Though Merz Is Not Collaterally Estopped From Arguing That the Hard Switch Took Place, the IPP Nonetheless States a Claim That the Hard Switch Occurred**

Merz, the only other party named in Count One, is not collaterally estopped from arguing that the IPP fails to state a claim against it because the product hop did not occur. (*See* Dkt. No. 116 at 1.)[14] Merz was not a party to the action in *Namenda I* or *Namenda II*, and the IPP did not move for collateral estoppel with respect to Merz in this action. (*See* Dkt. No. 113.)

Nonetheless, for the same reasons discussed in *Namenda III*, I find that the IPP has stated a plausible claim that the product hop occurred.

In *Namenda III*, I found it persuasive for purposes of the DPPs' federal claims that both the *Namenda I* and *Namenda II* courts had identified exclusionary conduct that occurred prior to the entry of the preliminary injunction. *See Namenda III*, 2016 WL 4992690, at *10–*11. As a

---

14      Merz would also not be collaterally estopped from arguing that, under the facts alleged in the IPP Complaint, it had absolutely nothing to do with the hard switch. However, likely because Merz chose to be represented by the same counsel as Actavis and Forest, and likely because these parties chose to submit a consolidated brief in support of their motions to dismiss both the DPP and IPP Complaints, Merz never raised this argument separate and apart from Actavis and Forest. (*See* Forest Br. at 15–33.) The Court therefore does not address it.

result, I held that the DPPs had alleged an injury on the basis that "they were forced to pay for certain patients' memantine treatment at brand-name prices because these patients switched to Namenda XR *prior* to the entry of the injunction." *Namenda III*, 2016 WL 4992690, at *12 (emphasis in original). Plaintiffs' injury, the Court found, was that they were forced to pay for Namenda XR "*after* generic entry—when absent Defendants' anticompetitive conduct, their patients' prescriptions would have been filled by a far cheaper generic." *Id.* (emphasis in original). In other words, the DPPs had adequately pled that Forest's announcement discontinuing Namenda IR, as well as the tactics that accompanied the announcement, was sufficiently coercive.

The very same reasoning applies to the IPP Complaint. The IPP alleges it was injured because it was deprived of the opportunity to buy lower-priced generic Namenda IR and forced to buy more expensive branded Namenda XR. (CAC ¶ 202.) Further, like the DPP Complaint, the IPP Complaint alleges that once patients switched their prescriptions as a result of the "hard switch" tactics, "reverse commuting" back to Namenda IR was highly unlikely. (*Id.* ¶ 126.) These allegations are substantively identical to those in the DPP Complaint, and they therefore survive a motion to dismiss for the same reasons articulated by this Court in *Namenda III*.

### c) *The IPP Sufficiently Pleads That It Was Injured as a Result of the Hard Switch*

According to Actavis, Forest, and Merz, the IPP has failed to allege a cognizable antitrust injury based on Forest's announcement that it was discontinuing the Namenda IR formulation, because the IPP will not be able to establish "antitrust injury," *i.e.*, that these tactics actually *caused* consumers to switch from Namenda IR to Namenda XR. (Forest Suppl. Br. at 10.)

"Antitrust injury" is a component of antitrust standing under federal law. "Unlike the United States government, which is authorized to sue anyone violating the antitrust laws, a

private antitrust plaintiff must show 'standing' to sue" in a federal antitrust case.  Phillip E.

Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 3.01[A] (4th ed. 2018 suppl.).

Among other standing requirements, a plaintiff must show that it has suffered "antitrust injury,"

which is "defined as the kind of injury that the antitrust laws were intended to prevent and 'flows

from that which makes defendants' acts unlawful.'" *Id.* (citing *Brunswick Corp. v. Pueblo Bowl-

O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Previously, with respect to the DP Action, this Court held that the DPPs would be

required to show at the summary judgment stage that "patients switched to Namenda XR because

of the announced withdrawal of Namenda IR . . . prior to the injunction." *Namenda III*, 2016

WL 4992690, at *12.  However, that holding related to the *wholesaler plaintiffs'* claims *under*

*federal law*, which unquestionably requires that a private plaintiff demonstrate antitrust standing

before he can proceed with his claim.

Here, however, the IPP alleges no claims under federal law.  So that argument fails as a

matter of law.  To the extent Actavis, Forest, and Merz raise the federal requirement of "antitrust

injury" as grounds for dismissal of the 27 state law claims in Count One, this argument is

irrelevant.

Actavis, Forest, and Merz have not briefed whether each of the 27 *state laws* under which

the IPP brings monopolization claims each contains a similar "antitrust injury" or "antitrust

standing" requirement.  (*See* Forest Suppl. Br. at 10–11.)  *McLaughlin v. Am. Tobacco Co.*, 522

F.3d 215 (2d Cir. 2008), cited by Actavis, Forest, and Merz, is inapposite, not the least because it

is a RICO case—with federal mail and wire fraud as the predicate acts—and not an indirect

purchaser case based on state antitrust laws.  *Id.* at 222.  Therefore, I conclude that they have no

basis to argue that the IPP has not sufficiently alleged injury under any of the 27 state law monopolization theories.

In supplemental briefing, Actavis, Forest, and Merz argue for the first time that the IPP Complaint does not plausibly allege any antitrust injury because the plaintiffs' expert in the DP Action "disclaimed any need to assess why patients switched to Namenda XR." (Forest Suppl. Br. at 10.) They highlight the fact that one of the DPPs' experts in that Action, Dr. Russell Lamb, calculated "aggregate overcharge damages" rather than "individualized analysis" for purposes of class certification. *Namenda V*, 2018 WL 3970674, at *10. In the DP Action, the Court found that this was sufficient to defeat Defendants' motion for summary judgment, because direct purchasers would have been indifferent to individual consumers' choices and instead would have paid attention to the market as a whole. *Id.* at *30.

The methodology used by the DPPs' expert—namely, evidence on a motion for summary judgment in the DP Action—is of no relevance in deciding whether the IPP has pleaded (not proven) a state antitrust violation. This argument is a red herring and entirely unpersuasive on a motion addressed to the pleadings.

## 2. The IPP States a Claim for Monopolization Based on the Settlement Agreements

As discussed, when a patent holder provides favorable terms to an alleged infringer as part of a settlement agreement, this is called a "reverse payment." *Actavis,* 570 U.S. at 141. The Supreme Court has held that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." *Id.* at 158. Reverse payments comprised of cash, nominally conferred as compensation for avoided litigation costs, are most suspect, but reverse payments may also provide value in the form of early entry licenses, a period of exclusivity, or cash for avoided litigation costs. *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.,*

791 F.3d 388, 403 (3d Cir. 2015) ("We do not believe *Actavis*'s holding can be limited to reverse payments of cash ."); *accord In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552 (1st Cir. 2016).

As mentioned above, Count One for monopolization under the laws of 27 states alleges that, in addition to engaging in an anticompetitive hard switch, Actavis, Forest, and Merz "entered into unlawful agreements" with generic manufacturers "to settle patent infringement suits as part of an overall anticompetitive scheme." (CAC ¶¶ 193.)

Actavis, Forest, and Merz have moved to dismiss Count One on the ground that the IPP has failed to state a claim that the settlement agreements were, in and of themselves, unlawful. (Gen. Defs' Suppl. Br. at 3; Forest Suppl. Br. at 4.)

### a)    *The IPP Brings a Reverse Payments Case Under* Actavis

Defendants first argue that the IPP actually disclaims reliance on a reverse payment theory under *Actavis*, 570 U.S. 136. (Gen. Defs. Suppl. Br. at 3; Forest Suppl. Br. at 4.) They support this argument with several quotations from the IPP's brief in opposition to their original motions to dismiss. (Gen. Defs. Suppl. Br. at 4; Forest Suppl. Br. at 4.) These include the following statements made by the IPP, among others: "Forest desperately tries to convert the [IPP]'s theory of its case into a reverse payment settlement case, which it is not." (IPP Resp. to Forest Br. at 25.) "The [IPP] has not pled any reverse payment agreement claims." (*Id.*)

However, despite this language, the IPP argues, in this very same brief, "Even under an Actavis analysis, the [IPP]'s Complaint survives. *See* Directs' Brief, which the [IPP] adopts and incorporates by reference." (*Id.* at 27.) Over several pages, the IPP then fleshes out a claim under *Actavis*, including that the early entry licenses should trigger scrutiny because the negotiated entry dates fell after expiration of the '703 patent and only three months before

expiration of the pediatric exclusivity period, (*id.* at 27) and that the acceleration clauses in the settlement agreements, like most favored nation clauses, constitute reverse payments under *Actavis*, (*id.* at 29). In supplemental briefing, moreover, the IPP argued that the payments in the settlement agreements were unlawful because they exceeded expected litigation costs. (IPP Resp. to Forest Suppl. Br. at 10.)

So the pertinent question is: does the CAC allege facts that adequately plead a claim under *Actavis*, even if the IPP identified the proper legal theory only in the alternative?

> **b)** **The IPP States a Claim for Unlawful Reverse Payments in the Form of Early Entry Licenses, Cash Payments, and Unspecified Benefits**

Defendants argue—as they did in their original motion to dismiss—that early entry licenses are *per se* pro-competitive and do not constitute reverse payments in violation of the rule laid out in *Actavis*. (Forest Suppl. Br. at 6.) In particular, Defendants point out that the early entry licenses permitted the Generic Defendants to enter three months before the pediatric exclusivity period expired. (Gen. Defs. Suppl. Br. at 5.)

Defendants also argue that any monetary payments the Generic Defendants received as part of the settlement agreements constituted avoided litigation costs, as lawfully permitted by *Actavis*. (Forest Suppl. Br. at 6–7; Gen. Defs. Suppl. Br. at 5–7.)

Finally, they state that the IPP's allegations with respect to the reverse payments are bare and conclusory, and they therefore must be dismissed under *Twombly*, 550 U.S. at 557. (Forest Suppl. Br. at 6; Gen. Defs. Suppl. Br. at 6–7.)

In *Namenda III*, this Court held that the DPPs had stated a claim against Actavis, Forest, and Merz based on the reverse settlement agreements with generic manufacturers. 2016 WL 4992690, at *15. As part of that decision, the Court said it could not determine as a matter of

law that the settlement agreements were *not* anticompetitive simply because they allowed for entry prior to the end of exclusivity. *Id.* The Court distinguished *Actos I*, 2015 WL 5610752, at *13, which had found that certain early entry licenses did not constitute anticompetitive reverse payments, because the plaintiffs in that case had not alleged a two-step anticompetitive scheme involving a post-settlement product hop. *Id.*

This same reasoning is applicable to the instant motion. Defendants have not cited any new, controlling case law which holds that, as a matter of law, early entry licenses are immune from antitrust scrutiny. And as discussed above, the opinions in *King Drug*, 791 F.3d at 403, and *Loestrin 24 Fe*, 814 F.3d at 552, suggest that no item of value that was transferred from plaintiff to defendant is immune from antitrust scrutiny as a matter of law. Rather, all benefits conferred as part of a settlement agreement are subject to antitrust review under the Rule of Reason. *See also* 2 William C. Holmes, *Intellectual Property and Antitrust Law* § 38:3 (Sept. 2018 update) (recent decisions on reverse payments "appear to favor a burden-shifting analysis keyed into the size of the reverse payment, proof of demonstrated anticompetitive effects, and the presence or absence of plausible justifications for the payment, with the trier balancing anticompetitive effects against procompetitive justifications.").

Regarding the alleged cash payments for avoided litigation costs, the Court held in *Namenda III* that *Actavis* required courts to compare a given payment to estimated future litigation costs and to "consider whether a payment 'reflects traditional settlement considerations, such as avoided litigation costs or fair value for services' to determine if it was justified." 2016 WL 4992690, at *14 (internal quotation omitted). "These intrinsically fact-based determinations," the Court found, "cannot be made on a pre-answer motion to dismiss."

35

*Id.* The Court also rejected Defendants' argument that the FTC had created a universal safe harbor for litigation costs up to $7 million. *Id.* at 29.

Actavis, Forest, and Merz now argue for the first time in supplemental briefing that "the FTC has subsequently extended the safe harbor to additional reverse payment consent orders." (Forest Suppl. Br. at 7). The Court has read these consent orders. They do exclude "compensation for saved future litigation expenses of up to $7 million." *See, e.g.*, Stip. Order at 3–4, *FTC v. Allergan*, No. 17-cv-312 (N.D. Cal. Jan. 23, 2017), ECF No. 4. But they do not announce a shift in FTC policy that would automatically immunize all payments under $7 million in all lawsuits and contexts from allegations of anticompetitive conduct under *Actavis*.

Finally, the Court disagrees with the Defendants that the IPP has not met its burden under *Twombly* with respect to the reverse payments simply because the Complaint does not estimate the value of the payments or anticipated litigation costs. (Gen. Defs. Suppl. Br. at 6.) The Complaint alleges that the Generic Defendants "very likely received something of value in exchange for the agreement to delay entry," (CAC ¶ 76) and no more is required at the motion to dismiss stage. Courts do not "require that the plaintiffs provide precise figures and calculations at the pleading stage" because "very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis." *Loestrin*, 814 F.3d at 552; *see also In re Opana ER Antitrust Litigation*, 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016) ("precise valuation may require discovery").

### c)   *The IPP Sufficiently Alleges That It Was Injured as a Result of the Settlement Agreements.*

Finally, Defendants argue that the IPP fails to adequately plead that the settlement agreements caused it antitrust injury. (Gen. Defs. Br. at 26.) The IPP's injuries are too speculative, they argue, because "Plaintiff's sole theory of harm . . . is that consumers would

have been able to purchase lower-price generic products earlier" had the litigation not settled. (*Id.*) Obviously, this would have lowered the amount the IPP would have to reimburse individual consumers who were beneficiaries under its plans.

The IPP alleges that, absent the unlawful settlement agreements, one of three events would have occurred that would have allowed for earlier entry of generic Namenda: (i) the generics would have prevailed in the patent litigation against Forest and Merz; (ii) the Generic Defendants would have launched "at risk" prior to the resolution of the patent litigation; or (iii) Forest and Merz would have settled the litigation legally with an earlier generic entry date. (CAC ¶ 81.)

The IPP's theory is similar to that of the DPPs, and in *Namenda III* this Court found that the DPPs had adequately alleged antitrust injury as a result of the settlement agreements. *Namenda III*, 2016 WL 4992690, at *15.

Specifically, with respect to the first early entry scenario, this Court held that, while the DPPs had alleged no facts to suggest that Forest's and Merz's patent was invalid or that the Generic Defendants would have prevailed in litigation, this could be left to the summary judgment stage. *Id.* ("To survive a motion for summary judgment, [the DPPs] will have to substantiate these allegations with evidence suggesting that the settlement agreements did, in fact, delay generic entry and that the delay had the effect of allowing Forest to complete the hard switch."). There is no reason this Court should now find otherwise with respect to the CAC in the IP Action.

With respect to the second possible early entry scenario, an "at risk" launch, the IPP has alleged that the FDA tentatively approved the ANDAs of several of the generic companies in early 2010, (CAC ¶ 82, 83), and that an unusually large number of generic manufacturers (14)

submitted ANDAs with Paragraph IV certifications for Namenda IR, as compared to other branded drugs, (*id.* ¶ 69). Defendants argue that this is insufficient to show that an "at risk" launch was anything more than speculative, particularly given the expense of "at risk" launches and the fact that the Delaware court had issued claim construction opinions in the patent litigation that were unfavorable to the generic manufacturers. (Forest Br. at 41–42.) Again, however, this Court heard these very same arguments in *Namenda III* and found that they were more appropriately determined after discovery at the summary judgment stage. 2016 WL 4992690, at *15.

Finally, with respect to the third, "alternative settlement" theory, the IPP alleges that, in the absence of unlawful settlement agreements that caused the Generic Defendants to act against their self-interest when settling, earlier entry would have been possible. (CAC ¶ 84.) Defendants argue that this impermissibly second guesses an otherwise pro-competitive settlement. (Forest Br. at 44 ("Plaintiffs [*sic*] cannot premise an antitrust theory on the claim that they [*sic*] could imagine a different agreement that might have been *even more* procompetitive.") (emphasis in original).)  Once again, however, the Court rejected this argument in *Namenda III*, 2016 WL 4992690, at *15; and other courts have expressly recognized the viability of the "alternative settlement" theory in this type of litigation. *In re Androgel Antitrust Litig. (No. II)*, No. 09-md-2084, 2018 WL 2984873, at *16 (N.D. Ga. June 14, 2018) (collecting cases).

This Court thus concludes that the IPP has stated a claim for monopolization on the basis of the settlement agreements.

### 3. The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One

Defendants next argue that the IPP fails to state a claim for an "anticompetitive scheme" under Count One. (Forest Suppl. Br. at 9.) Defendants argue that, because the IPP fails to state a

claim for either an anticompetitive hard switch or for anticompetitive settlement agreements, it cannot use an "overarching scheme" claim to tie this conduct together. But since this Court has already found that the IPP does state a claim on the basis of both the hard switch and the settlement agreements, this argument fails.

In addition, any ruling regarding the duplicative nature of the overarching scheme claim was confined to the DP Action. The DPPs had brought five claims, the first three of which alleged violations of Section 2 of the Sherman Act. (15-cv-7488, Dkt. No. 29 ¶¶ 237–65.) In the DPP Complaint, Count I was based on the hard switch, and Count III was based on the settlement agreements. (*Id.*) Count II alleged an "overarching scheme" based on the hard switch and settlement agreements. (*Id.*) Counts I through III were all asserted against Actavis, Forest, and Merz. (*Id.*) In *Namenda III*, this Court held that the "overarching scheme" claim was duplicative of the claims related to the product hop and the settlement agreements. 2016 WL 4992690, at *16.

The IPP Complaint is structured differently. It contains four Counts, the first two of which allege antitrust offenses under the laws of 27 states. (CAC ¶¶ 191–210.) As discussed earlier in this opinion, Count One alleges monopolization against Actavis, Forest, and Merz based on both the hard switch and the settlement agreements. (*Id.*) Count Two alleges a conspiracy to monopolize against all Defendants—Actavis, Forest, Merz, and the Generic Defendants—and bases these allegations on the settlement agreements but not on the hard switch. (*Id.*) Plainly, Counts One and Two are not duplicative because (i) they are asserted against different groups of defendants, and (ii) they are grounded in different conduct (conspiracy to monopolize being a separate theory from actual monopolization).

The Court therefore denies Actavis, Forest, and Merz's motion to dismiss Count One.

39

### 4.   The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action

In their original brief in support of their motion to dismiss both the DP and IP Actions, Actavis, Forest, and Merz argued that the DPPs' claims were time-barred.  (Forest Br. at 62–65.)

In *Namenda III*, this Court rejected Defendants' argument that the DPPs' claims based on the settlement agreements were time-barred because the DPP Complaint was filed more than five years after the last settlement agreement was executed.  2016 WL 4992690, at *16.  Relying on *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295–96 (2d Cir. 1979), it held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations periods"—but confined the damages period to four years before the filing of the DP Action based on the four-year statute of limitations in the Sherman Act.  *Id.*

The original brief's discussion of the statute of limitations and the IPP Complaint was limited to two footnotes.  The first footnote urged the Court to limit the IPP's damages "to four years prior to the filing of the Complaint—August 19, 2011, as opposed to the damages period asserted by IPPs [*sic*] as of April 14, 2010."  (*Id.* at 62 n.41.)

This I cannot do.  As Defendants themselves have acknowledged, the limitations period for each state's antitrust law is not uniformly four years.  (*See* App'x 2.)  Moreover, the parties have not briefed whether *Berkey Photo*, 603 F.2d at 267–68, which considered the question of ongoing injury with respect to the Sherman Act, is applicable to antitrust claims brought under state law.

In their second footnote, Defendants argue:  "[T]he antitrust laws of 26 states alleged by IPPs [*sic*], the consumer protection laws of 21 states alleged by IPPs [*sic*], and the unjust

enrichment claims of 28 states alleged by the IPP have limitations periods of five years or less (*see* Appendices 2–4), making it likely that these claims are also time-barred." (*Id.* at 65 n.42.)[15]

"Likely" is not a standard that results in dismissal. This Court cannot make a sweeping inference about statutes of limitation for state antitrust laws on the basis of federal cases interpreting the Sherman Act. Nor will it independently undertake a review each state's requirements, armed with only a number in the cell of a table and without the movants' having briefed the issues. If the issue is important enough to movants, they can call relevant cases under relevant laws to the court's attention. I will not do Defendants' work for them.

As a result, Actavis, Forest, and Merz's motion to dismiss—or, in the alternative, shorten—the Count One claims on statute of limitations grounds is denied without prejudice. However, as I will not immediately entertain a new motion, they will have to wait until discovery is over to make any renewed motion.

**B.    The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others**

I now turn to Defendants' arguments regarding the individual state law claims alleged under Count One.

