

Peter Safirstein
Direct Dial: 212-201-2845
psafirstein@safirsteinmetcalf.com

December 23, 2019

**VIA ECF**

The Honorable Robert W. Lehrburger
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Room 1960
New York, NY 10007-1312

Re: *Sergeants Benevolent Assoc. Health & Welfare Fund, et al. v. Actavis, plc, et al.*,
Case No. 1:15-CV-06549-CM-RWL (S.D.N.Y.)

Dear Judge Lehrburger:

    We write on behalf of Plaintiff and further to the Court's Order dated December 16, 2019 and provide the "updated disclosure" ordered by the Court. As demonstrated herein, and in previous submissions and Orders, the depositions plaintiff seeks are appropriate and non-duplicative. Greater particularity regarding the remaining open issues is provided below.

    Plaintiff seeks to depose William Meury, Forest's then Executive Vice President, Sales and Marketing. This important Forest executive testified in the NYAG action more than five years ago, but was not deposed in the DPP action. Forest challenges Plaintiff's ability to depose Meury on two topics in particular, the first one they describe as "the development and implementation of marketing plans regarding Namenda XR." But that is not the entirety of Plaintiff's topical description. Plaintiff clarified that the deposition topics were "including, but not limited to internal discussions and discussions with PBMs, Long Term Care facilities etc." Plaintiff also seeks Meury's testimony on "Forest's financial strategy regarding Namenda XR."

    In an effort to block this testimony, Forest cites to Mark Devlin's testimony in the DPP action on Namenda conversion trends, and formulary coverage -- specifically referring to an email from a David Okimoto (an analyst) who wrote in October, 2013 that he was asked if he noticed "any trends with Namenda conversion. They are concerned that XR business is not picking up as much as expected in LTC…" Devlin then testified that there were discussions "about the impact of that." (Devlin Deposition testimony, Exhibit B at 164:7-165:21). Devlin did not testify with any specifics as to the "trends" and Devlin provided no testimony on Forest's long term care business strategy.

    Defendants also cite to Devlin's deposition testimony regarding formulary coverage. He testified that in order for Forest to gain access to certain markets "you have to negotiate and

___
**Safirstein Metcalf LLP  The Empire State Building, 350 Fifth Ave., 59th Fl., New York, NY 10118**

discount your price, and those companies are very formidable negotiators." (Exhibit B: 234:10-13). He further testified that Forest did negotiate price with the "largest Medicare plan sponsor [United Healthcare AARP – Optum]" (Exhibit B: 234:18-235:1). Other than further testifying that the "concept of access is related to formulary coverage" (under objection from Plaintiff's counsel as this testimony was adduced on defendants' cross-examination) (Exhibit B:235:9-237:6) and testifying to the fact that Forest participated in negotiations with PBM's, Devlin provided no testimony. It is precisely because the concept was introduced, but never delved into, that Plaintiff in this litigation seeks to inquire as to what the substance of those negotiations were, what positions did Forest take in the negotiations, to what end, what positions did the PBMs (United Healthcare and others) take, and what agreements were reached and whether those agreements have changed over time.

Lastly, as to Devlin on these topics, Defendants seeks to block this inquiry by citing Devlin's testimony, again, over objection, on defendants' cross-examination where Devlin maintains a soliloquy. (Exhibit B: 258:1-166:24). To the extent that Devlin has testified to the fact that Forest "put a lot of money, effort and resources behind the conversion in how we promoted it and how we priced it" (Id. at 259:6-9) there is no testimony with regard to the details of this effort or if they changed over time.

Defendants also invoke deposition testimony of William Kane in the NYAG action to block this avenue of inquiry. (Exhibit C:42:6-78:6). Kane, an outside consultant, testified only that he "did do some supportive work on this project…[working with the] market research group and the marketing team…" (Id. at 43:20-24). But he also testified that he "didn't actually have a specific role in the design of the survey…" (Id. at 43:24-25). He then proceeded to testify about the surveys in general terms. He was unable to testify with certainty as to the methodology used in the surveys (Id. , e.g., at 50:17-18). He was unable to say whether physicians had been asked multiple choice questions. (Id. at 53:2-5). He was unable to say whether the Company that conducted the survey was "highly regarded." (Id at 55: 14-21), but testified that he "wasn't involved in their selection." Id. He was not asked and did not testify as to what use the Company made of the market research, whether there was any internal disagreement with regard to the information provided and whether the companies use of internal data had changed over a period of time.