---

15    The Generic Defendants adopt this argument in Actavis, Forest, and Merz's brief with their own footnote: "For the reasons set forth in Forest's motion to dismiss, Plaintiff's claims are also barred by the statute of limitations." (Gen. Defs. Br. at 50 n.27.) My holding above applies equally to the Generic Defendants.

1.    **The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States**

Defendants argue that the IPP may bring class claims only under the laws of eleven states—Delaware, Florida, Georgia[16], Kansas, Nevada, New Jersey, New York, Pennsylvania[17], South Carolina, and Virginia—because, as the Named Plaintiff, the IPP "lack[s] standing to assert claims under the laws of the states in which they [*sic*] do not reside or in which they [*sic*] suffered no injury." (Forest Br. at 65–66; Gen. Defs. Br. at 32–33.)

In supplemental briefing, however, Defendants concede that, pursuant to the Second Circuit's recent ruling in *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018), this is a "question of predominance under Rule 23(b)(3), not a question of standing under Article III." (Gen. Defs. Suppl. Br. at 9 (quoting *Langan*, 897 F.3d at 96.)

In *Langan*, which came before the Second Circuit on review of a grant of class certification, the Second Circuit denied Defendants' motion to de-certify the class and dismiss the case because the named plaintiff had not suffered injury-in-fact in each state where she asserted claims:

> [W]e write to make explicit what we previously assumed in *In re Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013): as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), *id.* at 126–27, not a question of 'adjudicatory competence' under Article III[.]

---

[16]    The IPP Complaint does not allege any claim under Georgia law, under any of Counts One through Four. (CAC ¶¶ 191–231.)

[17]    The IPP Complaint does not allege any claim under Pennsylvania law, under any of Counts One through Four. (CAC ¶¶ 191–231.)

897 F.3d 88, 93 (2d Cir. 2018). Since *Langan*, a number of district court opinions have followed its reasoning to deny motions to dismiss state law claims on Article III standing grounds because the named plaintiff did not make in-state purchases and thereby suffer injury-in-fact in those states. *See, e.g., Daniel v. Tootsie Roll Indus., LLC*, No. 17-cv-7541, 2018 WL 3650015, at *5 (S.D.N.Y. Aug. 1, 2018) (applying *Langan* to hold that named plaintiffs had Article III standing to assert claims on behalf of "nonparty class members with claims subject to different state laws"); *Donnenfeld v. Petro, Inc.*, No. 17-cv-2310, 2018 WL 4356727, at *12 (E.D.N.Y. Sept. 12, 2018) (denying defendant's motion to dismiss state consumer protection claims in states in which the plaintiff did not reside); *Holve v. McCormick & Co., Inc.*, No. 16-cv-6702, 2018 WL 3861406, at *10 (W.D.N.Y. Aug. 14, 2018) (holding that named plaintiff had Article III standing to bring class claims under Maryland state law). Thus, the Court will not presently grant Defendants' motion to dismiss a broad swath of the IPP's state law claims for lack of Article III standing.

I write briefly to note that *Langan* gives rise to certain prudential concerns for CAFA class actions. It seems clear enough that Sergeants Benevolent cannot state a claim under the laws of at least some states whose laws are pleaded in its Complaint. Put otherwise, if there were no CAFA and the IPP brought a monopolization claim under the law of, say, Utah, that action would be dismissed on motion because the IPP could not state a claim under the relevant law. No state court would allow it to continue as a plaintiff on the theory that the proper time to deal with this question was at class certification. An entity that has no claim fails to state a claim— not as a matter of Article III standing (the issue addressed in *Langan*) but under Rule 12(b)(6) or its state court equivalent. Yet a number of courts, purporting to follow *Langan*, have concluded that, because a class plaintiff who fails to state a claim under a particular state's law (*i.e.*, it

cannot recover for the alleged violation of law for its own account) nonetheless has Article III standing, the issue of whether the plaintiff fails to state a claim should abide a decision on a motion for class certification.

This court does not read *Langan* any more broadly than it purports to reach. Nothing in *Langan*, as I read it, precludes a defendant from moving to dismiss a CAFA plaintiff's claims under a particular statute pursuant to Rule 12(b)(6), on the grounds that the plaintiff fails to state a claim for its own account—a question entirely different from whether it has constitutional standing. CAFA—which confers no substantive rights on any litigant, but simply permits certain cases that do not otherwise belong in a federal court to be brought here—cannot be read to enable plaintiffs to state claims when the laws of the several states specifically provide to the contrary. It is imperative that too much not be read into *Langan* since neither CAFA nor state consumer protection laws require counsel to compete with other advocates for the positions of class counsel and lead plaintiff, both of which create healthy incentives to find the best class representative(s) possible.

For those courts that read *Langan* more broadly than I do, it is enough that a district court can conclude that a class plaintiff is not an appropriate class representative because he/it fails to state a claim at the class certification stage. But that comes at cost. A district court's inability to address these arguments at the motion to dismiss stage increases a plaintiff's leverage with respect to settlement negotiations, without any additional effort on its part.

So while I accept that *Langan* forecloses any argument that a CAFA plaintiff's claims should be dismissed on motion for lack of Article III standing, I decline to read it as foreclosing consideration of a properly made Rule 12(b)(6) motion at the motion to dismiss stage—a subject that the Court of Appeals nowhere addressed.

44

2.     **The IPP Fails to State a Claim for Monopolization in Three States That Follow *Illinois Brick* (Florida, Massachusetts, and Utah)**

Defendants next argue that the IPP fails to state a claim under Rule 12(b)(6) under the antitrust laws of Florida, Massachusetts, Puerto Rico, Rhode Island, and Utah, because these states follow the rule of *Illinois Brick* and prohibit indirect purchaser actions. (Forest Br. at 66; Gen. Defs. Br. 35–36; Gen. Defs. Suppl. Br. at 10 n.4.)[18] They are correct about three of these states.

a)     *Florida*

Count One of the IPP Complaint alleges a claim for monopolization under Fla. Stat. §§ 501.201, *et seq.* (CAC ¶ 201(d).) Actavis, Forest, and Merz argue that because the Florida Antitrust Act applies *Illinois Brick*, the IPP cannot recover as an indirect purchaser. (Forest Suppl. Br. at 10 n.4.)

I first note that the IPP incorrectly cites to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*, rather than the Florida Antitrust Act, *id.* §§ 542.15, *et seq.* I construe this as a typographical error but hold that Defendants are correct that the Florida Antitrust Act does not permit indirect purchaser recovery. "Florida adheres to the 'direct purchaser' rule enunciated in *Illinois Brick*." *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996).

The Court therefore **DISMISSES** the IPP's Florida Antitrust Act claim under Count One.

b)     *Massachusetts*

Count One of the IPP Complaint alleges a claims for monopolization under Mass. Gen. Laws, ch. 93A. (CAC ¶ 201(i).) Defendants move to dismiss the Massachusetts law claim under

---

[18]     Defendants also argue that any states that have not expressly adopted or rejected *Illinois Brick* should be treated as barring indirect purchaser claims. (Gen. Defs. Br. at 36 n.16 (citing *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011).) However, Defendants have not indicated which states these would be.

Count One on the basis that Massachusetts follows *Illinois Brick*. (Gen. Defs. Suppl. Br. at 10 n.4 (citing *Ciardi v. Hoffman-La Roche, Ltd.*, 762 N.E.3d 303, 308 (Mass. 2002).)

Again, I note that the IPP has incorrectly cited to chapter 93A, Massachusetts' consumer protection statute, rather than chapter 93, its antitrust statute. I again treat this as a typographical error, particularly since the IPP's conspiracy to monopolize claim is brought under chapter 93. I dismiss the claim anyway because *Ciardi* is squarely on point. Chapter 93A (consumer protection) allows indirect purchaser claims; chapter 93 (antitrust) does not. "Because the Antitrust Act is to be construed in harmony with judicial interpretations of comparable Federal antitrust statutes, the rule of law established in *Illinois Brick Co. v. Illinois* . . . would apply with equal force to preclude claims brought under G.L. c. 93 by indirect purchasers in Massachusetts." *Ciardi*, 762 N.E.2d at 308; *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785, 2018 WL 3973153, at *32 n.20 (D. Kan. Aug. 20, 2018).

The Court therefore **DISMISSES** the IPP's Massachusetts law claim under Count One.

### c)   *Puerto Rico*

Count One of the IPP Complaint alleges a claim for monopolization under the Puerto Rico Antitrust Act ("PRAA"), 10 P.R. Laws §§ 263, *et seq*. (CAC ¶ 201(aa).) Defendants move to dismiss because, while Puerto Rico does not expressly prohibit suits by indirect purchasers, the PRAA is modeled after the Clayton Act, under which indirect purchasers lack standing pursuant to the Supreme Court's decision in *Illinois Brick*. (Forest Suppl. Br. at 10 n.4.) The IPP counters that the PRAA does not limit standing to direct purchasers. (IPP Resp. to Gen. Defs. Br. at 11–12 (citing *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010)).)

Again, the correct citation for the PRAA is 10 L.P.R.A. §§ 257, *et seq.*, as section 263 covers price discrimination, specifically. The monopolization offense is found at 10 L.P.R.A. § 260. I once again construe this as a typographical error.

The Court recognizes that many district courts in the continental United States have dismissed indirect purchaser claims under the PRAA for lack of standing, based on the idea that the PRAA is modeled on federal statutes that do not extend standing to indirect purchasers. *See, e.g.*, *Opana ER*, 162 F.Supp.3d at 723 (collecting cases); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011).

Nonetheless, this Court finds that the U.S. District Court for the District of Puerto Rico has more faithfully interpreted the standing requirements of the PRAA, in light of how the Supreme Court of Puerto Rico reads that statute. *Rivera-Muniz*, 737 F. Supp. 2d at 61 (citing *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 520 (P.R. 1994)).

In *Pressure Vessels*, the Supreme Court of Puerto Rico interpreted the private damages section of the PRAA to hold that private remedies were available to any plaintiff who met the following conditions: (1) the person was harmed in his business or property (2) by reason of (3) actions prohibited by law. 137 D.P.R. at 518. The Supreme Court of Puerto Rico reasoned that, in order to satisfy this second prong, a plaintiff need only allege that "as a consequence of the legal violation, he has been injured." *Id.* at 520. Based on this interpretation of the PRAA in *Pressure Vessels*, the Court in *Rivera-Muniz* held, "Because Puerto Rico liberally construes its standing requirements in private antitrust cases, it is immaterial whether Plaintiffs are direct or indirect purchasers." *Rivera-Muniz*, 737 F. Supp. 2d at 61 (internal citation omitted).

Defendants' motion to dismiss this claim is, therefore, **DENIED**.

### d)      *Rhode Island*

Count One of the IPP Complaint alleges a claim for monopolization under R.I. Gen.

Laws §§ 6-36-1, *et seq.*  (CAC ¶ 201(t).)  Defendants move to dismiss this claim on the grounds

that Rhode Island's *Illinois Brick* repealer statute went into effect on July 15, 2013.  (Forest

Suppl. Br. at 10 n.4.)  Several federal district courts have held that the statute does not have

retroactive application.  *See, e.g.*, *In re Effexor Antitrust Litig.*, No. 11-cv-5661, 2018 WL

4466050, at *16 (D.N.J. Sept. 18, 2018) (also analyzing general presumption against retroactive

application in Rhode Island law); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D.

Pa. 2014) (same).

The Court agrees with Defendants and with the weight of federal case law and finds that

the IPP cannot bring claims under Rhode Island's antitrust law for conduct occurring before July

15, 2013.  As a result, the Court **DISMISSES IN PART** the Rhode Island law claim under

Count One, to the extent it seeks damages prior to that date.  *See Niaspan*, 42 F. Supp. 3d at 759

(restricting end payor plaintiffs from "recover[ing] for any overcharges incurred before the . . .

Rhode Island repealer statute took effect).

### e)      *Utah*

Count One of the IPP Complaint alleges a claim for monopolization under Utah Code

§§ 76-10-1301, *et seq.* [*sic*].[19]  (CAC ¶ 201(w).)  Defendants move to dismiss this claim on

*Illinois Brick* grounds, arguing, "Indirect purchasers may only bring claims under the Utah

Antitrust Act if they are citizens or residents of Utah."  (Gen. Defs. Br. at 35–36 n.15 (citing

Utah Code § 76-10-3109).)

---

[19]      Since this provision governs prostitution offenses, and since Count Two cites the Utah Antitrust Act at Utah Code §§ 76-10-3101, *et seq.*, (CAC ¶ 207(x)), the Court once again assumes this is a typographical error.

Despite Defendants' characterization, this is not in fact an *Illinois Brick* argument but instead an argument about the ability of the Named Plaintiff to state a claim under the Utah Antitrust Act pursuant to Federal Rule of Civil Procedure 12(b)(6). The statute reads, in relevant part: "A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant." Utah Code § 76-10-3109.

"The majority of courts that have been presented with this statute require at least one Utah citizen or resident be a named plaintiff." *Effexor*, 2018 WL 6003893, at *17 (collecting cases); *see also GEICO Corp. v. Autoliv, Inc.*, No. 16-13189, 2018 WL 5077767, at *27 (E.D. Mich. Aug. 30, 2018) (dismissing Utah antitrust claim with prejudice.)

Sergeants Benevolent, the sole Named Plaintiff in this case, has not alleged anywhere in the Complaint that it is a citizen or resident of Utah. Therefore, it fails to plead an element required to state a claim under the Utah Antitrust Act. The possibility that some beneficiary of the IPP may have retired to Utah is not enough, because none of the IPP's beneficiaries is a *named* plaintiff. Defendants' motion to dismiss the Utah monopolization claim under Count One pursuant to Rule 12(b)(6) is, therefore, **GRANTED**.

3.   **The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada)**

In supplemental briefing, Defendants argue for the first time that the IPP's state antitrust claims under the laws of Arizona, Hawaii, and Nevada fail because the IPP has not alleged that it has complied with state law notice requirements. (Forest Suppl. Br. at 12; Gen. Defs. Suppl. Br. at 12–13.)

### a)   *Hawaii*[20]

Count One of the IPP Complaint alleges an antitrust under Haw. Rev. Stat §§ 480, *et seq.* (CAC ¶ 201(e).) The Hawaii Antitrust Act reads, in relevant part: "A class action for claims for a violation of this chapter other than claims for unfair or deceptive acts or practices may be filed, and may be prosecuted on behalf of indirect purchasers by a person other than the attorney general as follows: (1) A filed copy of the complaint and all relevant supporting and exculpatory materials in possession of the proposed class representative or its counsel shall be served on the attorney general not later than seven days after filing of the complaint." Haw. Rev. Stat. § 480-13.3(a).

Generic Defendants argue that notice of suit must be provided to the state's attorney general and that failure to do so requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing Haw. Rev. Stat. § 480-13.3).) The IPP responds that at least two courts have allowed plaintiffs to proceed under the Hawaii Antitrust Act, despite their failure to comply with pre-suit notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253–54 (D. Conn. 2015) (*Aggrenox I*); *In re Aftermarket Filters Antitrust Litig.*, No. 08-md-4883, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009)).)

The Court finds the cases cited by the IPP to be persuasive on the question of whether failure to comply with the statutory requirement is fatal to a claim under the Hawaii Antitrust Act. In *Aftermarket Filters*, 2009 WL 3754041, at *6, the court held that the statutory scheme did not imply that dismissal was the proper remedy for failing to comply with the notification requirement. Moreover, defendants could not use the notification requirement "as a shield to

---

[20]     Although this Court would ordinarily proceed through the state law claims in alphabetical order, there exists much more fulsome case law regarding the pre-suit notice requirement under the Hawaii Antitrust Act than there does for any of the other states.

avoid answering for alleged anti-competitive behavior." *Id.* The court in *Aggrenox I*, 94 F. Supp. 3d at 253–54, adopted this reasoning.

The case cited by Defendants, *In re Asacol Antitrust Litig.*, No. 15-cv-12370, 2016 WL 4083333, at *14 n.14 (D. Mass. July 20, 2016) (*Asacol I*), is not persuasive. There, the court admitted that "[c]ourts are divided on whether Hawaii's statute necessitates dismissal" but dismissed the claim without looking specifically to Hawaii law. *Id.*

However, even if I were to find that the Hawaii statute required dismissal of the IPP's claim in Hawaii state court, I would find that Federal Rule of Civil Procedure 23 is comprehensive with respect to pre-filing requirements in federal court, as held by the United States Supreme Court in *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393 (2010). "The Second Circuit has not taken up the problem of the effect of *Shady Grove*'s split opinions." *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) (*Aggrenox II*). According to Justice Scalia's plurality opinion, "the only test of a Rule's validity under the Rules Enabling Act is 'whether it regulates procedure,'" which the Court "found that Rule 23 did." *In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 116 (D. Conn. 2014). According to Justice Stevens' concurrence, if the state rule conflicts with Rule 23, the state rule will yield only if it is not "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 419–20 (Stevens, J., concurring).

I find that Hawaii's limitation on class actions is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23." *In re Restasis Antitrust Litig.*, No. 18-md-2819, 2018 WL 5928143, at *6 (E.D.N.Y. Nov. 13, 2018). It thus

conflicts with the federal rule. *Id.* Under the plurality approach, therefore, the Hawaii Antitrust Act's notice provision would yield to Rule 23.

Moreover, a majority of federal courts have held that, pursuant to Justice Stevens' approach, the pre-suit notice requirement is not substantive. *See, e.g., Restasis*, 2018 WL 5928143, at *6. *Aggrenox I*, 94 F. Supp. 3d at 254, is particularly persuasive. There, the court reasoned that the plain language of the Hawaii statute itself "does not appear . . . to create a substantive right to recovery that only 'vests' after some action or inaction of the state attorney general. Rather, it creates a right to 'bring an action based on unfair methods of competition' in section 480–2, without any reference to notice, and delineates procedural prerequisites for class actions under the chapter in section 480–13.3." *Id.* The court there also observed that defendants had not drawn the court's attention to any arguments, *e.g.*, from the legislative history, that would counsel a different reading. *Id.*

This Court agrees with the weight of federal case law, which holds the pre-suit notice provision in the Hawaii Antitrust Act would, first of all, not require dismissal of the suit in state court and that, even if it did, would not override Rule 23 to bar a claim in federal district court.

The Court therefore **DENIES** Defendants' motion to dismiss the Hawaii law claim under Count One.

### b)   *Arizona*

Count One of the IPP Complaint alleges an antitrust claim under Ariz. Rev. Stat. §§ 44-1403, *et seq.* (CAC ¶ 201(a).) The Arizona Antitrust Act provides, in relevant part: "A person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state

law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general." Ariz. Rev. Stat. § 44-1415(a).

In supplemental briefing, Defendants argue that notice of suit must be provided to the state's attorney general when the complaint is filed, and that failure to comply with the notice provision is grounds for dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at *10–*11; *Asacol I*, 2016 WL 4083333, at *14–*15).) In response, the IPP cites *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017), where the district court allowed claims under Arizona's Antitrust Act to proceed, despite the plaintiffs' failure to comply with the statutory notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16.)

This Court does not see a meaningful distinction between the pre-suit notification requirement under the Hawaii Antitrust Act and that under the Arizona Antitrust Act, even if other courts have found to the contrary. Moreover, in addition to requiring those filing complaints to notify the attorney general, the statute by its terms also obliges those *answering* complaints to notify the attorney general. It is hard to imagine that failure to comply with this requirement would necessitate dismissal.

The Court is not persuaded by the reasoning in *Effexor*, 2018 WL 4466050, at *10–*11, or in *Asacol I*, 2016 WL 4083333, at *14–*15, which found that there was no conflict between Rule 23 and the Arizona pre-filing requirement. Instead, this Court agrees with the court in *Restasis*, 2018 WL 5928143, at *6, which found that the United States Supreme Court had held in *Shady Grove* that Rule 23 is "not silent on the question of whether a particular claim is eligible for class treatment." *Restasis*, 2018 WL 5928143, at *6. Rule 23 contains its own limitations on those claims eligible for class treatment; "[t]herefore, a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23 conflicts with the federal

rule." *Id.* Like Hawaii's statute, therefore, this Court could only find that this requirement was grounds for dismissal if it also found the requirement to be substantive.

For the reasons already discussed, however, because this Court finds that, Arizona's pre-suit notice requirement is purely procedural, Defendants' motion to dismiss the Arizona antitrust claim under Count One is **DENIED**.

### c)   *Nevada*

Count One of the IPP Complaint alleges an antitrust claim under Nev. Rev. Stat. §§ 598A.060, *et seq.* (CAC ¶ 201(n).) The Generic Defendants argue that notice of suit must be provided to the state's attorney general or the claim cannot proceed. (Gen. Defs. Suppl. Br. at 12 (citing Nev. Rev. Stat. § 598A.210(3)).) The statute states, in relevant part: "Any person commencing an action for any violation of the provisions of this chapter shall, simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. § 598A.210(3).