Defendants also seek to block Meury's deposition in this matter on the strength of two days of his trial testimony in the NYAG action where he testified in response to his own counsel's questions. Defendants cite to no deposition testimony nor to any testimony on these subjects adduced by the government. Meury's testimony was generally about, for example, a communications plan without detailing what that plan was (Exhibit D at 576:25-577:2). Although Meury also testified about "acceptable economics," no details are provided as to what that meant. Moreover, there is no testimony on how Forest's financial strategy interacted with Forest's partner and co-defendant Merz. (Id. at 577:3-6). Meury then testified about the need to have a "supply plan in place" without testifying as to what that plan was or how it was to be achieved. (Id. at 577:7-8). Critically, Forest's "marketing plans" and "financial strategy" post the November 2014 trial and in anticipation of and following the entry of the injunction is important to this litigation and has never been the subject of Meury's testimony nor the subject of any testimony cited by defendants in their attempt to block off any inquiry into the entire area.

---
**Safirstein Metcalf LLP The Empire State Building, 350 Fifth Ave., 59th Fl., New York, NY 10118**

Their proffered testimony only demonstrates the need for the depositions Plaintiff seeks on the topics specified.[1]

In sum, Meury's testimony only skims the surface. Plaintiff in this action cannot say with certainty what the extent was of the document production in the NYAG action, however, based upon the document production to date, the nature of the Company's market research was highly questionable, yet it appears that Meury's self-serving testimony elicited by his own counsel more than five years ago stood unchallenged. Other aspects of Meury's testimony were unchallenged as well. Were Meury to be called by defendants as a trial witness, Plaintiff would have to be afforded the opportunity to cross-examine. What defendants' attempt to accomplish with their blocking effort is to ensure that Plaintiff's never challenge Meury's testimony with any pre-trial examination in this action and never address any of defendants marketing or financial plans for the years following the November 2014 trial despite Plaintiff's allegations that Forest's and Merz's illegal conduct continued post November 2014 with consequential damages to the putative class.

Defendants also attempt to block Plaintiff from inquiring of Meury regarding a "Review of Forest Compensation Policy." Defendants seek to foreclose such inquiry on the strength of Devlin's deposition testimony that Forest amended its compensation structure to reward the salesforce for selling Namenda XR and not reward the salesforce for selling Namenda IR. See Exhibit B ant 176:16-178:4. But there is no testimony, by Devlin, or anyone else as to: who originated the idea to change the compensation structure? Who was involved in making the decision to change the compensation structure? Was the compensation structure changed for any other product that Forest was marketing at or about that time? Did the compensation structure change with regard to Namenda XR after the change Devlin testified to? Did the compensation structure change with regard to Namenda IR after the change Devlin testified to? What was the compensation structure regarding Namzaric? How did the compensation structure of the salesforce compare with other compensation within the Company with regard to attempting to force the putative Class to switch to Namenda XR? All of these are appropriate areas of inquiry that should not be foreclosed because Forest can point to some testimony that touched on the subject.

As was clear from the meet and confer between the parties, and from Defendants' submission to the Court, Defendants take the broad position that if a word was used in testimony that coincides with the topics Plaintiff seeks to inquire about, Defendants argue that the entire area is foreclosed without regard to whether the testimony involved first-hand knowledge, was complete, was aided with the assistance of documents or was truthful.

Plaintiff also seeks to depose witnesses at both Forest and Merz regarding the pediatric extension granted by the FDA in connection with autism studies. Forest and Merz seek to block that testimony on the strength of earlier testimony. However, as demonstrated below, the testimony referred to by defendants only barely skims the surface of Plaintiff's intended inquiry. Defendants cite to the testimony of June Bray. Bray testified at deposition in the DPP action,

---

[1] Forest/Merz also reference Meury's testimony at 604:25-609:3, however that trial testimony, also adduced by Forest's counsel appears to largely repeat what Meury has aleady testified to.