Defendants argue that failure to notify the attorney general requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at *10–*11; *Asacol I*, 2016 WL 4083333, at *14–*15).) In response, the IPP does not cite any cases that discuss Nevada law particularly, but instead argues generally that "pre-suit notice requirements are procedural and, therefore, superseded by federal law." (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 346 (7th Cir. 1997).)

Only scant federal case law interprets the Nevada Antitrust Act's statutory notice requirement in light of *Shady Grove*, and the Court is not aware of any Nevada cases that discuss whether the requirement is substantive or procedural in nature.

Again, however, the Court sees no meaningful difference between the text of Nevada's statute and that of Hawaii's. The Court remains unpersuaded by the reasoning of the two cases cited by Defendants, for the reasons discussed above.

As a result, Defendants' motion to dismiss the Nevada law claim under Count One is **DENIED**.

### 4.  The IPP Fails To State a Claim for Monopolization Under the Law of Kansas

Defendants argue that the IPP may not maintain a claim for monopolization (as opposed to conspiracy to monopolize) under the laws of Kansas, New York, and Tennessee because those statutes do not permit recovery for unilateral anticompetitive conduct. (Forest Br. at 67.)[21]  For example, commentators have observed that "Section 50-132 [of the Kansas Restraint of Trade Act] would not appear to extend to cases of unilateral monopolization." 6 Julian von Kalinowski, Peter Sullivan, & Maureen McGuirl, *Antitrust Laws and Trade Regulation* § 116.03 (2d ed. 2018); *see also Commonwealth Electrical Inspection Servs. v. Town of Clarence*, 6 A.D.3d 1185, 1186 (N.Y. App. Div. 2004) (New York's Donnelly Act does not create a cause of action for unilateral anticompetitive conduct); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (the Tennessee Trade Practices Act does not create a cause of action for unilateral monopolization).

But the IPP Complaint does not allege monopolization via unilateral action.  It pleads "plead some sort of concerted action" in support of its non-conspiracy monopolization claims. (*See* Forest Br. at 67.)  The most obvious example is the IPP's allegation, in support of Count

---

21    Although Actavis, Forest, and Merz purport to seek dismissal of the IPP's monopolization claims at CAC ¶¶ 207(g), 207(p) and 207(w), those paragraph numbers actually correspond to Count Two of the IPP Complaint—conspiracy to monopolize—which is not unilateral conduct by definition. As it has several times throughout this opinion, the Court assumes that this is a typographical error, and it treats the pleadings as if Actavis, Forest, and Merz instead move to dismiss the equivalent state law claims under Count One of the IPP Complaint.

One, that Forest and Merz "entered into unlawful agreements with the Generic [] Defendants."
(CAC ¶ 193). That is by definition *not* unilateral action. The IPP Complaint also plausibly
alleges that Forest's hard switch was executed with the participation of other parties; those
parties may not have been named as defendants but they did not have to be. For example, Forest
signed "an exclusive distribution contract in November, 2014 for Namenda IR with Foundation
Care, a mail-order-only pharmacy." (CAC ¶ 95). Forest also "agreed to pay rebates to health
plans to make sure they put Namenda XR on the same tier as Namenda IR so that members
would not have an incentive to choose Namenda IR and patients did not have to pay higher co-
payments for Namenda XR." (CAC ¶ 110). There is nothing unilateral about any of this.
Unilateral conduct might include, in the pharmaceutical context: launching a false advertising
campaign against a competitor; filing a sham petition with the FDA; filing a sham patent with the
PTO; or initiating sham litigation against a competitor. None of that is alleged here.

However, Actavis, Forest, and Merz also argue that, under the law of these three states,
monopolization, absent conspiracy, is not a cognizable cause of action. Since Count Two alleges
conspiracy to monopolize, in effect what Defendants argue is that Counts One and Two are
necessarily duplicative insofar as they are raised under the law of these three states.

### a) *Kansas*

Defendants cite *In re Relafen Antitrust Litigation*, 221 F.R.D. 260, 283 (D. Mass. 2004),
for the proposition that Kansas "prohibits combinations and conspiracies only" and move to
dismiss on that basis. (Forest Br. at 67.) The IPP argues that it has pled concerted action in the
form of the settlement agreements as the foundation for its Kansas law claim under Count One.
(IPP Resp. to Gen. Defs. Br. at 14.)

The Kansas Restraint of Trade Act ("KRTA") provides, in relevant part, "No person, servant, agent or employee of any person doing business within the state of Kansas shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business[.]"  Kan. Stat. § 50-132; *see also Good v. Dickinson*, 278 P. 730, 732 (Kan. 1929) (sale of business, although bilateral conduct, did not constitute trust or combination as required to allege monopolization).  The Kansas Supreme Court has observed (albeit in dicta) that, when bringing a claim for monopolization, conspiracy is "legal requirement under Kansas antitrust law."  *Bergstrom v. Noah*, 974 P.2d 520, 528 (Kan. 1999); *but see Bellinder v. Microsoft Corp.*, Nos. 00-c-0855, 00-C-00092, 99-cv-17089, 2001 WL 1397995, at *1 (Kan. Dist. Ct. Sept. 7, 2001) (certifying class action under Kan. Stat. § 50-132 where plaintiffs alleged that Microsoft "abused its monopoly power" but did not allege conspiracy).  The weight of published, appellate case law in Kansas holds that the IPP may not proceed on a theory of monopolization unless accompanied by allegations of conspiracy.

Other federal district courts have agreed that monopolization, absent conspiracy, does not state a claim under the KRTA.  *Relafen*, 221 F.R.D. at 283; *EpiPen*, 2018 WL 3973153, at *33.

Obviously, the IP's claim for conspiracy to monopolize is in Count Two, not Count One, and this court will dismiss duplicative counts.  Defendants' motion to dismiss the Kansas claim under Count One is, therefore, **GRANTED**.

### b)  New York

The Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination" that establishes a monopoly or restrains competition.  N.Y. Gen. Bus. Law § 340(1).  As the New York Court of Appeals has held, the term "arrangement" "must be interpreted as contemplating a reciprocal relationship of commitment between two or more legal or economic entities similar to

but not embraced within the more exacting terms, 'contract', 'combination' or 'conspiracy.'" *State v. Mobil Oil Corp.*, 344 N.E.2d 357, 359 (N.Y. 1976); *see also Glob. Reins. Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) ("An antitrust claim under the Donnelly Act . . . must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market.")

In other words, a plaintiff must allege concerted action to bring a claim under the Donnelly Act, which the IPP does here. (*See supra*.) However, unlike the Kansas statute, there is no requirement that a plaintiff use the word "conspiracy" in order to state a claim.

At least one other federal district court has refused to dismiss a Donnelly Act claim that alleged concerted action but not conspiracy. *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2660782, at *3 n.15 (D.N.J. Mar. 10, 2008).

Defendants' motion to dismiss the New York claim under Count One is, therefore, **DENIED**.

### c) *Tennessee*

Similar to the Donnelly Act, the Tennessee Trade Practices Act ("TTPA") declares unlawful "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition," as well as those "designed, or which tend to" control prices. Tenn. Code. § 47-25-101. The Supreme Court of Tennessee interprets the TTPA broadly. "Its broad and comprehensive provisions cover every conceivable case of an agreement or contract made to lessen or destroy competition and control prices." *Standard Oil Co. v. State*, 100 S.W. 705, 716 (Tenn. 1907). *See also Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005) (observing that "the language of Tennessee's antitrust statutes have not changed significantly

58

since *Standard Oil*" and finding that the TTPA prohibits "agreements" and "arrangements" that affect competition).

Defendants cite no relevant law in support of the proposition that the TTPA requires a plaintiff to allege conspiracy.

Accordingly, Defendants' motion to dismiss the Tennessee claim under Count One is, therefore, **DENIED**.

### C.   In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States

In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of monopolization based upon both the hard switch and the settlement agreements.

The Court also finds that, as a matter of law, the IPP may pursue its Count One claims for monopolization under the laws of all states **except** Florida, Kansas, Massachusetts, and Utah. Those claims are hereby **DISMISSED**.  The IPP's claim for monopolization under Rhode Island law is hereby **DISMISSED IN PART** to the extent it seeks damages for injuries occurring before July 15, 2013.

### VI.   Count Two:  Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants

Second, the IPP brings an additional 27 state law claims grouped under the heading "Count Two:  Conspiracy to Monopolize Under State Law." (CAC at 52.)  The claims under Count Two are, for the most part, identical to the 27 claims under Count One. (*Id.* ¶ 207.)

Count Two differs from Count One in three significant respects.

First, Count Two alleges conspiracy to monopolize rather than actual monopolization. "Defendants have intentionally and unlawfully conspired in order to allow Forest monopolize [*sic*] the market for memantine hydrochloride in violation" of state laws. (*Id.*)

Second, the IPP asserts claims for conspiracy to monopolize under Count Two against Actavis, Forest, Merz, *and the Generic Defendants*, who are not named in Count One. (*Id.* at 52.)

Third, whereas Count One alleges injuries to indirect purchasers stemming from both the hard switch and the settlement agreements, Count Two alleges injuries to indirect purchasers stemming from the settlement agreements only. (*Id.* ¶ 205.)

Beyond that, there are extremely minor, and likely inadvertent, differences between the state law causes of action underlying Counts One and Two. For example, Count One alleges monopolization under the laws of Florida and New Hampshire but does not allege monopolization under the laws of Illinois or Oregon. (*Compare id.* ¶¶ 201, 207.) Count Two, by contrast, alleges conspiracy to monopolize under the laws of Illinois and Oregon but does not allege conspiracy to monopolize the laws of Florida and New Hampshire. (*Id.*) There are also several differences—again, probably typographical errors—in the citations to the state codes. (*See, e.g., id.* ¶¶ 201(i), 207(i).)

Defendants move to dismiss Count Two in all or large part for many of the same reasons as they did for Count One, including:

- The IPP has expressly disclaimed reliance on *Actavis*, 570 U.S. at 158, and, in any event, cannot prove that the agreements contained unlawful "reverse payments, (Forest Br. at 34–60);

- Any injuries the IPP alleges it suffered due to the settlement agreements is purely speculative, (*id.* at 40–46);

- The claims are "likely" time-barred by the applicable state statutes of limitations, (*id.* at 65 n.42).

- The IPP lacks Article III standing to assert claims in states where it has not made purchases and thereby suffered injury in fact, which are all but nine states, (*id.* at 65–66);

- *Illinois Brick* bars the IPP's claims in six states, (Gen. Defs. Suppl. Br. at 10–11); and

- The IPP has failed to satisfy pre-suit notice requirements in four states, (Gen. Defs. Suppl. Br. at 11–13).

For the reasons discussed in the preceding sections of this opinions, none of these arguments has merit, with the exception of the arguments that (i) Massachusetts bars indirect purchasers from recovering under its antitrust act; (ii) Utah bars indirect purchasers from recovering under its antitrust act unless they are citizens or residents of Utah; and (iii) Rhode Island barred indirect purchasers from recovering under its antitrust act until the amendments of July 15, 2013. Therefore, the Massachusetts and Utah claims under Count Two are hereby **DISMISSED**, and the Rhode Island claim under Count Two is hereby **DISMISSED IN PART**, to the extent it seeks damages for injuries occurring before July 15, 2013.

Defendants also raise a handful of arguments specific to Count Two, *viz.*:

- The IPP does not adequately allege a conspiracy because it pleads only parallel conduct without the necessary "plus factors" that would be indicative of agreement; (Gen. Defs. Br. at 20; Forest Br. at 60);

- The Illinois Antitrust Act grants a right to bring a class action to the Illinois attorney general only (Gen. Defs. Br. at 35 n.15); and

- Oregon adheres to the law of *Illinois Brick* and therefore precludes recovery for indirect purchasers, (Gen. Defs. Br. at 35).

As with Count One, the Court first analyzes the argument of general applicability, and then turns to the Illinois and Oregon arguments.

### A.    The IPP States a Claim for Conspiracy To Monopolize

Defendants argue in their original briefing[22] that the IPP fails to allege a conspiracy, thereby necessitating dismissal of Count Two, because it has not pled sufficient "plus factors" to support an inference of conspiracy.  (Forest Br. at 60; Gen. Defs. Br. at 20.)

This is, of course, an argument with respect to the elements of an antitrust conspiracy under *federal* law.  Neither party has briefed the elements of conspiracy—let alone what is adequate at the motion to dismiss stage—under each state's law.  However, both parties have apparently used federal antitrust law as a guidepost, and this Court does the same.  The Court reminds the IPP that it will be required to show at the class certification stage that common legal issues with respect to the conspiracy elements of each state's law predominate over any individual issues.

Under the guideposts laid out by federal law, the IPP has pled sufficient circumstantial evidence to support a conspiracy to monopolize.

"[C]ourts have not given much attention to conspiracy to monopolize as a distinct antitrust offense."  2-16 Earl W. Kintner et al., *Federal Antitrust Law* § 16.39 (2017).  Nonetheless, "in deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2" of the Sherman Act.  2 von Kalinowski, Sullivan, & McGuirl, *supra*, § 26.02; *see also* Areeda & Hovenkamp, *supra*, § 41.01[A].  "In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice."  *Anderson News, L.L.C.*

---

[22]    By way of background, I note briefly that the Court did not previously have occasion to consider the conspiracy issue in the DP Action.  The DP Action did not expressly assert conspiracy as a cause of action, (15-cv-7488, Dkt. No. 29 ¶¶ 237–65), and the DPPs later informed the Court that they had abandoned any "inter-generic conspiracy claim" raised under Count IV of their Complaint, *Namenda V*, 2018 WL 3970674, at *25.

*v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Put another way, "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).

Defendants argue principally that parallel contingent launch provisions, on their own, are insufficient to establish a conspiracy. (Gen. Defs. Suppl. Br. at 8 (citing *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 55 (1st Cir. 2016)). Indeed, some courts in this district have found that pleading only contingent launch provisions does not survive a motion to dismiss. *See Actos I*, 2015 WL 5610752, at *23. Moreover, it is true that when plaintiffs build their conspiracy cases on contingent launch clauses alone, they often fail at the summary judgment stage. *See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-cv-1797, 06-cv-1833, 06-cv-2768, 2014 WL 2813312, at *14 (E.D. Pa. June 23, 2014). Finally, the *Nexium* court found that, at trial, the absence of evidence other than contingent launch provisions entitled the defendants to judgment as a matter of law on the conspiracy claim. *Nexium*, 842 F.3d at 55.

However, this Court disagrees that more is presently required because, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment . . . or a trial." *Anderson News*, 680 F.3d at 184 (internal citations omitted).

First, the IPP has met its burden to show parallel conduct, as it has alleged that the Generic Defendants entered into settlement agreements around the same time with Forest and

Merz that contained the same pertinent provisions. (*See* IPP Resp. to Forest Br. at 36–37; *see also* CAC ¶ 76.) For example, Plaintiff alleges that the Generic Defendants entered into the settlement agreements in July, September, October, and December of 2009. (CAC ¶ 75.) Plaintiff also alleges that each of these agreements contained acceleration clauses, which led to agreement not to launch any competing generic formulations until July 11, 2015. (CAC ¶¶ 76, 79.) Even at the summary judgment stage, for example, the *Nexium* court found it significant for inferring the existence of a conspiracy that each generic competitor "agreed to delay its market entry on the express condition that every other Generic Defendant do the same." *Nexium*, 842 F. Supp. 3d at 254. The Court will not ignore this potent allegation merely because other courts have found that, after discovery, additional support is required.

Second, the IPP adequately alleges "plus factors" that support an inference of conspiracy at the motion to dismiss stage. The IPP Complaint directly alleges that the settlements were "negotiated collectively" or in such a manner that each Generic Defendant was informed of the pertinent terms of the other agreements. (CAC ¶¶ 75, 77.) Such collective negotiations, if true, would certainly constitute circumstantial evidence of a conspiracy.

The IPP Complaint also adequately alleges behavior against interest, which, combined with allegations of parallel conduct, can be indicative of concerted rather than independent action. *See, e.g., Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000); *Apex Oil*, 822 F.2d at 254. Forest, Merz, and the Generic Defendants entered into the settlement agreements between July and December of 2009, which allowed for generic entry no earlier than July 11, 2015. (CAC ¶ 19–29.) The FDA's automatic, 30-month stays allegedly began to expire in April 2010. (CAC ¶ 72.) The FDA tentatively approved the generics' ANDAs in January and April of 2010. (CAC ¶ 82.) This translates to a delay of roughly five years in exchange for only three

months' competition within the exclusivity period, which certainly states a claim against interest that is plausible on its face.

Finally, the presence of contingent launch clauses, which are analogous to "most favored nation" provisions, raises antitrust scrutiny, even if they may have certain procompetitive effects. *See, e.g., U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 701 (S.D.N.Y. 2013).

The Court finds that the IPP states a claim for conspiracy to monopolize.

### B.   Illinois

Count Two (but not Count One) of the IPP Complaint alleges claims under the Illinois Antitrust Act ("IAA"), 740 Ill. Comp. Stat. 10/3, *et seq.* (CAC ¶ 207(e).) Defendants move to dismiss this claim because the statute states, in relevant part, "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. Comp. Stat. 10/7(2); (Forest Suppl. Br. at 10 n.4). *See also Gaebler v. N.M. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996); *Bobrowicz v. City of Chicago*, 522 N.E.2d 663, 669 (Ill. App. Ct. 1988).

The IPP responds that the restriction "does nothing more than dictate the manner in which the procedural device of a class action can proceed" and does not apply in federal court pursuant to the Supreme Court's holding in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). (IPP Resp. to Gen. Defs. Br. at 8–10.)

Courts in this circuit have split as to whether the indirect purchaser class action bar in the IAA is procedural or substantive, under Justice Stevens' concurrence in *Shady Grove. Compare Dig. Music*, 812 F. Supp. 2d at 416, with *Aggrenox II*, 2016 WL 4204478, at *6. However, the Court agrees with those cases in this circuit that have treated the IAA as stating a procedural rule

applicable in Illinois state courts, rather than a substantive rule applicable to federal courts sitting in diversity jurisdiction in New York.

First, the same paragraph of the statute begins by stating that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. 10/7(2). The statute therefore does not limit the substantive rights of an injured party in an individual action. *See Aggrenox II*, 2016 WL 4204478, at *6 ("[A]ny indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action.")

Moreover, were the IAA to prohibit class actions altogether, the statute would read no differently than the New York class actions bar at issue in *Shady Grove*—a fact observed by at least one other court in this circuit. *Aggrenox II*, 2016 WL 4204478, at *6 ("I cannot square Shady Grove's allowance of a Rule 23 class action despite New York's class-action bar with the dis allowance of a Rule 23 class action in the case of Illinois's class-action bar simply on the basis that Illinois's bar is narrower.").

Defendants' motion to dismiss the Illinois claim for conspiracy to monopolize under Count Two is **DENIED**.

### C.      Oregon

Defendants argue that "the laws of Oregon bar recovery for at least part of the period for which Plaintiff seeks damages." (Gen. Defs. Br. at 35 (citing *Niaspan*, 42 F. Supp. 3d at 759.) The IPP responds that "[t]his is a non-issue" given that the class period begins after the enactment of Oregon's *Illinois Brick* repealer. (IPP Resp. to Gen. Defs. Br. at 13.)

Oregon's *Illinois Brick* repealer statute became effective on January 1, 2010. *See* Or. Rev. Stat. § 646.780; Laws 2009, c.304, § 1, eff. Jan. 1, 2010. The IPP has proposed a Class

Period beginning April 14, 2010.  (CAC ¶ 146.)  There is therefore no *Illinois Brick* problem for purposes of this case.

Defendants' motion to dismiss the Oregon claim for conspiracy to monopolize under Count Two is **DENIED**.

### D.   In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States

In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of conspiracy to monopolize.

The Court also finds that, as a matter of law, the IPP may pursue its Count Two claims for conspiracy to monopolize under the laws of all states **except** Massachusetts and Utah.  Those claims are hereby **DISMISSED**.  Moreover, the IPP's claim for conspiracy to monopolize under Rhode Island law is hereby **DISMISSED IN PART** to the extent that it seeks to recover for injuries incurred prior to July 15, 2013.

### VII.   Count Three:  Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants

The IPP Complaint next alleges an additional 25 state law claims grouped under the heading "Count Three:  Consumer Protection and Unfair and Deceptive Trade Practices."  (CAC at 56.)  The IPP asserts this cause of action against all Defendants:  Actavis, Forest, Merz, and the Generic Defendants.  (*Id.*)

This cause of action alleges that "Defendants engaged in unfair competition or unfair acts or unconcionable [*sic*] acts or practices in violation of" state consumer protection statutes.  (CAC ¶¶ 212.)  Specifically, "There was a gross disparity between the price that [the IPP] and [Class] members paid for the brand product and the value received, given that a less expensive substitute

generic product should have been available." (*Id.* ¶ 213.) Count Three also alleges that the IPP and the Class "were deprived of the opportunity to purchase a generic version of Namenda IR 5 or 10 mg tablets and forced to pay higher prices for Namenda XR." (*Id.* ¶ 214.) Together, these allegations form the factual nucleus on which the 25 state law consumer protection claims are based.