**Safirstein Metcalf LLP The Empire State Building, 350 Fifth Ave., 59th Fl., New York, NY 10118**

under objection, as to what a "pediatric extension" is in the context of Namenda. For example, Bray testified that a company such as Forest is allowed to submit a request to the FDA to generate data in the pediatric population and if the FDA agrees with the sponsor company, the FDA will grant the sponsor company an additional six months of market exclusivity. (Exhibit H at 32:18-39:4). This granting of market exclusivity is important here because Forest/Merz utilized this "pediatric extension" device to further delay generic entry into the marketplace and charge members of the putative class outsized profits while supposedly testing this Alzheimer drug on children.

Bray also testified that "several studies" were proposed to the FDA and that ultimately Forest's studies showed that Namenda was ineffective in treating autism. (Id. at 104:19-106:5). Bray also testified generally as to the process by which Forest developed its request to the FDA (Id. 108:15-113:3).

Defendants also seek to foreclose Plaintiff from inquiring into the "pediatric extension" area on the strength of Marco Taglietti's 2014 deposition in the NYAG action where he was questioned by Forest's attorneys. Taglietti's testimony is of a general nature, and, remarkably, inconsistent with Bray's testimony. We say "remarkably" in light of the fact that defendants are using these snippets of testimony to try to forestall inquiry in this area. Taglietti, for example, testified about the FDA's request that Forest conduct the pediatric studies (Exhibit I at 235:22-236:6). Bray, on the other hand, testified that the FDA's "request" was issued in response to Forest's request to the FDA for a "pediatric written request" (Exhibit H at 32:24-33:15)– a fact that Taglietti omitted from his testimony. Taglietti generally testified about the FDA program and also testified that Forest's studies failed to show any benefit in children with autism. (Exhibit I:234:19-238:6).

Lastly, on this topic, Forest and Merz seek to block Plaintiff's inquiry regarding the pediatric extension on the strength of David Solomon's deposition testimony in the DPP action which just generally described the pediatric waiver. (Exhibit G:52:25-55:6).

At no time was any deponent asked to examine the particularities – the details – as to what multiple studies were proposed by Forest (none of the proposed studies were attached as exhibits). No discussion was had as to what in particular was known about the treatment of autism prior to the FDA Request or how Namenda could even possibly be beneficial. No discussion was had as to the discussions between Forest and or Merz and the doctors involved in the autism studies nor was there any discussion as whether Forest had paid any of the doctors in connection with the autism studies or whether, if payment was made, such payments had been disclosed to the FDA. No testimony was had as to any discussions between Forest and Merz on the subject of the pediatric extension. And, plainly, there is no testimony as to whether any of the generic company's had considered the utilization of Namenda for autism – even those generic companies that had a specialty in pediatrics, but nevertheless sat silent and allowed Forest to extend the exclusivity of Namenda.

Plaintiff also seeks to inquire regarding Forest's discussions with and relationship with Adamas Pharmaceuticals. Forest seeks to block such inquiry by referencing snippets of David Solomon's deposition in the NYAG action more than five years ago. In that action, Solomon

testified with regard to the fixed dose combination, known as Namzaric, that: "[a]nd ultimately we paid a lot of money to Adamas to acquire the rights that they had that would enable us to bring this -- it was a little bit of a holy grail for us to bring this fixed dose combination to the market and this was being brought to the board because there were significant up-front dollars around it, so it was the kind of transaction that we would have gotten our board to sign off on, and so that's what this is.." (Exhibit E at 181:16-182:2). Solomon further testified that Forest had "acquired the rights to Adamas, the work that Adamas had done. (Id. at 193:20-21). Then, with regard to the relationship between Adamas and Merz, Solomon testified, "[a]nd so, you know, we managed at the time we had to work things out, I talked earlier about the obligations to a licensor with respect to new development and who would have rights and so on, so there were some complexities that had to be worked out and so there was a side letter with Merz at the time that we worked out the agreement with Adamas to kind of resolve. But none of it was particularly controversial or substantive I don't think, it was really kind of ironing out the legal niceties of it all." (Id. 195:22-196:11).