As they have done with respect to Counts One and Two of the IPP Complaint, Defendants first advance several broad-based arguments aimed at dismissing Count Three of the IPP Complaint as a whole or in large part, *viz.*:

- The claims are "likely" time-barred under the applicable statute of limitations, (Forest Br. at 65 n.42);

- The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Gen. Defs. Br. at 31);

- The IPP must satisfy the pleading requirements of Fed. R. Civ. P. 9(b), since state consumer protection claims are grounded in fraud, (Gen. Defs. Br. at 38); and

- In the alternative, IPP has failed to satisfy the Fed. R. Civ. P. 8 pleading standard under *Twombly* and *Iqbal*, (*id.* at 37).

For the reasons already discussed, this Court denies the motion to dismiss the claims as "likely" time-barred. In addition, the Court has already held that it will not dismiss a broad swath of claims for lack of Article III standing, on the basis that the IPP did not suffer injury-in-fact in states where it did not make purchases. However, the Court must consider the other Rule 9(b) and Rule 8 arguments.

Defendants next make several separate state-specific arguments, *viz.*:

- The IPP may not bring state consumer protection claims where the state follows *Illinois Brick*, (*id.*);

- The IPP has failed to satisfy the pre-filing requirements under certain states' statutes, (Gen. Defs. Br. at 40; Gen. Defs. Suppl. Br. at 13);

- Certain states require a showing of consumer deception, which the IPP does not and cannot allege, (Forest Br. at 67 n.47);

- Some states require that the claim be based on a consumer transaction or conduct that is consumer-oriented, which the IPP does not plead, (Forest Br. at 67–68 n.48);

- A subset of consumer protection statutes do not cover antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40);

- Recovery is possible under certain consumer protection statutes only when the conduct complained of is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40, 41–42);

- Certain state statutes confer a right of action only on consumers who are natural persons with regard to transactions made primarily for personal or household purposes, (Forest Br. at 68 n.51), or on consumers who are elderly or disabled, (Forest Br. at 68 n.52; Gen. Defs. Br. at 40); and

- Some states' consumer protection laws prohibit nationwide class actions or prohibit class actions altogether, (Forest Br. at 68 n.53; Gen. Defs. Br. at 39, 41–42).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Three. The table in Appendix 3 of Actavis, Forest, and Merz's original brief provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 3.)

As this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then addresses each state law claim.

### A.   The IPP Adequately Pleads Its State Law Claims Under *Twombly* and *Iqbal*

Defendants argue that the IPP does not properly plead its claim for violation of state consumer protection laws under Count Three because (i) it does not cite to specific provisions of the consumer protection statutes and (ii) it does not plead the elements of each state's law. (Gen.

Defs. Br. at 37, 42.)  Merely listing citations to the state codes, they argue, does not satisfy *Iqbal*, 556 U.S. at 678 (2009) or *Twombly*, 550 U.S. at 570.

    The Court disagrees.

    First, the IPP is not required to identify the particular sections of the code under which the claims are brought, as long as defendants are on notice of the theory plaintiffs are pursuing. *See, e.g.*, *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017) (denying defendants' motion to dismiss even though indirect purchasers did not specify the state code sections under which the claims were brought).

    Moreover, the factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint.  *See In re Domestic Drywall Antitrust Litig.* No. 13-cv-2437, 2016 WL 3769680, at *11 (E.D. Pa. July 13, 2016) ("To the extent Defendants' one-paragraph [*Twombly*] argument is an invitation for the Court to comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation."); *see also In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016) (in securities fraud case, complaint "as a whole" adequately pleaded specific statements made or authorized by specific defendants, actual reliance, and failure to comply with statutory requirements).

    Finally, although state laws may vary to some degree in the elements that they require, the IPP has made an effort to limit its claims to state laws that share substantive foundational features—such as a right of action for "unfair," as opposed to "deceptive," trade practices. *See, e.g., Propranolol*, 249 F. Supp. 3d at 729 (finding that a high level of detail was "not necessary at the pleading stage because the 'elements of unjust enrichment are similar in every state.'")

(citing *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014)).

**B.     The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b)**

Defendants next argue that because "allegations of deceptive trade practices . . . amount to allegations of fraud," the IPP must satisfy the heightened pleading standard of Rule 9(b)." (Gen. Defs. Br. at 38 (citing *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988); Gen. Defs. Reply at 24.)

The IPP responds that it "has carefully limited its consumer fraud claims to the 'unfair methods' and 'unfair trade practices' prongs of the statutes." (IPP Resp. to Gen. Defs. Br. at 17.) (*See also* CAC ¶ 214 (alleging injury "as a direct and proximate result of Defendants' unfair competition, unfair or unconscionable acts and practices").) The IPP also responds that *NCC Sunday Inserts*, 692 F. Supp. at 330, was binding only with respect to the Connecticut Unfair Trade Practices Act, under which the IPP does not bring a claim. (*Id.* at 17.)

Courts regularly distinguish between state consumer protection claims that proceed under a theory of "deceptive practices" and those that proceed under a theory of "unfair practices." *See, e.g., In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1074 (S.D. Cal. 2017); *In re Auto. Parts Antitrust Litig. (Instrument Panel Clusters)*, No. 12-md-2311, 2014 WL 2993753, at *19 (E.D. Mich. July 3, 2014). This is consistent with the federal FTC Act, which allows recovery for "unfair" as well as "deceptive" acts or practices, 15 U.S.C. §§ 45(a)(1), 45(n), and on which "virtually every" state consumer protection law is based, *Toward Greater Equality in Business Transactions:  A Proposal to Extend the Little FTC Acts to Small Businesses*, 96 Harv. L. Rev. 1621, 1622 (1983).

As for *NCC Sunday Inserts*, that decision—which addresses a statute not at issue in this case, the Connecticut Unfair Trade Practices Act—does not hold that the heightened pleading standards of Rule 9(b) apply to allegations under state consumer protection laws. That case held only that, "To the extent that fraud is being alleged under the rubric 'deceptive trade practices,' Rule 9(b) governs the pleading procedures." *NCC Sunday Inserts*, 692 F. Supp. at 330.

The IPP does not allege anything under the rubric of "deceptive trade practices"— deliberately so. In the absence of any "developed argument or legal authority" for Defendants' argument that I must treat the CAC as alleging deception rather than unfair acts, the claims may proceed. *Dig. Music*, 812 F. Supp. 2d at 408 n.10.

Defendants' motion to dismiss all Count Three claims on these grounds is, therefore, **DENIED**.

### C.     *Illinois Brick* Does Not Bar the IPP's Consumer Protection Claims

Defendants argue—but do not cite any persuasive authority—that consumer protection claims brought by indirect purchasers are barred in all states that follow *Illinois Brick*. (Gen. Defs. Br. at 31–34.) Instead, the cases they cite focus overwhelmingly on unjust enrichment claims brought by indirect purchasers. (*Id.*)

The Generic Defendants cite only one case in which a court dismissed a consumer protection act claim that was duplicative of a state antitrust claim; in that instance, however, the district court based its finding on a case from the Supreme Court of Illinois that specifically barred plaintiffs from invoking the Consumer Fraud Act to recover for conduct not covered by the Illinois Antitrust Act. *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009).

The Court **DENIES** without prejudice the Defendants' motion to dismiss the majority of claims under Count Three in one fell swoop. I will consider the *Illinois Brick* arguments to the extent that the Defendants have briefed them with respect to each state's law.

### D.     The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others

I now turn to the arguments aimed at individual state law claims.

At this particular stage, the Court notes that it has been tasked with determining the intricacies of 25 states' consumer protection laws, in many cases with the benefit of very little briefing. For certain claims, Defendants' arguments for dismissal consists of little more than a footnote in its brief, which in many cases is a citation to either a single federal district court opinion in a similar, nationwide class of indirect purchasers, or a particular statutory provision, with little or no explanation of how state courts have interpreted this particular provision.

As is its duty, the Court has taken these arguments seriously. Nonetheless, the Court cautions that, to the extent this very limited briefing invites the Court to *sua sponte* "comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation." *Domestic Drywall*, 2016 WL 3769680, at *11. In other words, this Court responds to the arguments that are affirmatively raised in Defendants' briefing but does not undertake an independent assessment of arguments that are not pointed out by the Defendants—who are represented by able counsel.

Because of Defendants challenge each state's law on multiple grounds, this opinion proceeds state by state.

### 1.     Alabama

Generic Defendants move to dismiss the Alabama claim under Count Three because the IPP cites to Alabama's antitrust statute, Ala. Code § 8-10-3, rather than to its consumer

protection statute, Ala. Code § 8-10-5. (Gen. Defs. Br. at 37 n.17.) As this Court has done throughout this opinion for the benefit of both the IPP and the Defendants, it takes the IPP at its word that this is a typographical error. (*See* IPP Resp. to Gen. Defs. Br. at 18 n.8.)

For the first time in supplemental briefing, Defendants argue that the IPP fails to satisfy the pre-filing notice requirement under Alabama's consumer protection statute. (Gen. Defs. Suppl. Br. at 13 (citing Ala. Code § 8-19-10(e).) That provision states, in relevant part: "At least 15 days prior to the filing of any action under this section, a written demand for relief . . . , shall be communicated to any prospective respondent by placing in the United States mail or otherwise." Ala. Code § 8-19-10(e).

It also states: "The demand requirements of this subsection shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section." *Id.*

Defendants have not argued that they maintain a place of business or keep assets within the state, and nothing in the CAC alleges that they so do. (*See* CAC ¶¶ 16–30.) Even if this Court were to determine that Defendants maintain a place of business or keep assets in the state, nothing in the statute suggests that notifying defendants is a prerequisite to suit or that an action that failed to comply with this provision would require dismissal in state court. Indeed, the relatively flexible notice provisions for out-of-state defendants suggests otherwise. Moreover, the tenor of the provision as a whole suggests that it operates much like a Rule 68 offer of judgment and is aimed at encouraging settlement.

74

*Effexor*, 2018 WL 4466050, cited by Defendants, did not analyze the language of the various notice provisions at issue or opine on their purpose. That case also did not examine whether, under the laws of each state, the proper remedy for non-compliance with the notice remedy would be dismissal. Beyond *Effexor*, Defendants cite no case for the proposition that defendant notification requirements under these statutes would require dismissing the claim here.

Defendants' motion to dismiss the Alabama law claim under Count Three is **DENIED**.

### 2.    Arizona

The IPP has withdrawn this claim. (IPP Resp. to Gen. Defs. Br. at 17 n.7.)

### 3.    California

Defendants first argue that the California Unfair Competition Law ("CUCL") requires a showing of consumer deception. (Forest Br. at 67 n.47.) The IPP responds that it has limited its state consumer protection claims to the "unfair methods" and "unfair trade practices" prongs of state statutes. (IPP. Resp. to Gen. Defs. Br. at 17.)

Here, the IPP has the better of the arguments. For purposes of CUCL, unfair practices include, among other things, "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Moreover, California's Supreme Court has held "that because the prohibitions on 'unlawful,' 'unfair' or 'fraudulent' practices are written in the disjunctive, each of those 'prongs' gives rise to a separate and distinct theory of liability." 1-16 Cheryl Lee Johnson (ed.), *California Antitrust and Unfair Competition Law* § 16.04 (revised ed. 2018) (citing *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)); *see also Podolsky v. First Healthcare Corp.*, 58 Cal. Rptr. 2d 89, 102 (Cal. Ct. App. 1996) (nursing home's practice of requiring relatives of patients on Medicare/Medicaid to sign guarantees could fall under "unlawful" prong of the CUCL, even if not deceptive). Therefore, the IPP is correct that it need not allege deceptive behavior to survive a motion to dismiss.

Defendants next argue that the IPP must plead primarily intrastate conduct in order to allege a claim under the CUCL. (Forest Br. at 68 n.50). The IPP responds that the Complaint alleges intrastate effects and that, as a matter of law, a nationwide antitrust class action satisfies "intrastate" pleading requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

The Court agrees that the IPP has pleaded intrastate effects in its Complaint, insofar as the IPP alleges both that it indirectly purchased Namenda in California, (CAC ¶ 15), and that hundreds of thousands of consumers nationwide, including, presumably, California residents, were affected, (*id.* ¶ 48).

The only case cited by Defendants is inapposite, as it discusses wholly extraterritorial application of the statute and says nothing about whether the conduct must occur "primarily" within the state. *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005). In other cases, California courts have allowed class members who were either California residents or for whom the relevant transaction had occurred in state to bring claims under the CUCL. *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999) (class members who were either California residents or for whom the defendant had purchased insurance within California could bring claims).

Finally, Defendants argue that the IPP has not satisfied California's pre-filing notice requirement. (Gen. Defs. Br. at 41 (citing Cal. Bus & Prof. Code § 17209).) That provision reads: "If a violation of this chapter is alleged or the application or construction of this chapter is in issue in any proceeding *in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court*, each person filing any brief or petition with the court in that proceeding shall serve, within three days of filing with the court, a copy of that brief or petition on the Attorney General . . . and on the district attorney of the county in which the lower

court action or proceeding was originally filed." *Id.* (emphasis added). That provision, by its terms, applies only to appellate proceedings in state court. Since this is a diversity case in a federal district court, the statute does not apply.

As a result, the Court **DENIES** the Defendants' motion to dismiss the California claim under Count Three.

### 4.    District of Columbia

Defendants argue that the IPP fails to state a claim under the D.C. Consumer Protection and Procedures Act ("DCCPPA") because it is not a "consumer" within the meaning of that statute. (Forest Br. at 67–68 n.48 (citing D.C. Code § 28-3905(k).)

The relevant provision of the DCCPPA states: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). "When used as a noun," a "consumer" means "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services, including as a co-obligor or surety, or does or would otherwise provide the economic demand for a trade practice." *Id.* § 28-3901(a)(2)(A). A "trade practice" means "any act ... [involving] ... a sale, lease or transfer, of consumer goods or services." *Id.* § 28-3901(a)(6). When used as an adjective, "consumer" relates to things "receive[d] and normally use[d] for personal, household or family purposes." *Id.* § 28-3901(a)(2)(B)(i).

Sergeants Benevolent, the only Named Plaintiff in this Action, does not fit the definition of "consumer" under the plain language of the statute. Additionally, the D.C. Court of Appeals has clarified that "the CPPA was designed to police trade practices arising only out of consumer-merchant relationships, and does not apply to commercial dealings outside the consumer sphere." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (internal quotations omitted). "[T]he CPPA does not protect merchants in their commercial dealings with suppliers or other merchants." *Id.*

at 83. For example, D.C. courts have held that a taxi driver's claims for coerced purchases of gasoline and other supplies against his taxi-owners association do not state a claim under the DCCPPA. *Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 (D.D.C. 1988). The relevant question is whether the plaintiff's activity is akin to that of a merchant. *Ford*, 908 A. 3d at 83.

In addition, "Courts overseeing multidistrict litigation as well as state courts in the District of Columbia have . . . held that transactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the [DCCPPA] seeks to reach. Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the [DCCPPA] covers." *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-m-2508, 2015 WL 5166014, at *30 (E.D. Tenn. 2015).

Sergeants Benevolent is not an "individual member of the consuming public." *Id.* Moreover, it is immaterial that Sergeants Benevolent pays for pharmaceuticals prescribed to its members, who do use them for "personal, family, or household purposes." D.C. Code § 28-3901(a)(2)(B)(i). As other courts have held, "when an insurance plan makes a purchase, it does so, not for personal purposes, but for the plan's business purposes, *i.e.*, to fulfill its side of a contractual relationship with its members, who pay premiums for its coverage." *Restasis*, 2018 WL 5928143, at *7 (collecting cases).

Because the IPP fails to state a claim under the DCCPPA under Rule 12(b)(6), the Court **GRANTS** Defendants' motion to dismiss.[23]

---

[23]   Defendants also argue that the DCCPPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19). However, because the Court dismisses the DCCPPA claim under Count Three for failure to state a claim based on a retail purchase for personal, family, or household purposes, it does not reach these arguments.

5.   **Florida**

Defendants move to dismiss the claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") on the grounds that the IPP does not sufficiently allege intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20.)  Relatedly, Defendants argue that a plaintiff may not use the FDUTPA to bring claims on behalf of a nationwide class. (Gen. Defs. Br. at 39 n.18).

The cases cited by Defendants, however, say nothing about an intrastate conduct requirement and instead stand for the proposition that the FDUTPA covers only those individuals who live or make purchases in Florida.  It is intrastate *injury*, not conduct, which implicates the FDUTPA.

For example, in *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So.2d 1037, 1040 (Fla. Dist. Ct. App. 2000), the court held that plaintiffs, a class of users, brokers, and servicers of Siemens/Oce ultra-high speed printers, possessed viable causes of action under FDUTPA only if they were also Florida consumers, and that they would not be entitled to recovery merely on the basis that Siemens/Oce had entered into certain anticompetitive agreements or otherwise engaged in unlawful conduct within the state of Florida. *Id.*

Likewise, the court in *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228 (S.D. Fla. 2002), held that a nationwide class of aircraft owners could not recover under the FDUTPA merely because the defendant's unlawful conduct had taken place within the state. *Id.*  Instead, only Florida consumers could take advantage of the FDUTPA. *Id.*

Finally, *Coastal Physician Servs. of Broward Cty., Inc. v. Ortiz*, 764 So.2d 7, 8 (Fla. Dist. Ct. App. 1999), held that the FDUTPA was "for the protection of in-state consumers for either in-state or out-of-state debt collectors." *Id.*

The IPP alleges that it "indirectly purchased, paid and/or provided reimbursement for Namenda in . . . Florida." (CAC ¶ 15.) Moreover, although the IPP brings the IP Action on behalf of a nationwide Class, it does not purport to enable all members of the Class to recover under the FDUTPA. For these reasons, Defendants' motion to dismiss the Florida claim under Count Three is **DENIED**.

### 6.    Hawaii

Defendants argue that the Hawaii Unfair and Deceptive Acts or Trade Practices statute ("HUDAP") only "allow[s] suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes." (Forest Br. at 68 n.51). The statute reads, in relevant part: "No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." Haw. Rev. Stat. § 480-2(d). The preceding section of the statute defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Haw. Rev. Stat. § 480-1.

Sergeants Benevolent Association Health & Welfare Fund is not a natural person. It is a trust, incorporated in New York, which reimburses either pharmacies or its members for purchases of Namenda. Additionally, Sergeants Benevolent also does not pay for Namenda "primarily for personal, family, or household purposes," regardless of how its member insureds use Namenda. *See Restasis*, 2018 WL 5928143, at *7. Therefore, it fails to state a claim under Rule 12(b)(6) with respect to the HUDAP.

Defendants' motion to dismiss the Hawaii law claim under Count Three is **GRANTED**.

7.   **Idaho**

Defendants first argue that plaintiff has failed to plead deceptive conduct, as required by the Idaho Consumer Protection Act ("ICPA"). (Forest Br. at 67 n.47.) The IPP responds that the ICPA confers a right of action based on "unfair" conduct. (IPP Resp. to Gen. Defs. Br. at 17.) Defendants also argue that the ICPA makes unlawful only specific types of conduct, including misrepresentations, and does not include antitrust conduct. (Gen. Defs. Br. at 40 n.19 (citing Ida. Code § 48-603).) These arguments are treated together.

Like many state consumer protection laws, most of the conducted enumerated in the ICPA focuses on deceptive, fraudulent, or misleading practices. Idaho Code § 48-603. Nonetheless, there is no firm requirement that a plaintiff show deception since, for example, "engaging in any unconscionable method, act, or practice in the conduct of trade or commerce" is expressly contemplated by the Act. Ida. Code § 48-603(18); *id.* § 48-603C. Other courts have found that plaintiffs may state a claim for anticompetitive conduct, even if that conduct is not deceptive, under this prong of the ICPA. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004).

Moreover, the ICPA contains a harmonization provision with the federal FTC Act. Idaho Code § 48-604(1). And, the Supreme Court of Idaho has held that the ICPA must be "liberally construed to effect the legislative intent to deter deceptive *or unfair trade practices* and to provide relief for consumers exposed to proscribed practices." *In re W. Acceptance Corp., Inc.*, 788 P.2d 214, 216 (Ida. 1990) (emphasis added) (internal quotation omitted). The Court therefore denies Defendants' motion to dismiss the ICPA claim.

Defendants next argue that the ICPA requires that the underlying conduct involve a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68 n.48 (citing

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, 737 F. Supp. 2d 380, 409 (E.D. Pa. 2010).)