However, as Forest and Merz both well know, the relationship involving Adamas involved more than Namzaric – it involved Namenda XR as well. There is no testimony regarding that. Nor is there any testimony as to the following, just as an example: When did discussions between Forest and Adamas start? Why did they start? What and how many agreements were reached between Forest and Aamas? Over what period of time? How much did Forest pay Adamas? Why? Were there any side agreements between Forest and Adamas? Forest viewed its Namenda Franchise consisting of Namenda IR, Namenda XR and Namzaric as critical to the success of the Company – what role did Adamas play with regard to each of the three components of the franchise? What has transpired between Forest (and Merz) and Adamas regarding the Namenda franchise subsequent to Solomon's October 2014 deposition testimony during the intervening approximate five subsequent years covered by the instant action? What discussions did Forest and Adamas have with regard to the strength of the patent for Namenda XR, particularly leading up to and including the trial wherein Forest lost to a Generic Manufacturer on its patent? What was the full scope of the dispute between Merz and Adamas? What was the resolution of that dispute– if any? Of course, no testimony is on the record regarding Merz's view of Merz's relationship with Adamas and its view of any legal disputes, nor is there any discussion of Merz's views of Adamas' interactions with Forest.

The pattern continues. As before, with more unanswered questions in the record than answers, Forest/Merz, represented by the same counsel, seek to foreclose entire areas of inquiry that have never been inquired about.

With regard to Merz's discussions with Forest regarding the settlements of the generic lawsuits and the financial arrangements, Merz/Forest seek to block such inquiry on the strength of 14 pages of testimony where the Merz attorney witness refused to answer questions at the behest of counsel (who happened to also be representing Forest at the same time). Exhibit J at 135:2-149:2. However, such non-testimony should not foreclose Plaintiff's counsel from asking the Merz CEO witness, for example, about how the two business partners went about selecting their respective counsel, how the litigation was funded, how the settlements were funded, what budget, if any, was set aside in connection with the litigation, and what the discussions were, if any, as to how it came to be that counsel for Forest and Merz in the underlying patent litigation

now represent generic defendants in this litigation despite the fact that the parties were adverse in the patent litigation and have adverse positions in this litigation. Unsurprisingly, none of these questions were addressed in the DPP deposition, which, of course, did not name the generic manufacturers as defendants.

Lastly, defendants raise various miscellaneous arguments to foreclose further inquiry by arguing that "other proposed topics are vague to the point of being meaningless." (Def. letter at 3). Defendants, however, fail to convey to the Court the discussions at the "meet and confer" on these particular topics. The topic "Discussions regarding MDV Partners" is not only very particularized, but as Plaintiff's counsel told Defendants, is based on particular documents produced by Defendant. Those documents show the involvement of Forest with Adamas and private equity – a topic unexplored in this litigation. Further, plaintiff informed Defendants that an open area of inquiry is Forest's relationship with various generic defendants such as Dr, Reddy's (DRL), Teva and Amneal, some of which have not settled and some of which have settled, but each which is uniquely a defendant in this action. This is a natural area of inquiry and should be non-controversial. Inquiring into "Joint Defense Agreements" in an antitrust case is also relevant and non-controversial. Legal alliances between defendants and adversaries is an appropriate area of inquiry and also has not been explored in this litigation.

Lastly, Merz/Forest argue that Namzaric (and Adamas) are not a proper subject of inquiry in this litigation as those terms do not appear in the complaint. Defendants apparently make this argument with their proverbial tongue in cheek. As the Court will likely remember, it was defendants who insisted that Plaintiff and third parties must produce data related to Namzaric as Defendants were the ones who considered Namzaric to be part of the case. Namzaric is an Adamas product. Defendants should not be allowed to now limit Plaintiff's inquiry into the relevance of Namzaric having argued the contrary previously.

For all of the reasons stated above, Plaintiff believes that it is appropriate for the Court to order the requested depositions.

Respectfully submitted,

/s/Peter Safirstein
Peter Safirstein
Safirstein Metcalf LLP

cc: all counsel of record (via ECF)