In *Sheet Metal Workers*, the court referenced a state court decision, *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Ida. 2005), which examined the unconscionability provisions of the ICPA and found that they were "designed to prohibit unconscionable 'sales conduct' that is *directed at the consumer.*" *Id.* (emphasis added). *Wasden*, however, hinged on two factors: whether the alleged price-fixing of sorbates, an antimicrobial food and animal feed additive, was "sales conduct" for purposes of the ICPA and whether the defendants had ever sold sorbates to consumers in Idaho. *Id.* at 430, 435.

Here, by contrast, the Defendants are alleged to have marketed and sold Namenda to consumers at inflated, anticompetitive prices by, among other things, restricting consumer access to generic versions of Namenda and announcing the withdrawal of the Namenda IR formulation directly to consumers. Thus, construing the allegations in the light most favorable to the Plaintiff, I find that the IPP has adequately alleged "consumer conduct" within the meaning of the statute. *See also New Motor Vehicles*, 350 F. Supp. 2d at 185 (upholding claim for antitrust conduct under ICPA).

Defendants' motion to dismiss is **DENIED**.

### 8.     Illinois

Defendants first argue that plaintiffs must allege deception in order to state a claim under the Illinois Consumer Fraud Act ("ICFA"). (Forest Br. at 67 n.47.) *See also Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991) (plaintiff's "cause of action must stand or fall on whether defendants' conduct was deceptive") (citing *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990)). The IPP argues that it can

plead its claim under the "unfairness" prong of the ICFA, which is separate from the "deception"

prong. (IPP Resp. to Gen. Defs. Br .at 17.)

At bottom, it is unclear whether *Laughlin*'s statement that the ICFA's "reach was to be

limited to conduct that defrauds or deceives consumers or others" was intended to bar all future

claims brought under its "unfairness" prong, or whether its holding was, instead, restricted to the

price discrimination claims alleged in that particular case. 550 N.E.2d at 993. Subsequent cases

in Illinois imply that "unfairness" has survived *Laughlin*: "[a] plaintiff may allege that conduct

is unfair under the [I]CFA without alleging that the conduct is deceptive." *Hill v. PS Illinois Tr.*,

856 N.E.2d 560, 568 (Ill. Ct. App. 2006). "A deceptive practices claim must meet Rule 9(b)'s

heightened pleading standard, while an unfair practices claim need not because it is not based on

fraud." *Wheeler v. Assurant Specialty Prop.*, 125 F. Supp. 3d 834, 842 (N.D. Ill. 2015). I will

follow the lead of those Illinois courts and decline to dismiss the IPP's claim as a matter of law

on these grounds.

Second, Defendants argue that the ICFA is inapplicable to antitrust conduct. (Forest Br.

at 68 n.49 (citing 815 Ill. Comp. Stat. 505/2; *Laughlin*, 550 N.E.2d at 993); Gen. Defs. Br. at 40

n.19.) The IPP responds that the ICFA "should be interpreted in the same manner and to the

same extent as Section 5 of the FTC Act," which unquestionably includes conduct that violates

the antitrust laws. (IPP Resp. to Gen. Defs. Br. at 26 (citing 815 Ill. Comp. Stat. 505/2).)

Again, this Court is not persuaded that *Laughlin* bars the current claims. *Laughlin* held

that price discrimination, which was not actionable under the IAA, was similarly not actionable

under the ICFA. 550 N.E.2d at 993 ("There is no indication that the legislature intended that the

Consumer Fraud Act be an additional antitrust enforcement mechanism."); *accord Butler v.*

*Jimmy John's Franchise, LLC*, No. 18-cv-0133, 2018 WL 3631577, at *8 (S.D. Ill. July 31,

2018) ("the Illinois Supreme Court has instructed that plaintiffs cannot use the [ICFA] to get around the fact that their theory does not fly under the [IAA]."). As a result, *Laughlin* stands for the proposition that the ICFA is not a safety net that serves to catch residual anticompetitive behavior, although it does not speak to whether the ICFA countenances claims that are also actionable under the IAA.

A subsequent case, *Gaebler v. N.M. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996), relied on *Laughlin* to bar claims for anticompetitive conduct that were brought pursuant to the ICFA *only*—presumably because plaintiffs had tried to skirt the IAA's prohibition on indirect purchaser class actions. *Id.* ("[C]lassic antitrust allegations dressed in Consumer Fraud Act clothing" did not state a claim). However, federal courts in Illinois and the Seventh Circuit have questioned whether *Gaebler*, which interprets *Laughlin* as preventing the ICFA from ever being a remedy for anticompetitive conduct, states the law too broadly. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1049 n.12 (N.D. Ill. 2007) (noting that no other Illinois appellate courts have interpreted *Laughlin* in this manner). And, consistent with both *Laughlin* and *Gaebler*, other federal courts have held that "[i]t remains possible . . . that an unfair practice might be covered by both the antitrust law and the Consumer Fraud Act." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 831 (7th Cir. 2014). The Court finds these recent cases, as well as the lack of subsequent appellate case law in Illinois, persuasive on the question of whether *Gaebler* bars recovery for anticompetitive conduct under the ICFA.

Third, Defendants argue that the ICFA bars class actions. (Gen. Defs. Br. at 39, n.18; Forest Br. at 68, n.53). However, they fail to cite to any provision of the ICFA that does so. Instead, they cite to the IAA, which does not purport to apply to other statutes. 740 Ill. Comp. Stat. § 10/7(2) ("no person shall be authorized to maintain a class action . . . for indirect

purchasers asserting claims under *this Act*") (emphasis added). In the absence of any arguments, case law, or citations to the consumer fraud statute, the Court finds that this argument does not provide sufficient grounds for dismissing the ICFA claim.

Finally, Defendants argue that the ICFA requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing Ill. Comp. Stat. 505/10a(a)).) But that section reads, in relevant part, "Proof of a public injury, a pattern, or an effect on consumers and the public interest generally shall be required in order to state a cause of action under this Section *against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act*." Ill. Comp. Stat 505/10a(a) (emphasis added). By its terms, the statute is inapplicable to the case at bar.

Defendants' motion to dismiss the Illinois claim under Count Three is **DENIED**.

### 9.    Kansas

Defendants argue that the IPP has failed to allege consumer deception in satisfaction of the elements of the Kansas Consumer Protection Act ("KCPA"). (Forest Br. at 67 n.47.) The IPP responds generally that it brings its claims pursuant to the "unconscionable" prong of the state consumer protection laws. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants' interpretation of the statute. The KCPA is intended to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. § 50-623; *see also id.* §§ 50-626, 50-627. As with other state laws, the enumerated offenses under the statute focus overwhelmingly on deceptive or fraudulent acts. Unlike other states, however, Kansas courts have spoken more uniformly to the issue of whether the "unconscionability" prong of the statute also requires a showing of deception: "In order to

render the contract between the parties unconscionable, there must be some element of deceptive bargaining conduct present as well as unequal bargaining power." *Cornelison v. Denison State Bank*, 315 P.3d 278 (Kan. Ct. App. 2014) (citing *Willman v. Ewen*, 230 Kan. 262, 266, 634 P.2d 1061 (1981)); *see also State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 272 Kan. 1313, 1321, 38 P.3d 707, 713 (2002) (same). And, unlike courts in, for example, Illinois, courts in Kansas have not affirmatively excused a plaintiff proceeding with a claim for unconscionability from satisfying the heightened pleading requirements for claims grounded in fraud. *Compare Wheeler*, 125 F. Supp. 3d at 842, *supra*.

Because the IPP cites no cases in support of its arguments, and cites one in support of Defendants', the KCPA claim is **DISMISSED**.[24]

### 10.   Maine

Defendants argue that the Maine Unfair Trade Practices Act ("MUTPA") provides a cause of action only for persons who purchase goods "primarily for personal, family, or household purposes." (Forest Br. at 68 n.51.) The statute provides a remedy to, in relevant part "[a]ny person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal." Me. Rev. Stat. tit. 5, § 213(1).

For the reasons discussed above, the Court finds that Sergeants Benevolent, an insurer, has not purchased or paid for Namenda "primarily for personal, family, or household purposes." *See Restasis*, 2018 WL 5928143, at *7. It has paid for the drug because it is an insurer and has a

---

[24]     Defendants also argue that the KCPA bars class actions (Gen. Defs. Br. at 39 n.18; Forest Br. at 68 n.53); that the statute requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented (Forest Br. at 67–68 n.48); that the statute is inapplicable to antitrust conduct (Gen. Defs. Br. at 40; Forest Br. at 68 n.49); and that the statute only allows suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes (Forest Br. at 68 n.51). However, because the Court dismisses the KCPA claim on the grounds that it is inapplicable to antitrust conduct, it does not reach these arguments.

contractual duty to reimburse its members for their purchases. Therefore, it fails to state a claim under Rule 12(b)(6).

Defendants' motion to dismiss is **GRANTED**.[25]

### 11.   Massachusetts

In order to bring a claim under Massachusetts' state consumer protection law, Defendants argue that the IPP must allege primarily intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs. Br. at 41 n.20.) Defendants do not cite any case law for this proposition, although they do cite Mass. Laws ch. 93A, § 1, which defines "trade" and "commerce" to include "trade or commerce directly or indirectly affecting the people of this commonwealth." *Id.* The IPP responds that the Complaint alleges intrastate effects and that, as a matter of law, a nationwide antitrust class action satisfies "intrastate" pleading requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

On its own, the "affecting people of this commonwealth" language does not persuade the Court that this claim should be dismissed, particularly as the IPP has alleged sales of Namenda IR and Namenda XR affecting consumers and third party payors across the country, including in Massachusetts.

It is true that an earlier version of the Massachusetts statute contained an exemption for defendants "of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce," as well as for defendants who met certain other criteria. *See Dodd v. Commercial Union Ins. Co.*, 365 N.E.2d 802, 808 (Mass. 1977). However, the statute no longer carves out such defendants. Rather, the current version of that provision now states, in relevant

---

25      Defendants also argue that the MUTPA requires a showing of consumer deception. (Forest Br. at 67 n.47.) However, because the Court dismisses the MUPTA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

part, "For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions." Mass. Laws ch. 93A, § 3.

Next, Defendants argue that G.L. c. 93A does not allow for class actions or indirect purchaser actions. *Ciardi*, 762 N.E.2d at 314, is squarely on point: it holds that both class actions and indirect purchaser actions are permitted under Massachusetts' consumer protection law. *Id.*

Finally, Defendants argue in their supplemental briefing that the IPP has not satisfied the pre-filing notice requirement under chapter 93A. (Gen. Defs. Suppl. Br. at 13 (citing Mass. Gen. Laws ch. 93A, § 9(3).)  Like Alabama's consumer protection statute, the pre-suit notice provisions of chapter 93A do not apply if "the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth." *Id.*  Defendants do not argue, and nothing in the CAC alleges, that they maintain a place of business or keep assets in Massachusetts. (*See* CAC ¶¶ 16–30.)  Moreover, nothing in § 9(3) suggests that a Massachusetts court would dismiss an action under Chapter 93A if a plaintiff failed to comply with this provision.  Like the Alabama statute, the provision appears to operate like a Rule 68 offer of judgment, capping damages for defendants who make settlement offers in good faith.

Defendants' motion to dismiss the Massachusetts law claim under Count Three is **DENIED**.

### 12.   Michigan

Defendants first argue that the IPP is required to allege consumer deception to plead a claim under the Michigan Consumer Protection Act ("MCPA"). (Forest Br. at 67 n.47.)  The IPP argues that it can base its claim on "unfair" practices.  (IPP Resp. to Gen. Defs. Br. at 17.)

The IPP is correct.  "The MCPA is broader than common law torts of fraud inasmuch as it prohibits 'not only 'deceptive' business practices but also those which are 'unfair' and

'unconscionable.'" *Game On Ventures, Inc. v. Gen. RV Ctr., Inc.*, 587 F. Supp. 2d 831, 839 (E.D. Mich. 2008) (citing *Mayhall v. A.H. Pond Co.*, 341 N.W.2d 268, 270 (Mich. Ct. App. 1983)). The Court finds that the IPP has adequately alleged conduct falling under § 445.903(z)—"Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold." (*Compare* CAC ¶ 213). Therefore, Defendants' first argument fails.

Defendant next argues that the IPP fails to plead a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing *Sheet Metal Workers*, 737 F. Supp. 2d at 412).) *Sheet Metal Workers*, however, dismissed the plaintiffs' MCPA claim in a sham patent litigation case because plaintiffs had not "alleged that [defendant] had an intent to deceive consumers and because their actions [did] not fall within any of the enumerated prohibited practices listed in section 445.901 [*sic*]." *Id.* The facts of *Sheet Metal Workers* are readily distinguishable, particularly as the IPP has adequately alleged "unfair" conduct under an enumerated provision of the statute.

Third, Defendants argue that the MCPA is inapplicable to antitrust conduct because it only applies to "specific types of conduct," such as misrepresentations. (Gen. Defs. Br. at 40 n.19 (citing Mich. Comp. Laws § 445.903); Forest Br. at 68 n.49.) The IPP opposes this argument on the basis that the MCPA is "modeled after the FTC Act and extend[s] to prohibit unfair methods of competition including monopolistic conduct." (IPP Resp. to Gen. Defs. Br. at 26.)

The IPP is correct. The MCPA does contain harmonization language: it enables injured persons to bring a class action caused by "a method, act, or practice in trade or commerce declared by a circuit court of appeals or the supreme court of the United States to be an unfair or

deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act." Mich. Compiled Laws § 445.911(3)(c). Moreover, federal courts have sustained causes of action under the MCPA for antitrust conduct. *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999).

Defendants' motion to dismiss is **DENIED**.

### 13. Missouri

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Missouri Merchandising Practices Act ("MMPA"). (Forest Br. at 67–68, n.48 (citing Mo. Rev. Stat. § 407.020(1).)

The Court is not convinced that the provision of the MMPA cited by Defendants contains such a requirement. "The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice." Mo. Rev. Stat. § 407.020(1). "Trade or commerce," in turn, is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." *Id.* § 407.010(7).

Because Defendants have cited no authority commensurate with the proposition that Missouri restricts recovery under the MMPA to consumer-oriented conduct not covered by the IPP Complaint, their motion to dismiss the Missouri claim under Count Three is **DENIED**.

### 14. Montana

Defendants argue that the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPCPA") only "allow[s] suits by consumers who are natural persons with regards [*sic*] to

transactions made primarily for personal or household purposes." (Forest Br. at 68, n.51 (citing Mont. Stat. § 30-14-102).)

The MUTPCPA enables a "consumer" to bring an action for damages, Mont. Stat. § 30-14-133(1), and defines "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes," *id.* § 30-14-102(1).

As I have held with respect to other state laws containing this requirement, I find that Sergeants Benevolent has failed to state a claim under the MUTPCPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis*, 2018 WL 5928143, at *7.

Defendants' motion to dismiss is, therefore, **GRANTED.**[26]

### 15.   Nebraska

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Nebraska Consumer Protection Act ("NCPA"). (Forest Br. at 67–68 n.48 (citing Neb. Rev. Stat. § 59-1601).) As with their claim under Missouri law, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-oriented" conduct or that such conduct not covered by the IPP Complaint. Section 59-1601 of the NCPA is broad, with no indications that recovery is restricted to certain types of conduct: "person" is defined to include trusts," *id.* § 59-1601(1), and "trade and commerce" is defined to mean, in relevant part, "any commerce directly or indirectly affecting the people of the State of Nebraska," *id.* § 59-1601(2).

---

[26]     Defendants also argue that the MUTPCPA does not permit class actions. (Forest Br. at 68 n.53.) However, because the Court dismisses the MUTPCPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

As a result, Defendants' motion to dismiss the Nebraska claim under Count Three is **DENIED**.

### 16.   Nevada

Defendants argue that the Nevada Deceptive Trade Practices Act ("NDTPA") requires the IPP to allege deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it has limited its claims to the "unfair methods" and "unfair trade practices" prongs of the statute. (IPP Resp. to Gen. Defs. Br. at 17.)

The NDTPA enumerates deceptive trade practices at sections 598.015 through 598.025 of the statute. Section 598.0923 of the statute makes it a violation to "knowingly . . . violate a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3). This Court adopts the reasoning in *Effexor*, 2018 WL 4466050, at *20, which found that a plaintiff could state a claim under this section of the NDTPA where the claims were "predicated on allegations of anticompetitive conduct, which are considered prohibited acts under Nev. Rev. Stat. § 598A.060." *Id.*

Defendants next argue that the Nevada Deceptive Trade Practices Act ("NDTPA") confers a right of action only to elderly or disabled persons. (Gen. Defs. Br. at 40 (citing Nev. Rev. Stat. § 598.0977); *see also* Forest Br. at 68 n. 52.) Because the IPP, "a New York trust, is not an elderly or disabled person located in Nevada," it cannot bring a claim. (Gen. Defs. Br. at 40.)

I agree with the IPP that private relief in the statute is not so limited. As the IPP persuasively argues, Nev. Rev. Stat. § 41.600 operates to provide a right of action to "any person who is a victim of consumer fraud." (IPP Resp. to Gen. Defs. Br. at 31 (citing Nev. Rev. Stat. § 41.600; *Southern Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099 (D. Nev. 2007)).) The statute defines "consumer fraud" to encompass acts that violate the NDTPA. *See*

Nev. Rev. Stat. § 41.600(2)(e) ("'consumer fraud' means . . . a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive"). In *Southern Serv. Corp.*, 617 F. Supp. 2d at 1100, moreover, the U.S. District Court for the District of Nevada found that "person," as used in Nev. Rev. Stat. § 41.600, could include a corporate competitor, which indicates that private relief under the statute is not restricted to elderly or disabled persons. The fact that the law makes special provision for the elderly and disabled does not mean that others are not covered elsewhere in the statute.

Other federal district courts to examine this issue are in accord and have not restricted NDTPA claims to elderly or disabled plaintiffs. *DDAVP*, 903 F. Supp. 2d at 227; *Domestic Drywall*, 2016 WL 3769680, at *10.

Defendants' motion to dismiss the Nevada law claim under Count Three is **DENIED.**

### 17.    New Hampshire

Defendants argue that the New Hampshire Consumer Protection Act ("NHCPA") only applies when the underlying conduct is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). Defendants cite to the provision of the statute that deems unlawful "any unfair method of competition . . . in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2. The IPP alleges it has met this requirement, both with respect to its Complaint and as a matter of nationwide class action law. (IPP Resp. to Gen. Defs. Br. at 32.)

Without more, the Court is not persuaded that the "within this state" language in the statute requires dismissal of the claim. "[C]ourts interpreting New Hampshire's consumer protection law disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013) (collecting cases). However, based on the language of the statute, this

Court agrees with those cases that have held that sales of the offending goods into New Hampshire alleges sufficient intrastate conduct to satisfy the NHCPA. *DDAVP*, 903 F. Supp. 2d at 231.

Defendants' motion to dismiss the New Hampshire claim is, therefore, **DENIED**.

### 18.   New Mexico

Defendants first argue that the New Mexico Unfair Practices Act ("NMUPA") requires plaintiffs to allege deceptive conduct. (Forest Br. at 67, n.47). The IPP says that the NMUPA also covers unfair or unconscionable conduct. (IPP Resp. to Gen. Defs. Br. at 17.)

The IPP has the better reading of the NMUPA. In addition to deceptive conduct, the NMUPA also makes unlawful "unconscionable trade practices," which include those that "result[] in a gross disparity between the value received by a person and the price paid." N.M. Stat. § 57-12-2(E)(2); (*compare* CAC ¶ 213). Federal courts have permitted price-fixing claims, which typically do not require alleging deception, to proceed under this provision. *In re Lipitor Antitrust Litig.*, No. 12-cv-2389, 2018 WL 4006752, at *20 (D.N.J. Aug. 21, 2018); *Domestic Drywall*, 2016 WL 3769680, at *8. Although this is not a price-fixing case, the Court is persuaded by these cases that hold that a plaintiff need not allege consumer deception. In addition, and for the same reasons, the Court also rejects Defendants' argument that the NMUPA does not provide a remedy for antitrust conduct. (Forest Br. at 68, n.49; Gen. Defs. Br. at 40 n.19.)

Defendants next argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the NMUPA. (Forest Br. at 67–68 n.48 (citing N.M. Stat. §§ 57-12-2–3).)

As with their claim under Missouri and Nebraska law, however, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-

oriented" conduct or that such conduct not covered by the IPP Complaint. Section 57-12-3 of the NMUPA states: "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." Section 57-12-2, in turn, defines "trade or commerce" very broadly, including "the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value, including any trade or commerce directly or indirectly affecting the people of this state." N.M. Stat. § 57-12-2(C).

Defendants' motion to dismiss is **DENIED**.

### 19.   New York

Defendants move to dismiss the IPP's claim under section 349 of New York's General Business Law ("NYGBL") for failure to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it is not required to plead deceptive conduct to recover under the statute and that allegations of "unfair" conduct suffice. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants. Section 349 of the NYGBL does not contain an "unfair" or "unconscionable" practices prong, and therefore a plaintiff must plead consumer fraud or deception in order to bring a claim. In addition, while antitrust conduct is actionable under section 349, plaintiffs still must allege deception to state a claim. *See Dig. Music*, 812 F. Supp. 2d at 410 (analyzing New York cases); *see also* 7 von Kalinowski, Sullivan, & McGuirl, *supra*, § 132.07. Even cases cited by the IPP hold that any plaintiff who brings a claim under section 349 must allege deceptive conduct in its Complaint. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 907 (E.D. Pa. 2012) (dismissing claim for failure to allege deception as the basis for injury) (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611–12 (N.Y. 2000)).

As a result, Defendants' motion to dismiss the New York claim is **GRANTED**.[27]

### 20.   North Carolina

Defendants ask this Court to dismiss the IPP's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") because it has failed to allege conduct that is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 41 n.20 (both citing N.C. Gen. Stat. § 75-1.1).) However, nothing in the section of the statute cited by Defendants indicates that a claim may be brought pursuant to the NCUDTPA only if the conduct is "primarily intrastate." *See* N.C. Gen. Stat. § 75-1.1.

Second, Defendants argue that the NCUDTPA only permits actions by natural persons with regard to transactions made primarily for personal or household purposes. (Forest Br. at 68 n.51 (citing N.C. Gen. Stat. 75.1-1).) Again, nothing in the cited section indicates that a claim would be restricted to natural persons or to transactions made primarily for personal or household purposes. In fact, "commerce" is expressly defined to "include[] all business activities, however denominated," and exempts only "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b).

Defendants' motion to dismiss is **DENIED**.

### 21.   Rhode Island

Defendants argue that the Rhode Island Deceptive Trade Practices Act ("RIDTPA") limits relief to "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I. Gen. Laws § 6-13.1-5.2(a); (*see also* Forest Br. at 68 n.51).

---

[27]   Defendants also argue that NYGBL § 349 requires a plaintiff to allege a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67–68 n.48), and that the statute covers only conduct that is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). However, because the Court dismisses the NYGBL § 349 claim for failure to plead deceptive or fraudulent conduct, it does not reach these arguments.

As discussed in previous sections, Sergeants Benevolent fails to state a claim under the the RIDTPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis*, 2018 WL 5928143, at *7.

Defendants' motion to dismiss is, therefore, **GRANTED.**[28]

### 22.   Tennessee

Defendants argue that the TCPA is inapplicable to antitrust conduct. (Forest Br. at 68 n.49; Gen Defs. Br. at 40 n.19 (citing Tenn. Code § 47-18-104(b)).)  There appears to be a split among Tennessee's intermediate courts with respect to this question.  Some courts have held expressly that "the TCPA does not apply to anti-competitive conduct." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006).  Others have concluded that anticompetitive conduct is an "unfair" practice covered by the TCPA.  *Blake v. Abbott Labs.*, No. 03A01-9509-cv-00307, 1996 WL 134947, at *5–*7 (Tenn. Ct. App. Mar. 27, 1996).

More recent decisions in Tennessee, including *Bennett*, have reasoned that, by not incorporating the "unfair methods of competition" language from the federal FTC Act into Tennessee's "little FTC" Act, the Tennessee legislature intended to prohibit recovery for anticompetitive conduct under the TCPA.  *Bennett*, 198 S.W.3d at 754–55; *see also Sherwood v. Microsoft Corp.*, No. M2000-1850-COA-R9-CV, 2003 WL 21780975, at *31–*33 (Ten. Ct. App. July 31, 2003); *Duke v. Browning-Ferris Indus. of Tenn., Inc.*, No. W2005-146-COA-R3-CV, 2006 WL 1491547, at *8 (Tenn. Ct. App. May 31, 2006).  Instead, the legislature intended that consumers injured by such conduct would have an exclusive remedy under the state antitrust statute, the Tennessee Trade Practices Act.  *Sherwood*, 2003 WL 21780975, at *33.  *Blake*, by

---

[28]   Defendants also argue that the RIDTPA requires a showing of consumer deception, (Forest Br. at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49).  However, because the Court dismisses the RIDTPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

comparison, did not analyze the legislative history of the TCPA or its incongruities with the federal FTC Act, instead relying on the statutory mandate that it be "liberally construed." 1996 WL 134947, at *6–*7.

Like other federal courts to review this issue, I find that the more recent opinions of the Tennessee Court of Appeals, such as *Bennett* and *Sherwood*, both persuasive in their own right, as well as indicative of how the Tennessee Supreme Court would likely rule on this question. *See Relafen*, 221 F.R.D. at 284; *In re Photochromic Lens Antitrust Litig.*, No. 10-md-2173, 2011 WL 4914997, at *4 & n.14 (Oct. 14, 2011).

Therefore, Defendants' motion to dismiss the Tennessee claim under Count Three is **GRANTED**.[29]

### 23.    Utah

Defendants first argue that the Utah Consumer Sales Practices Act ("UCSPA") requires the IPP to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that a plaintiff may state a claim under the UCSPA for "unfair" acts or practices that are not inherently deceptive. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with the IPP. The UCSPA expressly allows a plaintiff to plead "unconscionable" conduct as the basis of its claim, and that this does not require a showing of fraud or deception. *See* Utah Code § 13-11-5; *see also New Motor Vehicles*, 350 F. Supp. 2d at 205; *Gallegos v. LVNV Funding LLC*, 169 F. Supp. 3d 1235, 1245 (D. Utah 2016) (considering separately claims for deceptive and unconscionable acts).

---

[29]    Defendants also argue that the TCPA requires a showing of consumer deception (Forest Br. at 67 n.47) and that the statute does not permit class actions (Forest Br. at 68 n.53; Gen. Defs. Br. 39 n.18.) However, because the Court dismisses the TCPA claim as inapplicable to antitrust conduct, it does not reach these arguments.

Defendants next argue that the UCSPA is inapplicable to antitrust conduct because anticompetitive conduct is not enumerated within the statute's list of "deceptive practices." (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19 (citing Utah Code § 13-11-4).) The IPP responds that the UCSPA contains a harmonization provision with the FTC Act, giving it a broad reach. (IPP Resp. to Gen. Defs. Br. at 26.)

First, the list of deceptive practices in the statute is not exclusive, by its own terms. Utah Code § 13-11-4(2). Second, Defendants cite to the "deceptive act or practice" provision of the UCSPA, whereas the IPP has stated that it brings all claims under Count Three pursuant to the "unfair" or "unconscionable" practices prongs of the relevant statutes. Here, the relevant provision is not section 13-11-4 but instead section 13-11-5. Finally, other federal district courts have found that allegations of anticompetitive conduct, when brought pursuant to the "unconscionability" provision of the UCSPA, can survive a motion to dismiss. *New Motor Vehicles*, 350 F. Supp. 2d at 205; *Aftermarket. Filters*, 2009 WL 3754041, at *9. Therefore, the Court declines to dismiss the UCSPA claim on this ground.

Defendants next move to dismiss the UCSPA claim because it applies only to natural persons making purchases for personal or household purposes. (Forest Br. at 68 n.51 (citing Utah Code §§ 13-11-3(2)(a), 13-11-19.)

The Court disagrees that the UCSPA clearly restricts recovery in this manner. Utah Code § 13-11-5 states, "An unconscionable act or practice by a supplier *in connection with a consumer transaction* violates this act, whether it occurs before, during, or after the transaction." *Id.* § 13-11-5 (emphasis added). Utah Code § 13-11-19, which provides a private cause of action, permits a *"consumer* who suffers loss as a result of a violation of this chapter" to recover actual damages. *Id.* § 13-11-19(2) (emphasis added). The statute defines "consumer transaction" in Section 13-

11-3(2) but does not anywhere define "consumer." That subsection reads, in relevant part: "'Consumer transaction' means a sale . . . or other . . . transfer or disposition of goods . . . , to, *or apparently to*, a person for . . . primarily personal, family, or household purposes." Utah Code § 13-11-3(2)(a) (emphasis added). "Person," moreover, expressly includes a "corporation, . . . *trust*, partnership, association, . . . or any other legal entity." *Id.* § 13-11-3(5) (emphasis added).

On its face, the definition of "consumer transaction" appears to contemplate sales of goods to—among other entities—corporations and trusts for their "personal," "family," or "household" purposes. This, of course, is possible only through an entity's members, employees or customers, which is consistent with the IPP's allegations in its Complaint.

The Court is not aware of any case law that would prohibit recovery by the IPP for failure to state a claim on the basis of these statutory provisions. The Court is aware of only one case, from the District of Utah, that purports to interpret "consumer" for purposes of subsection 13-11-19. *Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, No. 16-cv-168, 2018 WL 1183372, at *5 (D. Utah Mar. 6, 2018), *motion to certify appeal denied*, 2018 WL 2122855 (D. Utah May 8, 2018). The court in that case reasoned that the plaintiff, whose products were reviewed on Defendant's website, did not have a cause of action under the UCSPA because the plaintiff did "not allege or argue that it is a consumer harmed by Defendants' conduct." *Id.* The facts of the IP Action are clearly distinguishable, however, because Sergeants Benevolent alleges that, through its own reimbursements or payments for branded Namenda, it grossly overpaid for the product relative to its value. (CAC ¶ 213.) In addition, at least one federal court has allowed a corporation, which that a competitor engaged in false consumer advertising in the course of consumer transactions, to recover under the UCSPA. *See Derma Pen, LLC v. 4EverYoung Ltd.*,

No. 13-cv-00729, 2017 WL 2258362, at *15 (D. Utah May 22, 2017), *aff'd*, 736 F. App'x 741 (10th Cir. 2018).

In addition, unlike other consumer protection statutes reviewed by this Court, the UCSPA contemplates sales made both "to" and "apparently to" a person for personal, family, or household purposes. Utah Code § 13-11-3(2)(a). The Court is not aware of any Utah case that interprets this language, and the distinction is not clear from the legislative history. The "apparently to" language was inserted as part of S.B. 75, which expanded the definition of "consumer transaction" related to identity fraud. 2000 Utah Las Ch. 57 (West) (S.B. 75) ("'Consumer transaction' . . . *includ[es] the use or misuse of personal identifying information of any person in relation to a consumer transaction to, or apparently to*, a person for primarily personal, family, or household purposes."). Later, the identity fraud language was stripped from the definition, but the phrase "apparently to" was retained. 2004 Utah Laws Ch. 55 (H.B. 195). Construing the allegations in the Complaint in the light most favorable to the IPP, however, the Court finds that sales of Namenda were made either to or "apparently to" consumers primarily for their personal, family, or household purposes. Therefore, the Complaint states a claim.

Finally, Defendants argue that class actions are not permissible under the UCSPA. (Forest Br. at 68 n.53; Gen. Defs. Br. at 39 n.18 (citing Utah Code § 13-11-19(2)).) The UCSPA states, in relevant part: "A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages[.]" Utah Code § 13-11-19(2).

However, another paragraph of the same section permits a consumer to bring a class action for actual damages provided certain preconditions are satisfied. Utah Code § 13-11-19(4)(a); *see also Miller v. Basic Research, LLC*, 285 F.R.D. 647, 654–55 (D. Utah 2010). Specifically, class plaintiffs proceeding under the UCSPA must allege that the specific action

was declared unlawful pursuant to an administrative rule, a court order, or (in limited cases) a consent judgment before the consumer transactions on which the action was based occurred. *Id.*

Courts that have examined the class action damages bar under the UCSPA have tended to defer the question of whether an action meets the statutory prerequisites until later stages of the case. *See, e.g., In re General Motors LLC Ignition Switch Litig.*, Nos. 14-md-2543, 14-mc-2543, 2018 WL 4351892, at *46 n.63 (S.D.N.Y. Sept. 12, 2018) ("The Court defers to another day whether the provision" that limits damages under the UCSPA "applies here."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, MDL No. 2672, 2018 WL 4777134, at *28–*29 (N.D. Cal. Oct. 3, 2018) ("The Court will not make these determinations at this stage.").

The Court agrees that this issue is more appropriately handled following discovery, when the parties can address (i) if the statutory prerequisites have been met with respect to the conduct and particular transactions alleged and, (ii) in the alternative, whether the need to make this individualized determination in Utah would defeat predominance.

Defendants' motion to dismiss the UCSPA claim is **DENIED**.

### 24.   Vermont

Defendants move to dismiss the Vermont Consumer Protection Act ("VCPA") because it permits only claims brought by natural persons making purchases for personal or household purposes. (Forest Br. at 68 n.51 (citing Vt. Stat. tit 9 § 2461(b).)

This cited provision restricts recovery to a "consumer." Vt. Stat. tit. 9 § 2461(b). "Consumer," in turn, is defined as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household . . . , or a person who

purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for the use or benefit of his or her business or in connection with the operation of his or her business." Vt. Stat. tit. 9, § 2451a(a) (emphasis added).

As discussed in preceding sections, Sergeants Benevolent cannot state a claim under this statute by alleging that it reimbursed for Namenda on behalf of its insured members. *See Restasis*, 2018 WL 5928143, at *7. The language of the statute clearly restricts the term "consumer" to end users of the product.

Therefore, Defendants' motion to dismiss the VCPA claim is **GRANTED**.

### 25. West Virginia

Defendants argue for the first time in their supplemental briefing that the IPP's claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") must be dismissed because the IPP has not satisfied the statutory pre-filing notice requirement. (Gen. Defs. Suppl. Br. at 13 (citing W. Va. Code § 46A-6-106(c).) That provision reads, in relevant part: "[N]o action, counterclaim, cross-claim or third-party claim may be brought pursuant to the provisions of this section until the person has informed the seller or lessor in writing and by certified mail, return receipt requested, of the alleged violation and provided the seller or lessor twenty days from receipt of the notice of violation but ten days in the case a cause of action has already been filed to make a cure offer." W. Va. Code § 46A-6-106(c).

Unlike the similar pre-suit notice requirement under the Hawaii Antitrust Act, the state court remedy for noncompliance with the WVCCPA's pre-filing notice requirement appears to be dismissal of the claim. *Harrison v. Porsche Cars North Am., Inc.*, No. 15-0381, 2016 WL 1455864, at *3 (W. Va. Apr. 12, 2016) (unpublished opinion) (dismissing claim for failure to comply with pre-suit notice provisions).

Because the notification requirement is an express precondition to filing suit, federal district courts sitting in diversity have also granted defendants' motions to dismiss when the plaintiffs have not complied with this provision. *Waters v. Electrolux Home Prods., Inc.*, 154 F. Supp. 3d 340, 354 (N.D. W. Va. 2015) (consumer class action); *Mullins v. Ethicon, Inc.*, No. 12-cv-2952, 2017 WL 319804, at *3 (S.D. W. Va. Jan. 20, 2017) (consumer class action); *McCoy v. Southern Energy Homes, Inc.*, No. 09-cv-1271, 2012 WL 1409533, at *13 (S.D. W. Va. Apr. 23, 2012); *Stanley v. Huntington Nat. Bank*, No. 11-cv-54, 2012 WL 254135, at *7 (N.D. W.Va. Jan. 27, 2012) (individual action). Other courts have dismissed the claim without prejudice. *Processed Egg Prods.*, 851 F. Supp. 2d at 911.

To this Court's knowledge, no federal district court has examined the cure offer requirement in light of the Supreme Court's holding in *Shady Grove*. Certainly, the pre-suit cure offer requirement is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23," because it requires certain prerequisites to filing suit that Rule 23 does not. *Restasis*, 2018 WL 5928143, at *6. It therefore conflicts with the federal rule.

The question is therefore whether the cure offer requirement is "so bound up with the state-created right or remedy that it define the scope of that substantive right or remedy." *Id.* (citing *Shady Grove*, 559 U.S. at 419–20 (Stevens, J., concurring)).

This Court finds that it is. Under the statute, the cure offer, where accepted, tolls the applicable statute of limitations "for the period the effectuation of the cure offer is being performed." W. Va. Code § 46A-6-106(e). Moreover, where the accepted cure offer is performed, it constitutes a complete defense to the action. *Id.* § 46A-6-106(h). And, if a defendant accepts and performs a cure offer, and a plaintiff brings suit anyway, the defendant is

entitled to attorneys' fees and costs for defending the action. *Id.* In other words, the cure offer creates substantive defenses and additional remedies under state law.

For this reason, the Court **GRANTS** Defendants' motion to dismiss the West Virginia claim under Count Three.[30]

### E.    In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States

In sum, the Court finds that the IPP Complaint adequately pleads facts supporting its allegations of unfair trade practices against all Defendants. The Court also finds that, as a matter of law, the IPP may pursue its Count Three claims for consumer protection law violations under the laws of all states **except** Arizona (which claim was withdrawn by the IPP), the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia. Those claim are hereby **DISMISSED**.

## VIII.   Count Four:  Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants

Finally, the IPP Complaint alleges 44 state law claims grouped under the heading "Count Four:  Unjust Enrichment." (CAC at 56.) The IPP asserts this cause of action against all Defendants:  Forest, Actavis, Merz, and the Generic Defendants. (*Id.*)

This cause of action alleges that "Defendants have benefited from the overcharges" on Namenda IR and XR; that these benefits were "made possible by the unlawful and inequitable acts alleged" in the Complaint; that "Defendants' financial benefits are traceable to Plaintiff and End-Payor Class members' overpayments"; and that "Plaintiff and End-Payor Class members

---

[30]    Defendants also argue that the WVCCPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47); requires plaintiffs to plead a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67–68 n.48); and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19).  However, because the Court dismisses the WVCCPA claim for failure to serve a cure offer on the Defendants prior to initiating the lawsuit, it does not reach these arguments.

have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges." (CAC ¶¶ 219–21.) Together, these allegations form the factual nucleus on which the 44 state unjust enrichment claims are based.

At the outset, the IPP notes that, "[t]o the extent required, this claim is pled in the alternative to other claims in this Complaint." (CAC ¶ 218.) The IPP maintains that "unjust enrichment is a separate cause of action" from both state antitrust and consumer protection laws, "which plaintiffs are allowed to plead in the alternative under Federal Rule of Civil Procedure 8—regardless of consistency and whether based on legal of [*sic*] equitable grounds." (IPP Resp. to Gen. Defs. Br. at 41). The IPP also alleges that it has no adequately remedy at law. (CAC ¶ 230.)

As they have done with respect to Counts One, Two, and Three of the IPP Complaint, Defendants first make several broad-based arguments aimed at dismissing Count Four of the Complaint as a whole, including:

- The claims are "likely" time-barred under the applicable statute of limitations, (Forest Br. at 65 n.42);

- The IPP has failed to satisfy the Fed. R. Civ. P. 8 pleading standard under *Twombly* and *Iqbal*, (Gen. Defs. Br. at 42);

- The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Forest Br. at App'x 4);

- The IPP has not plausibly alleged that it conferred any benefit on the Generic Defendants, (Gen. Defs. Br. at 46);

- The IPP may not skirt the strictures of *Illinois Brick* by bringing indirect purchaser claims as equitable actions for unjust enrichment, (Gen. Defs. Br. at 34–36 nn.12, 14; Forest Br. App'x 4);  and

- Equitable claims cannot be used as a backstop where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws (Gen Defs. Br. at 43).

This Court has already addressed the first three of these arguments. For the same reasons discussed in preceding sections, the Court therefore denies Defendants' motions to dismiss on those grounds.

The Court addresses the remaining three arguments—related to conferral of a benefit, *Illinois Brick*, and equitable claims—in its discussion below.

As with Count Three, Defendants also make several separate, state-specific arguments aimed at dismissing the individual state law claims under Count Four, *viz.*:

- Certain states have no independent cause of action for unjust enrichment, (Gen. Defs. Br. at 44; Forest Br. at 70 n.55);

- Some states require the plaintiff to allege that the defendant received a direct benefit from it, (Gen. Defs. Br. at 44–45; Forest Br. at 77 n.57); and

- A subset of states require the plaintiff to allege privity with the defendant, (Gen. Defs. Br. at 47–48), or "something approaching privity," (Forest Br. at 70).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Four. The table in Appendix 4 of Actavis, Forest, and Merz's original brief provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 4.)

Again, as this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then proceeds through each state claim, determining whether the relevant arguments raised warrant dismissal.

## A.   Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State

Federal district courts generally recognize that "[t]he elements of unjust enrichment are similar in every state." *Lazarek v. Ambit Energy Holdings, LLC*, No. 15-cv-6361, 2017 WL 4344557, at *6 (W.D.N.Y. Sept. 29, 2017) (citing *Credit Default Swaps*, 2014 WL 4379112, at

*18).  Both *Lazarek* and *Credit Default Swaps* base their reasoning in large part on a law review article, which compared the elements of unjust enrichment in each state and, finding them to be similar, proposed that these state laws could be applied to antitrust claims.  Daniel R. Karon, *Undoing the Otherwise Perfect Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409–10 & n.79 (2005).

That article summarized the elements of unjust enrichment as follows: "(1) [plaintiff] conferred a benefit upon the defendant, who had knowledge of the benefit; (2) [t]he defendant accepted and retained the conferred benefit; and (3) [u]nder the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it."  *Id.* at 409.

Notably, the IPP adopts this same formulation in its brief.  (IPP Resp. to Gen. Defs. Br. at 38.)

The Generic Defendants move to dismiss all of Count Four with respect to themselves — but not with respect to Actavis, Forest, and Merz—because "Plaintiff's Complaint does not plausibly allege that Plaintiff conferred even an indirect economic benefit . . . on the Generic Defendants."  (Gen. Defs. Br. at 46; Gen. Defs. Suppl. Br. at 17–18.)  The IPP responds that the Generic Defendants received a benefit "in the nature of profits resulting from unlawful overcharges."  (IPP Resp. to Gen. Defs. Br. at 39.)

Even by the IPP's own logic, however, the unlawful overcharges did not unjustly enrich the Generic Defendants.  If the benefit alleged is indeed "profits resulting from unlawful overcharges"—profits which could have come only from sales of branded Namenda IR and Namenda XR—then the CAC alleges no facts consistent with the claim that any benefit flowed from the IPP or the Class to the Generic Defendants.

In other words, nowhere has the IPP alleged that it or other members of the Class paid increased prices for *generic* versions of Namenda IR. Rather, the gravamen of the IPP Complaint is that it and other Class members paid increased prices for *branded* Namenda IR while generic Namenda IR was kept off of the market. All of these overcharge benefits flowed to Forest.[31]

Indeed, according to the CAC, the only benefits conferred upon the Generic Defendants came from Forest and Merz—not from the IPP or class members—and came in the form of: (i) cash payments for avoided litigation costs; (ii) early entry licenses; and (iii) an acceleration clause that guaranteed entry no later than other generic manufacturers. The IPP has wholly failed to allege a connection between these benefits, which again are the only benefits to Generic Defendants mentioned in the CAC, and the loss suffered by the IPP and other Class members. (*See* CAC ¶ 221 ("Plaintiff and [IPP] Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, *to the economic detriment of Plaintiff and the End-Payor Class members.*").)[32]

The Court therefore **DISMISSES** all 44 state law claims under Count Four with respect to the Generic Defendants.

---

[31]    Again, most likely due to their decision to retain the same counsel and to submit a brief jointly with Forest, Actavis and Merz have not challenged the unjust enrichment claims under Count Four on the basis that no benefit from the overcharges on Namenda flowed to them, so the Court will not raise and address this argument *sua sponte*.

[32]    The *Restatement (Third) of Restitution and Unjust Enrichment* states, "While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." *Restatement (Third) of Restitution and Unjust Enrichment* § 1 (2011). The IPP presumably could have chosen to rely upon this theory to prosecute its claims of unjust enrichment. However, the IPP has also stated expressly in its Complaint and in briefing that it conferred a benefit on Generic Defendants in the form of overcharges, so the Court does not reach this question.

**B.    The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington)**

The remaining Defendants next move to dismiss the claims for unjust enrichment under the laws of 20 states because allowing the IPP to pursue such claims would constitute an impermissible "end run" around the *Illinois Brick* prohibition on indirect purchaser actions. (Gen. Defs. Br. at 34–36 nn.12, 14; Forest Br. App'x 4.)[33]

As an initial matter, these 20 states include Puerto Rico and Utah. As this Court has already determined when addressing the arguments brought against Count One, Puerto Rico and Utah allow indirect purchaser claims. Accordingly, the Court **DENIES** Defendants' motion to dismiss the Puerto Rico and Utah unjust enrichment claims.

Whether the remaining 18 state claims can be dismissed based on *Illinois Brick* depends on whether the claims stand on their own or simply reflect an alternative election of equitable remedies by the IPP. Courts in this circuit have observed that "unjust enrichment takes at least two forms:" autonomous and parasitic. *In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011). "Parasitic claims are where the unjust enrichment is based upon a predicate wrong, such as a tort, breach of contract or other wrongful conduct such as an antitrust violation." *Id.* (internal quotation omitted). "Conversely, unjust enrichment may provide an independent ground for restitution, and this is known as autonomous restitution." *Id.* (internal quotation omitted).

Logically, "Autonomous claims in an area regulated by an independent body of law are more problematic than parasitic claims because the premise for such a claim must be that, even if the defendants' conduct is blameless under the substantive requirements of federal and state

---

[33]    Because Actavis, Forest, and Merz adopt the Generic Defendants' briefing in whole, this Court continues to refer to Generic Defendants' briefs, even though these defendants were dismissed from Count Four.

antitrust statutes and state consumer protection statutes, the plaintiffs nevertheless can still obtain restitution." *Id.* at 411–12. This becomes even trickier when the state legislature has expressed a policy preference restricting certain groups of plaintiffs from recovering.

The majority of courts in this circuit have followed the rule that indirect purchasers may not allege autonomous unjust enrichment claims if that state follows *Illinois Brick*. "It is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick.*" *Dig. Music*, 812 F. Supp. 2d at 412; *accord DDAVP*, 903 F. Supp. 2d at 232; *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) ("Certainly, if such plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate.").

This Court agrees with the logic of those decisions, which is respectful of states' own policy determinations about who may recover for anticompetitive conduct. It therefore **DISMISSES** the following ten autonomous unjust enrichment claims brought in states that follow the rule of *Illinois Brick*: Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington.

Defendants seek dismissal of claims in an additional eight states that follow *Illinois Brick* but for which the Complaint pleads a viable antitrust or consumer protection claim: Alabama, Idaho, Massachusetts, Minnesota, Missouri, New York, Rhode Island, and South Dakota. (Gen. Defs. Br. at 34–36.) By definition, these are parasitic claims rather than autonomous claims.

"As to parasitic claims premised on a violation of state law, these claims boil down to an election of remedies." *Dig. Music*, 812 F. Supp. 2d at 413. This turns on a case-by-case examination of whether each state's antitrust or consumer protection statute has "override[n]" or

"limit[ed] . . . the scope of restitutionary relief" that would normally be available to a plaintiff at equity. *Id.*

No party has briefed the extent to which each of these eight states' antitrust and consumer protection laws limits a plaintiff's ability to recover in equity. Absent such argument or briefing, this Court will not undertake an independent assessment of whether and to what extent these each of these statutes restricts equitable recovery.

Therefore, Defendants' motion to dismiss these eight parasitic unjust enrichment claims is **DENIED**, without prejudice to consideration of the issue at a later date on proper briefing.

### C.    Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming)

Defendants also argue that, in an antitrust case, claims for unjust enrichment cannot lie where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws. (Gen Defs. Br. at 43.) This is true regardless of whether those states follow *Illinois Brick.* On these grounds, they move to dismiss any autonomous unjust enrichment claims remaining, which would be those under the laws of Arkansas and Wyoming.

The IPP responds that recovery under a theory of autonomous enrichment is not contingent on statutory claims. (IPP Resp. to Gen. Defs. Br. at 39–40.)

The Court is aware of some cases that support Defendants' argument. For example, in *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, 737 F. Supp. 2d 380, 426 (E.D. Pa. 2010), the court applied the respect-for-state-policies rationale undergirding *Digital Music* and held that it would dismiss all autonomous unjust enrichment claims "unless plaintiffs have presented convincing caselaw establishing that a state recognizes unjust enrichment as an autonomous cause of action." *Id.* at 426; *accord Niaspan*, 42 F. Supp. 3d at 763.

112

This Court finds, however, that such a determination inappropriately shifts the burden at the motion to dismiss stage to the nonmoving party—particularly in light of the fact that unjust enrichment claims can morph from parasitic to autonomous once a court determines that the predicate statutory claims do not survive. Rather than asking the plaintiff to shoulder the burden of these contingencies, the Court finds it is more appropriate at this stage that the parties moving to dismiss bear the burden of arguing that the state does not recognize an autonomous cause of action for unjust enrichment, as Defendants do here with respect to California, Illinois, and Mississippi. (*See* Forest Br. App'x 4.)

In the alternative, the party moving to dismiss may argue that the policy reasons barring recovery under the predicate statues are strong enough to require dismissing any autonomous unjust enrichment claim in that state. For example, at least one district court has held that it would "decline to allow autonomous restitution where recovery under state antitrust and consumer protection statutes is specifically prohibited." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 n.13 (E.D. Pa. 2010). The Court agrees that such an approach accords respect to states' own substantive policy determinations.

Here, however, the Court has not had occasion to determine whether recovery is "strictly prohibited" under the antitrust and consumer protection laws of Arkansas and Wyoming. This is because (i) the IPP did not allege antitrust or consumer protection claims in those states, and (ii) Defendants did not independently raise reasons why the IPP would be prohibited from recovering under the antitrust laws of Arkansas and Wyoming, beyond the fact that the IPP simply did not allege those claims in the first place. *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D. Cal. 2009) (defendants briefed policy reasons why

plaintiffs could not recover under the antitrust laws and, therefore, by extension, the unjust enrichment laws, of Arkansas, Virginia, Montana, and Puerto Rico).

In sum, this Court agrees with the reasoning of *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000). That case reasoned that a federal policy requiring dismissal of all autonomous unjust enrichment claims in an antitrust case would both "fail[] to read Plaintiffs' complaint in the light most favorable to Plaintiffs and confuse[] Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws."

Therefore, the Court **DENIES** Defendants' motion to dismiss the claims under Arkansas and Wyoming law, without prejudice to consideration of the issue at a later date on proper briefing.

**D.     The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others**

The Court now turns to Defendants' state-specific arguments for dismissing the IPP's unjust enrichment claims under Count Four. (Gen. Defs. Br. at 44–50.)

**1.     Alabama**

Defendants argue that the IPP cannot allege a claim for unjust enrichment in Alabama because to do so it must allege that it conferred a direct benefit on the Defendants. (Forest Br. at 70 n.57 (citing *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.*, No. 09-cv-192, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011); Gen. Defs. Br. at 45 n.24 (same).)

The IPP responds that unjust enrichment does not require a direct benefit because it does not require privity. (IPP Resp. to Gen. Defs. Br. at 43.) The IPP also cites several federal

district court cases that denied motions to dismiss based on the "direct benefit" requirement, none of which discuss that requirement in the context of Alabama law.  (*Id.*)

"The essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Const. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (emphasis in original).  The IPP Complaint plainly alleges that Defendants "hold" money, in the form of overcharges on Namenda IR and Namenda XR that "belongs to" the IPP or to other members of the Class.  It is a foundational principle of antitrust law that overcharges are passed along the distribution chain to consumers.

The case cited by Defendants is distinguishable.  In *Danny Lynn Electric & Plumbing*, 2011 WL 2893629, at *6, plaintiffs' payments of inflated fees to a company did not directly benefit individual employees of the company, whose annual bonuses were tied to that company's profits. *Id.*  It could not be said, in other words, that the individuals "held" money, through their bonuses, that belonged to the fee payers. *Id.*

Defendants' motion to dismiss this claim is **DENIED**.

### 2.    Arizona

Defendants argue that the claim for unjust enrichment under Arizona law should be dismissed because the IPP does not allege that it "directly" benefitted the Defendants.  (Gen. Defs. Br. at 45 n.24 (citing *In re Refrigerant Compressors Antitrust Litig.*, No. 09-MD-02042, 2013 WL 1431756, at *26 (E.D. Mich. Apr. 9, 2013)).)

Arizona law, however, does not appear to require that the plaintiff confer any benefit directly on the defendant. *See Murdock-Bryant Const., Inc. v. Pearson*, 703 P.2d 1197, 1202–03 (Ariz. 1985).  In that case, the court found that the excavation and site preparation subcontractor

115

had conferred a benefit on a joint venture partner, even though that partner had signed the JV agreement with the prime contractor after the excavation and site preparation subcontractor's work had already been performed. *Id.*

Other federal district courts have also rejected the so-called "direct benefit" argument to hold that indirect purchasers may state a claim for unjust enrichment under Arizona law. *See In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1175–76 (N.D. Cal. 2015). Those courts reasoned, in part, that unjust enrichment in Arizona is a "flexible, equitable remedy," and "[a] benefit may be any type of advantage, including that which saves the recipient from any loss or expense." *Id.* The *Lidoderm* court found, accordingly, that indirect purchasers still stated a claim even though they had dealt directly with intermediaries in the chain of distribution, rather than defendants. *Id.*; *see also Flonase*, 692 F. Supp. 2d at 543.

Defendants' motion to dismiss this claim is **DENIED**.

### 3.    California

Defendants argue that California has no independent cause of action for unjust enrichment. (Gen. Defs. Br. at 44.)

While some California courts have held that there is no independent recovery in unjust enrichment, others have simply restyled a claim for unjust enrichment as a claim sounding in quasi-contract, and still other courts have treated these claims in the ordinary course, enumerating its elements. 55 *Cal. Jur. 3d Restitution* § 2 (noting inconsistent treatment of unjust enrichment claims and collecting cases). For example, the Ninth Circuit recently held, in the same opinion, that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution,'" but later held that "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015).

Because this Court apparently may construe the claim as one for quasi-contract, the Court **DENIES** Defendants' motion to dismiss.

### 4.    District of Columbia

Defendants argue that the claim for unjust enrichment under the District of Columbia's law should be dismissed for the IPP's failure to allege that it conferred a direct benefit on the Defendants. (Gen. Defs. Br. at 45 n.24 (citing *Refrigerant Compressors*, 2013 WL 1431756, at *26).)

The Court disagrees. *Refrigerant Compressors* relied on cases that did not analyze D.C. law. *See also Lidoderm*, 103 F. Supp. 3d at 1176 (finding Defendants' citation to *Refrigerant Compressors* "not helpful"). Defendants have cited no other case law requiring D.C. law to be so construed, and the Court is aware of none. *See id.* ("I find that in absence of cases arising under District of Columbia law that support defendants' proposed narrow definition of direct benefit, the claims under District of Columbia law can proceed.").

Defendants' motion to dismiss this claim is **DENIED**.

### 5.    Florida

Defendants also that the claim for unjust enrichment under Florida law should be dismissed because the IPP must allege that it conferred a direct benefit on the Defendants. (Gen. Defs. Br. at 45, n.24 (citing *Century Senior Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011).)

The Court agrees with the district court's thoughtful analysis in *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 928–29 (E.D. Pa. 2012), which upheld a claim for unjust enrichment under Florida law against the same challenge. That case surveyed several Florida cases and determined that while some Florida courts had not allowed plaintiffs to rely on the doctrine of unjust enrichment absent a direct benefit, other courts had allowed these claims to

proceed. *Id.* For example, on a motion to dismiss, an appellate court overturned a trial court's dismissal of a medical services provider's unjust enrichment claim, which was based on uncompensated treatment of defendant HMO's members. *Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1199 (Fla. Dist. Ct. App. 2006). Florida courts have also confirmed that recovery under quasi-contract is available "even where the parties had no dealings at all with each other." *Commerce P'ship 8098 L.P. v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997).

Therefore, at this stage, the Court **DENIES** Defendants' motion to dismiss.

### 6.   Idaho

Defendants move to dismiss the claim for unjust enrichment under Idaho law because the IPP fails to allege privity (or "something approaching privity") and that the IPP conferred a direct benefit on Defendants. (Forest Br. at 70 nn.56–57; Gen. Defs. Br. at 45 n.24.) Defendants cite *Beco Const. Co., Inc. v. Bannock Paving Co., Inc.*, 797 P.2d 863, 867 (Ida. 1990).

The Court agrees and dismisses this claim as to all Defendants. First, the *Beco Construction* court rejected the plaintiff's contention that "the equitable principle of unjust enrichment does not require the plaintiff and the defendant to have any other relationship beyond the nexus that one party may not unjustly enrich itself at the expense of the other." *Id.*

Second, other Idaho courts have similarly restricted recovery in the absence of a direct relationship. *See, e.g.*, *Stevenson v. Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 842–44 (Ida. 2012) ("The Stevensons' argument, reduced to its essence, is that because they conferred a benefit upon Jefferson, and Jefferson conferred a benefit upon Windermere, they can cut out the middleman and directly recover from Windermere for unjust enrichment. . . . We are unwilling to expand the doctrine of unjust enrichment to the extent advocated by the

Stevensons."); *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 336 P.3d 802, 806 (Ida. 2014) (summarizing cases).

Defendants' motion is **GRANTED**.

### 7.   Illinois

Defendants argue that Illinois has no independent cause of action for unjust enrichment and that, in the alternative, the IPP has failed to allege privity with Defendants or conferral of a direct benefit on Defendants. (Gen. Defs. Br. at 44, 45 nn.22, 24.)   Defendants also argue that the IPP has failed to allege a duty owed to it by Defendants, which is required under Illinois law for recovery in unjust enrichment. (Gen. Defs. Br. at 48 n.26.)

First, Illinois appears to recognize an independent cause of action for unjust enrichment. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). However, it is also true that, recently, intermediate appellate courts have called this into question. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (noting apparent disagreement in Illinois law). This Court follows the controlling view of the Illinois Supreme Court and declines to dismiss the IPP's unjust enrichment claim under Illinois law.

A plaintiff in Illinois is likewise not required to allege privity or allege a direct benefit. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (listing *HPI Health Care* as a case that "concluded that the benefit received by a defendant need not be direct to establish an unjust enrichment claim").

Defendants cite *Cleary*, 656 F.3d at 517, to support their contention that defendants must receive a benefit from plaintiff in a "direct way." (Gen. Defs. Br. at 45.) However, *Cleary* was

decided on the basis that the plaintiffs had not alleged *any* detriment that would make the defendants' retention of profits from cigarette sales unjust, since plaintiffs had not proven that they would have refrained from purchasing defendants' cigarettes even defendants had disclosed their true nature and risk. 656 F.3d at 519. Because the IPP has alleged a detriment here, in the form of overcharges, *Cleary* is inapposite.

Finally, Defendants cite *Martis v. Grinnell Mut. Reins. Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009), for the proposition that the IPP must allege a duty owed to it by Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 48 n.26.) Contrary to Defendants' argument, however, *Martis* dismissed plaintiff's claim because plaintiff's claim under the Illinois Consumer Fraud Act ("ICFA") had been dismissed; therefore, there was no underlying fraud count upon which the plaintiff could establish a duty in unjust enrichment. 905 N.E.2d at 928. Here, by contrast, the Court has found that the IPP has stated a claim under the ICFA.

Therefore, Defendants' motion to dismiss the IPP's claim for unjust enrichment under Illinois law is **DENIED**.

### 8. Kansas

Defendants argue that the IPP fails to state a claim for unjust enrichment under Kansas law because it does not allege either (i) that the IPP and the Defendants are in privity or (ii) that the IPP conferred a direct benefit on Defendants. (Gen. Defs. Br. at 44, 45 nn.22, 24.)

Kansas does not require privity. "Our past cases establish that recovery under quasi-contract or unjust enrichment is not prohibited simply because the subcontractor and the owner of the property are not in privity. This conclusion is consistent with the theory of quasi-contract and unjust enrichment, which does not depend on privity." *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).

120

Other district courts have been similarly unable to find any authority for the proposition that plaintiffs in Kansas are required to allege a "direct benefit." *See Processed Egg Prods.*, 851 F. Supp. 2d at 930 (E.D. Pa. 2012); *Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1090 (S.D. Cal. 2017); *Lidoderm*, 103 F. Supp. 3d at 1177–78; *Auto. Parts Antitrust Litig. (Instrument Panel Clusters)*, 2014 WL 2993753, at *30. In particular, this Court adopts the thoughtful analysis in *Processed Egg Prods.*, 851 F. Supp. 2d at 929–30, which summarized several Kansas cases that permitted plaintiffs to maintain unjust enrichment claims absent "direct" benefits.

Accordingly, Defendants' motion to dismiss this claim is **DENIED**.

### 9.   Maine

Defendants argue that to plead a claim for unjust enrichment under Maine law, the IPP must allege that it conferred a benefit directly on the Defendants. (Gen. Defs. Br. at 45 n.24.)

The Defendants again cite *Refrigerant Compressors*, 2013 WL 1431756, at *25, which dismissed a similar claim for unjust enrichment, albeit without any analysis of Maine's laws.

Beyond *Refrigerant Compressors*, the Court is aware of one trial-level case from Maine purporting to condition recovery on a direct benefit. *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001). In that case, however, a prospective buyer claimed unjust enrichment against the owner of a piece of property, on the theory that the buyer's negotiations with a third-party developer had led to the owner's repudiating their original contract and entering into a higher-priced land sale contract with that developer. *Id.* The court there found that the prospective buyer had failed to allege that *any* cognizable benefit was conferred. *Id.*

At present, and in the absence of any additional briefing by Defendants on this issue, neither *Refrigerant Compressors* nor *Rivers* convinces the Court that Maine's unjust enrichment law requires a plaintiff to allege a direct benefit in order for its claim to survive a motion to

dismiss. *See also TFT-LCD (Flat Panel)*, 2011 WL 4501223, at *11 (denying motion to dismiss claim under Maine's unjust enrichment law for failure to allege direct benefit).

Defendants' motion is **DENIED.**

### 10.    Massachusetts

Defendants argue that Massachusetts law similarly requires that the IPP confer a direct benefit on Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which does not contain any analysis of Massachusetts law and does not cite to any cases containing analysis of Massachusetts law. 2013 WL 1431756, at *25.

Moreover, Massachusetts law does not appear to include such a requirement. *See, e.g., Meshna v. Scrivanos*, No. CIV.A. 2011 01849 BLS 1, 2012 WL 414476, at *4 (Mass. Super. Ct. Dec. 21, 2011) (plaintiff employees successfully pleaded unjust enrichment claim against restaurant owner on the basis that owner was unjustly enriched by tips that customers left for employees). *See also Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1091 (S.D. Cal. 2017) (noting absence of direct benefit rule in Massachusetts cases).

Defendants' motion to dismiss is **DENIED**.

### 11.    Michigan

Defendants argue that Michigan law also requires the IPP to allege that it conferred a direct benefit on Defendants, again citing *Refrigerant Compressors*. (Gen. Defs. Br. at 45 n.24 (citing 2013 WL 1431756, at *25).) The IPP responds that other courts have sustained claims for unjust enrichment under Michigan law by indirect purchaser classes. (IPP Resp. to Gen. Defs. Br. at 43 (citing *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 706 (E.D. Pa. 2014).)

This Court is persuaded that, under Michigan law—which strictly grounds a claim for unjust enrichment in quasi-contract—the relationship between the IPP and the Defendants is too attenuated to support a claim of unjust enrichment. *See A & M Supply Co. v. Microsoft Corp.* ("*A & M II*"), No. 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008) (requiring direct benefit). In *A & M I*, the Court of Appeals vacated and remanded the trial court's certification of a class of "individuals who purchased, leased, or licensed a copy of Windows 95 or Windows 98 from an entity other than Microsoft." *A & M Supply Co. v. Microsoft Corp.* ("*A & M I*"), 654 N.W.2d 572, 575 (Mich. Ct. App. 2002). In a later proceeding, *A & M II*, the Court of Appeals dismissed the unjust enrichment claims by indirect purchasers against Microsoft because there was no "direct contact" between the parties, nor any showing that "Microsoft received any direct payment or other benefit from those purchasers." 2008 WL 540883, at *2.

Although there may be limited exceptions to the "direct benefit" requirement where the plaintiff and defendant are directly in contact, *see Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 504 N.W.2d 635, 641 (Mich. 1993), the IPP has not alleged that either it or any Class members had direct contact with Actavis, Forest, or Merz. *See also Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 920 (Mich. Ct. App. 1980) ("The process of imposing a 'contract-in-law' to prevent unjust enrichment is an activity which courts should approach with some caution.").

Therefore, Defendant's motion to dismiss this claim is **GRANTED**.

### 12.   Mississippi

Defendants cite *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007), for the proposition that unjust enrichment is not a separate cause of action in Mississippi.

After reading *Cole* and the case on which it relies, *Coleman v. Conseco, Inc.*, 238 F. Supp. 2d 804, 813 (S.D. Miss. 2002), the Court is not convinced that Mississippi courts have barred unjust enrichment as a separate cause of action. Although Mississippi courts discuss unjust enrichment as a "theory of recovery," this is not incompatible with its being considered a cause of action. *See Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987) ("The doctrine of unjust enrichment or recovery in quasi-contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another[.]") (citing *Hans v. Hans*, 482 So.2d 1117, 1122 (Miss. 1986)).

Other federal courts have agreed. "Contrary to *Coleman* and its federal progeny . . . there is a substantial body of Mississippi case law that treats unjust enrichment as a separate cause of action." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 193 (D. Me. 2010).

Defendants' motion to dismiss this claim is **DENIED**.

### 13.    New York

Defendants argue that New York requires both privity and conferral of a direct benefit in order allege a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24; *id.* at 48; Forest Br. at 70 nn.56–57.) The privity argument is a non-starter. "[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment[.]" *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215, 863 N.E.2d 1012, 1018 (2007).

The New York Court of Appeals has announced a rule that the relationship between the parties may not be "too attenuated" in a claim for unjust enrichment. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 216, 863 N.E.2d 1012, 1018 (2007). In *Sperry*, for example, the Court of Appeals dismissed a claim by end purchasers of rubber products against manufacturers of processing

chemicals that had allegedly been sold to the rubber product manufacturers at a markup. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 209, 863 N.E.2d 1012, 1013–14 (2007).

Later, the New York Court of Appeals dismissed on the same grounds a claim for unjust enrichment brought by a real estate broker, which had conducted due diligence on certain properties, against a rival brokerage firm, which had purchased those due diligence reports from the developer and eventually won the commission to sell the properties in the original broker's stead. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 519, 973 N.E.2d 743, 748 (2012). Over a dissent, the Court of Appeals held that "regardless of whether [the defendant rival firm] was a good-faith purchaser of the due diligence materials, the complaint fails to present a sufficient connection between [plaintiff and defendant] to form the basis of an unjust enrichment claim." *Id.*

However, wrongdoing can create the requisite relationship between benefactor and beneficiary. The First Department has synthesized the rule as follows: "a plaintiff must plead some relationship between the parties that could have caused reliance or inducement and . . . the relationship cannot be too attenuated." *Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1, 4, 982 N.Y.S.2d 98, 100–01 (2014); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

In *Philips International Investments*, for example, the First Department denied a motion to dismiss an unjust enrichment claim against a group of limited partnerships that had swooped in to purchase viable properties in a real estate transaction—cutting plaintiff, who had done much of the development work, out of the deal—because they "knew of the alleged wrong being done to plaintiff and of their essential role in the allegedly wrongful scheme." *Philips Int'l Investments, LLC v. Pektor*, 117 A.D.3d 1, 8, 982 N.Y.S.2d 98, 103 (2014).

At this time, the Court cannot hold that the relationship between the IPP and the Defendants is too attenuated as matter of law, since the IPP has plausibly pled that Defendants derived an economic benefit from charging monopolistic and artificially inflated prices for Namenda, a direct and proximate result of Defendants' unlawful practices. *Cf. Duran v. Bautista*, 2015 N.Y. Slip Op. 50507(U), 19, 2015 WL 1567020, at *18 (N.Y. Sup. 2015) ("It is against equity and good conscience to permit [the defendant] to retain the proceeds . . . if the Class is able to prove the alleged fraudulent scheme.")

Other district courts examining this requirement with respect to indirect purchaser class actions are in accord. *See Processed Egg Prods.*, 851 F. Supp. 2d at 930; *DDAVP*, 903 F.Supp.2d at 234; *Suboxone*, 64 F. Supp. 3d at 709–10.

The Court therefore **DENIES** Defendants' motion to dismiss the claim for unjust enrichment under New York law, without prejudice to renewal at a later date.

### 14.   North Carolina

Defendants cite *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989), for the proposition that a plaintiff must allege that it conferred a direct benefit on a defendant. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.)  The *Effler* court affirmed the trial court's entry of summary judgment in favor of defendant because the record did "not satisfy plaintiff's burden of showing that she conferred a benefit *directly* on defendant." *Effler*, 380 S.E.2d at 152 (emphasis added).

The North Carolina Supreme Court has defined the elements of the claim more broadly, without reference to a "direct" benefit: "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party.  The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a

126

manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable." *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988).

Moreover, "cases decided after *Effler* have held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable*, No. 16 CVS 4393, 2017 WL 536361, at *5 (N.C. Super. Feb. 7, 2017) (collecting cases); *see also Bandy v. Gibson*, No. 16 CVS 456, 2017 WL 3207068, at *5 (N.C. Super. July 26, 2017) (same).

Generally, federal district courts that have recognized this split in North Carolina authority have not dismissed unjust enrichment claims on pre-answer motions. *Lidoderm*, 103 F. Supp. 3d at 1178 (citing other federal cases). In particular, the court in *Processed Egg Prods.*, 851 F. Supp. 2d at 931–32, found that the more expansive language of *Booe*, from the North Carolina Supreme Court, was more persuasive than the language of *Effler*, from the intermediate appellate court. *Id.* This Court agrees that, given both the divide in authority and the clear language of *Booe*, a case from the North Carolina Supreme Court, it cannot dismiss the claim on these grounds.

Therefore, the Court **DENIES** Defendants' motion to dismiss the North Carolina claim for unjust enrichment.

### 15. North Dakota

Defendants argue that unjust enrichment under North Dakota law requires the plaintiff to have conferred a direct benefit on the defendant, citing *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 680 N.W.2d 634, 642 (N.D. 2004) and *Relafen*, 225 F.R.D. at 28. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.)

In *Ritter*, defendant and plaintiffs worked on the same construction project; the defendant argued that the plaintiffs, which had not chosen to contract with it directly at the outset of the

127

project, could not later sue it for unjust enrichment. 680 N.W.2d at 642 (citing *Apache Corp. v. MDU Res. Grp., Inc.*, 603 N.W.2d 891 (N.D. 1999)).

*Apache*, however, does not stand for the proposition that, in North Dakota, unjust enrichment claims universally require a direct benefit. Rather, that case holds that, when parties involved in a single project do not all contract with one another, "[t]he separate contracts convey clearly the limited kinds of liability and exposure each party has in mind. . . . Respect for that contract arrangement requires the courts to refuse restitution between the parties who did not contract with each other." *Apache*, 603 N.W.2d at 895 (citing Dan B. Dobbs, *Law of Remedies*, § 4.1(2), p. 372 (2d ed. 1993)). *Accord In re Auto. Parts (Fuel Senders) Antitrust Litig.*, 29 F. Supp. 3d 982, 1025 (E.D. Mich. 2014) (declining to dismiss indirect purchasers' unjust enrichment claim under North Dakota law on the basis of *Apache*); *In re Auto. Parts (Bearings) Antitrust Litig.*, 50 F. Supp. 3d 836, 864–65 (E.D. Mich. 2014).

Moreover, North Dakota courts have upheld unjust enrichment claims even where no direct benefit was alleged. *See, e.g., Opp v. Matzke*, 559 N.W.2d 837, 840 (N.D. 1997) (well driller had stated claim for unjust enrichment against landowner even though she had not asked him to drill the well and did not reside on the property; since defendant "provide[d] her family a place to live on the property," she benefitted from the well).

Defendants' motion to dismiss the North Dakota claim is **DENIED**.

### 16.   Rhode Island

Defendants argue that Rhode Island law requires the IPP to allege that it conferred a direct benefit on Defendants. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which dismissed the Rhode Island unjust enrichment claim without any analysis of Rhode Island law. 2013 WL 1431756, at *25.

128

In Rhode Island, there are three elements of unjust enrichment. *R & B Elec. Co. v. Amco Const. Co.*, 471 A.2d 1351, 1355 (R.I. 1984). "First, a benefit must be conferred upon the defendant by the plaintiff. Second, there must be an appreciation by the defendant of such benefit. Finally, there must be an acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without paying the value thereof." *Id.* at 1356. None of these elements requires conferral of a direct benefit.

Moreover, "[t]he most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." *Id.* Because the Rhode Island courts have not stated clearly that an action for unjust enrichment requires that the plaintiff have conferred a benefit on the defendant directly, and because Defendants have cited no case that so holds, the Court denies Defendants' motion to dismiss this claim on such grounds.

However, because the conduct underlying this claim is based on antitrust violations, and because Rhode Island did not recognize a cause of action for indirect purchasers under its antitrust statute until July 15, 2013, the Court **DISMISSES IN PART** this claim to the extent the IPP seeks to recover for injuries incurred before that date.

### 17.   Tennessee

Defendants argue that a plaintiff in Tennessee must demonstrate either (i) that it "has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract" or (ii) that any attempt to exhaust these remedies would be futile, before it may recover in unjust enrichment. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525–26 (Tenn. 2005); (*see also* Gen. Defs. Br. at 46–47). Defendants further contend that the IPP's assertions at paragraphs 222–23 of its Complaint demonstrate that that the IPP intends to rely on a futility theory, but that, under Tennessee law, "a bare allegation of futility is not enough." (Gen. Defs. Br. at 46–47.)

*Freeman Indus.*, 172 S.W.3d at 526, held that, at the summary judgment stage, an affidavit from plaintiff's counsel averring that he was "unaware of any viable claims" against the party with which the plaintiff had been in privity, without any further factual basis, was insufficient to show that he was entitled to recover in unjust enrichment. *Id.*

The IP Action, however, is at the motion to dismiss stage, where plaintiff has adequately alleged that any claim against the pharmacies or distributors would be futile. (CAC ¶¶ 222–23.) It is thus easily distinguishable from *Freeman Industries*, and the IPP must be given the opportunity to prove up its futility argument after discovery is complete.

Defendants' motion to dismiss the Tennessee claim is **DENIED**.

### 18.    Utah

Defendants argue that, under Utah law, a plaintiff must allege that it conferred a benefit directly on a defendant. (Gen. Defs. Br. at 45 n.24 (citing *Concrete Prods. Co. v. Salt Late Cty.*, 734 P.2d 910, 911–12 (Utah 1987).)

In *Concrete Prods.*, 734 P.2d at 911, a concrete supplier delivered materials to a subcontractor hired for a public works project. *Id.* The supplier, which was never paid, unsuccessfully sued the subcontractor, and then turned around and attempted to sue the county government on the theory that the county had not required the general contractor to post a bond. *Id.* The court found that the subcontractor could not recover in unjust enrichment against the county because there was no benefit to the county whatsoever—"[i]nstead, [the county] will incur the expenses of cleaning and maintaining curbs and gutters with no resale value or intrinsic economic worth." *Id.* at 912. Although the *Concrete Products* court distinguished an earlier case, *Breitling Bros. Const. v. Utah Golden Spikers, Inc.*, 597 P.2d 869 (Utah 1979), by stating that "[n]o *direct* benefit, such as that demonstrated by the plaintiff in *Breitling*, is present here," *Concrete Prods.*, 734 P.2d at 911–12 (emphasis added), the use of the word "direct" in that

case's dicta does not convince the Court that a plaintiff must allege a direct benefit as part of its *prima facie* case.

Other district courts have also found that Utah law does not require a direct benefit. *Processed Egg Prods.*, 851 F. Supp. 2d at 932–34; *Auto. Parts (Bearings)*, 50 F. Supp. 3d at 864–65; *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1092–93.

Defendants' motion to dismiss the Utah unjust enrichment claim is, therefore, **DENIED**.

### 19. Washington

Defendants claim that Washington unjust enrichment law requires plaintiffs to allege a direct benefit. (Gen Defs. Br. at 45 n.24 (citing *Keil v. Scholten*, No. 48051-1-I, 2002 WL 988562, at *5 (Wash. Ct. App. Feb. 4, 2002) (unpublished opinion).)

In *Keil*, a group that had formed a joint venture to purchase a commercial real estate property sued a real estate broker for unjust enrichment, seeking recovery of two hundred thousand dollars he had earned as a commission from the sale proceeds. *Id.* at *4. But for the broker's fraud and misrepresentations concerning the sale, the group argued, it never would have paid the four hundred thousand dollars cash at closing from which the broker earned his fee. *Id.* at *5. The court found that the group could not recover the broker's commission on a theory of unjust enrichment because, pursuant to the sale documents, it was the property owner's obligation to pay the brokerage fee, not the group's. *Id.*

Similarly, in *State v. Am. Tobacco Co.*, No. 96-2-15056-SEA, 1996 WL 931316, at *8–9 (Superior Ct. Wash. Apr. 9, 1999), the court found that the State of Washington had not stated a claim for unjust enrichment against tobacco producers, because the benefit that the state alleged to have conferred, in the form of medical payments, was too attenuated. *Id.*

However, in *Chem. Bank v. Wash Pub. Power Supply Sys.*, 691 P.2d 254, 544 (Wash. 1984), the Supreme Court of Washington held that a group of bondholders, which had funded a

nuclear power plant construction project that later went bankrupt, had provided a "benefit" to the projects' participants—municipal entities that had bargained for a share of the plants' power output—such that restitution was appropriate. *Id.* at 558. The court reasoned that "the Restatement's definition of benefit is quite broad;" that the bond revenues—although flowing through a third party—had been raised on the request of the participants; and that, "[f]inally, it was for the participants' benefit that the plants were being built in the first place." *Id.*

This Court is not aware of any federal district court cases discussing the "direct benefit" requirement under Washington unjust enrichment law in the antitrust context. However, this Court concludes that it must follow the reasoning of the Washington Supreme Court in *Chemical Bank*. The IPP has alleged that unlawful overcharges for branded Namenda IR and Namenda XR flowed ultimately to Defendants, even though there were intermediaries in the chain of distribution. This is analogous to the bondholder financing that flowed to the participants in *Chemical Bank*. Moreover, it was on Defendants' account that higher prices for Namenda were passed through to the consumer.

Therefore, the Court **DENIES** Defendants' motion to dismiss

### 20.    West Virginia and Wisconsin

Defendants argue that a plaintiff must allege conferral of a direct benefit on a defendant in order to bring a claim for unjust enrichment in West Virginia and Wisconsin. (Gen. Defs. Br. at 45 n.24 (citing *Refrigerant Compressors*, 2013 WL 1431756, at 25–26)). *Refrigerant Compressors*, however, neither analyzes the law under either of these jurisdictions nor cites any case that does.

As a result, and in the absence of any additional briefing, Defendants' motion to dismiss these claims is **DENIED**.

### 21. Wyoming

Lastly, Defendants argue that the IPP has failed to allege that it conferred a direct benefit on Defendants, as required under Wyoming law. (Forest Br. at 70 n.57 (citing *Boyce v. Freeman*, 39 P.3d 1062, 1065–66 (Wyo. 2002).) In *Boyce*, 39 P.3d at 1063, the plaintiff gave a pickup truck to an employee of the defendant because the employee told the plaintiff that the defendant would pay for the truck. *Id.* Plaintiff was never paid for the truck and brought an unjust enrichment claim against the defendant, alleging that the employee had used the truck on the job and, therefore, that the defendant-employer was unjustly enriched. *Id.* The Supreme Court of Wyoming found that because nothing in the record showed that the employer knew it was expected to pay for the truck, or that the employer induced the plaintiff to give the truck to its employee, "[w]e see no evidence leading us to conclude that . . . good conscience requires [the defendant] to pay[.]" *Id.* at 1066. The opinion concluded, in part, that the employer had "received no *direct* benefit from this action." *Id.*

In *Boyce*, the Supreme Court of Wyoming also described the elements of unjust enrichment as follows: "(1) Valuable services were rendered, or materials furnished, (2) *to the party to be charged*, (3) which services or materials were accepted, used and enjoyed by the party, and, (4) under such circumstances which reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched." *Id.* at 1065 (citing *Coones v. F.D.I.C.*, 894 P.2d 613, 617 (Wyo. 1995) (emphasis added).)

The Court finds that the *Boyce* opinion as a whole establishes that a plaintiff seeking to recover under a theory of unjust enrichment under Wyoming law must allege a direct benefit.

Other federal district courts sitting in diversity are in accord. *See, e.g., Aftermarket Filters*, 2010 WL 1416259, at *2–3.

133

Therefore, Defendants' motion to dismiss the Wyoming claim is **GRANTED**.

### E.   In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States

In sum, the Court finds that the IPP Complaint has adequately pled facts supporting a claim for unjust enrichment against Actavis, Forest, and Merz only. The Court thus dismisses all claims under Count Four with respect to the Generic Defendants.

The Court also finds that, as a matter of law, the IPP may pursue its Count Four claims for unjust enrichment under the laws of all states **except** Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming. Those claim are hereby **DISMISSED**.

The Court also **DISMISSES IN PART** the IPP's claim under Rhode Island law, to the extent the IPP seeks recovery for injuries occurring prior to July 15, 2013.

## IX.   Conclusion

In conclusion, the Court holds as follows:

With respect to Count One for monopolization, the claims under the laws of Florida, Kansas, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Two for conspiracy to monopolize, the claims under the laws of Illinois, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Three for consumer protection and unfair and deceptive trade practices, the claims under the laws of Arizona, the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia are **DISMISSED** in their entirety.

With respect to Count Four, unjust enrichment, all claims are **DISMISSED ONLY WITH RESPECT TO** the Generic Defendants.  For the remaining Defendants, Actavis, Forest, and Merz, the claims under the laws of Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming are **DISMISSED** in their entirety.  The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

The Clerk of Court is respectfully requested to remove Docket Number 133 from the Court's list of pending motions.

Pursuant to this Court's memorandum endorsement at Docket Number 165, the Clerk of Court is also respectfully requested to remove Docket Number 150 from the Court's list of pending motions.

Dated: December 26, 2018

_____
Chief Judge

BY ECF TO ALL PARTIES