**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NAMENDA INDIRECT PURCHASER ANTITRUST LITIGATION | No. 1:15-cv-6549 (CM) (RWL) |

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANTS' *DAUBERT* MOTIONS; AND GRANTING IN PART AND DENYING IN PART THE MOTIONS FOR SUMMARY JUDGMENT**

McMahon, J:

Sergeants Benevolent Association Health & Welfare Fund commenced this antitrust lawsuit on behalf of itself and a class of similarly situated indirect purchasers of the brand and generic versions of Namenda – a drug used to treat Alzheimer's disease. Plaintiff accuses Defendants – Forest Laboratories and Merz Pharmaceuticals – of taking actions designed to limit generic competition for Namenda. Plaintiff originally advanced two theories of antitrust liability: (1) that Defendants' entered into several reverse-payment ("pay for delay") settlements with generic manufacturers of Namenda, which unlawfully delayed the market entry of generic competitors; and (2) Defendants' conduct in effectuating a "hard switch" for consumers between two versions of Namenda.

On February 11, 2021, this Court certified a class of indirect purchasers (or "end payors") of Namenda. However, the decision certified only the "pay for delay" theory for class treatment, and "den[ied] the motion insofar as it seeks to certify the same class (or any subclass) pursuant to

the hard switch theory." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-cv-6549 (CM), 2021 WL 509988 at *1 (S.D.N.Y. Feb. 11, 2021).

Presently before the Court are three motions for summary judgment: one filed by Defendant Forest (ECF 564); one filed by Defendant Merz (ECF 555); and one for partial summary judgment on Count I filed by SBA (ECF 568). Also before the Court are seven *Daubert* motions to exclude the opinions and proposed testimony of several experts.

The motions to exclude are granted in part and denied in part. As is generally the case, the principal reason given by each side for excluding the testimony of experts proffered by the other boils down to, "their expert doesn't agree with our expert, and since our expert is correct, theirs is not." Such motions waste the Court's time. There are, however, valid grounds for excluding certain portions of the testimony of several experts.

As for the summary judgment motions, they, too, are granted in part and denied in part. The motions are denied as to SBA's antitrust claims (Counts I and II). As to the consumer-protection claims (Count III), Forest's motion is granted for claims arising under the laws of Alabama, Massachusetts, and Michigan, but are denied for the remaining states; while Merz's motion is granted for all claims except the one arising under California law. Finally, Defendants' motions are granted as to the unjust-enrichment claims (Count IV) arising under the laws of Arkansas, Florida, and New York, but are denied without prejudice as to the rest of the states for further briefing (following trial) on whether the claims are duplicative under each state's unjust-enrichment jurisprudence.

## I.    BACKGROUND

This decision is the latest in a long line of opinions addressing actions that Forest took regarding its brand-name drug, Namenda. The underlying facts of the case are recounted at length

in these other opinions. *See, e.g., New York v. Actavis, PLC* ("*Namenda I*"), No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. Schneiderman ex rel. New York v. Actavis, PLC* ("*Namenda II*"), 787 F.3d 638 (2d Cir. 2015); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC* ("*Namenda III*"), No. 15-cv-7488, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) (denying motion to dismiss federal claims brought by direct purchasers); *In re Namenda Direct Purchaser Antitrust Litig.* ("*Namenda V*"), 331 F. Supp.3d 152 (S.D.N.Y. 2018) (certifying class of direct purchasers); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc (Namenda VI)*, No. 15-cv-6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) (denying Defendants' motion to dismiss in this indirect-purchaser action); *In re Namenda Indirect Purchaser Antitrust Litig. ("Namenda VII")*, No. 15-cv-6549 (CM), 2021 WL 1000489 (S.D.N.Y. Jan. 12, 2021); *In re Namenda Indirect Purchaser Antitrust Litig. ("Namenda VIII")*, No. 15-cv-6549 (CM), 2021 WL 509988 (S.D.N.Y. Feb. 11, 2021) (granting in part and denying in part motion for class certification).

The Court only summarizes the facts relevant to summary judgment.

## A.  The Product

Namenda IR (immediate release) and Namenda XR (extended release) (collectively "Namenda") are brand-name prescription drugs that contain the active ingredient memantine. Namenda is used to treat Alzheimer's disease, and has been commercially successful ever since Forest introduced Namenda IR to the U.S. market in 2003. Total annual sales of Namenda IR grew to approximately $1.5 billion by 2013, the same year that Forest launched Namenda XR. *Namenda II*, 787 F.3d at 647.

Although both versions of Namenda were patent protected, the patents had different expiration dates. Therein lies the dispute animating this lawsuit. SBA alleges that Defendants acted anticompetitively in attempting to protect Namenda's market advantage afforded by the patents,

ultimately resulting in indirect purchasers paying higher prices for memantine than would otherwise have been the case but-for Defendants' conduct.

### B. The Parties

Lead plaintiff Sergeants Benevolent Association Health & Welfare Fund ("SBA") is a fund that administers the prescription drug benefit plan for active and retired New York City Police Department sergeants and their dependents. It represents a class of indirect-purchaser plaintiffs ("IPPs"), which includes – subject to some exceptions – "All Third-Party Payors who indirectly purchased, and/or paid, and/or provided reimbursement for, some or all of the price for Namenda IR 5 or 10 mg tablets, their AB-rated generic equivalents, and/or Namenda XR capsules" between June 1, 2012, through December 31, 2017. (ECF 489).

Third-party payors are entities (besides the patient or the health care provider) that reimburse for health care expenses. They include insurance companies and self-insured health and welfare plans run by employers. They are indirect purchasers because they do not purchase drugs directly from the manufacturer (in contrast to direct purchasers like wholesalers). Instead, they pay reimbursement for the purchases made by the individual consumers that they insure.

Defendant Forest Laboratories is a limited-liability company incorporated in Delaware that manufactures and sells branded pharmaceutical products. Forest is a wholly owned subsidiary of Actavis PLC (now known as Allergan PLC).

Defendants Merz GmbH & Co. KGaA.; Merz Pharma GmbH & Co. KGaA; and Merz Pharmaceuticals GmbH (collectively "Merz") are headquartered in Germany and are engaged in the development, production, and distribution of pharmaceutical products. Merz is the original holder of the patent at the center of this dispute, U.S. Patent No. 5,061,703. Merz granted Forest an exclusive license to the '703 Patent in June 2000, which gave Forest the right to market a

memantine drug in the United States. As part of the agreement, Forest was required to pay Merz 20% of its net revenues on sales of memantine products in the U.S. (ECF 607, Exh. 23 at 14).

### C.  The Hatch-Waxman Act and Generic Competition

Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., a pharmaceutical company must file a New Drug Application ("NDA") with the FDA any time it wishes to market a new brand-name drug. The NDA must provide the agency with scientific data showing that the drug is safe and effective. This generally requires conducting preclinical and clinical trials, and can take many years. *Namenda II*, 787 F.3d at 643; 21 U.S.C. § 355. Although the process is costly and time consuming, once a patented drug is approved, it enjoys a period of exclusivity on the market (generally twenty years) – effectively, a government-sanctioned monopoly. A brand-name drug's developer can recoup its investment into the drug during this exclusivity period because the drug faces no competition from generics. However, once the exclusivity period ends and generic versions of the drug enter the market, it generally results in the brand-name drug losing more than 80% to 90% of its market share within six months – a process known in the industry as going off the "patent cliff." *Namenda II*, 787 F.3d at 647.

In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98–417, 98 Stat. 1585. Hatch-Waxman attempted to serve a dual purpose: to lower drug prices by encouraging greater generic competition; and to incentivize innovation from branded drug manufacturers by providing for patent extensions beyond the standard 20-year patent term. *Namenda II*, 787 F.3d at 644.

To increase generic competition, Hatch-Waxman permits generic manufacturers to file an Abbreviated New Drug Application ("ANDA"), which allows them to "piggy-back" on an already-approved branded drug's NDA information to show that the generic is safe and effective. *Ibid*. The generic manufacturer can forgo any independent preclinical and clinic trials, but must certify that

5

the generic has the same active ingredients as, and is "bioequivalent" to, the already-approved brand-name drug. 21 U.S.C. § 355(j). By allowing generic manufacturers to "piggy-back" on the studies of already-approved drugs, Hatch-Waxman reduced the development costs for lower-priced generics, speeding their introduction to the market. *Namenda II*, 787 F.3d at 644.

But to succeed on an ANDA, a generic manufacturer must submit a certification to the FDA describing the generic's implications on patents held by the branded manufacturer. The relevant certification here is the "Paragraph IV" route, so named after 21 U.S.C. § 355(j)(2)(A)(vii)(IV). In a Paragraph IV certification, the generic manufacturer states that any relevant patent held by the brand-name manufacturer "is invalid or will not be infringed by the manufacture, use, or sale" of the generic. *FTC v. Actavis, Inc.*, 570 U.S. 136, 143 (2013) (quoting 21 U.S.C. § 355(j)(2)(A)(vii)(IV)). Submitting an ANDA under Paragraph IV exposes the applicant to patent litigation. A branded manufacturer has 45 days after the submission to initiate a patent-infringement action against the ANDA applicant. If the branded manufacturer files suit, the FDA "must withhold approving the generic, usually for a 30-month period, while the parties litigate patent validity (or infringement) in court." *Ibid.*; *see also* 21 U.S.C. § 355(j)(5)(B)(iii).

Hatch-Waxman provides incentives for generic manufacturers who incur the risk of patent litigation. Generic manufacturers that first file a Paragraph IV certification (as many "first" certifications can be submitted on the same day) receive a 180-day exclusive marketing period for that generic. Generic manufacturers that are not "first filers" cannot market their versions of the drug during this period. "If the first-to-file generic manufacturer can overcome any patent obstacle and bring the generic to market, this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars.' " *Actavis*, 570 U.S. at 144 (citation omitted).

Like any lawsuit, the parties can decide to settle the patent-infringement litigation arising out of the ANDA. However, in these instances, it is usually the brand-name manufacturer (the patent holder and plaintiff) that pays to settle the case against the generic manufacturer (the alleged infringer/patent challenger and defendant). Such settlements are therefore called "reverse payments" or "reverse settlements." Because these payments tend to preclude, rather than encourage, market entry of generic competitors, "there is reason for concern that settlements taking this form tend to have significant adverse effects on competition." *Id*. at 148. "[A] reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." *Id*. at 158. For this reason, the Supreme Court has held that reverse payments are not immune from antitrust scrutiny.

Defendants' reverse settlements to generic manufacturers form the IPP class' remaining theory of liability – that the Defendants "paid to delay" generic competition.

### D. The Generic Settlements

After Merz provided Forest with an exclusive license to the '703 Patent in June 2000, Forest developed Namenda IR and began marketing it in the U.S. following FDA approval in 2003. *Namenda II*, 787 F.3d at 647. Namenda IR's exclusivity period based on the '703 Patent was originally set to expire on April 11, 2010, but after securing several extensions, the final expiration date of the patent was October 11, 2015. *Namenda IV*, 2017 WL 4358244, at *6.

Starting in late 2007 – before Forest obtained the extensions – fourteen generic manufacturers "first filed" ANDAs in preparation to enter the market. These generic manufacturers provided Forest with Paragraph IV certifications, notifying Forest of their view that the '703 Patent was either invalid or was not infringed by their versions of a memantine product. (Second Amended Complaint, ECF 326 at ¶ 72). In early 2008, Forest and Merz commenced litigation against these generic manufacturers, triggering the automatic 30-month stay under Hatch-

7

Waxman, during which the validity of the '703 Patent was to be litigated. (*Id*. at ¶ 74). The lawsuits were filed in the District of Delaware, and the consolidated cases were assigned to Judge Sleet and then-Magistrate Judge Stark (now a District Judge).

Between April 2008 and August 2009, four of the fourteen first-filers ended their ANDA challenges against Forest for various reasons. (ECF 566 at ¶¶ 14–16). In July 2009, Magistrate Judge Stark issued a "*Markman*"[1] Report and Recommendation rejecting every claim construction proposed by the generic challengers and adopting Forest's and Merz's positions on nine out of thirteen disputed issues. *See Forest Labs., Inc. v. Cobalt Labs, Inc.*, No. 8-21-GMS-LPS, 2009 WL 1916935 (D. Del. July 2, 2009). Judge Sleet largely adopted the R&R, agreeing on all but one clerical issue. *See Forest Labs., Inc. v. Cobalt Labs, Inc.*, No. 8-21-GMS-LPS, 2009 WL 3010837 (D. Del. Sept. 21, 2009).

Following the *Markman* ruling, nine of the remaining ten challengers (all except for Mylan) settled the patent-infringement lawsuits between September 2009 and March 2010. (ECF 566 at ¶ 18; ECF 570 at ¶¶ 38–47). All were reverse settlements; the amounts Forest and Merz paid to the generic challengers (splitting the costs 50/50) ranged between $150,000 and $2 million. (ECF 566 at ¶ 25).

The reverse-settlement agreements provided that the generic manufacturer was not allowed to launch generic versions of Namenda IR earlier than three months before April 11, 2015 (the date of the '703 Patent's expiration) or October 11, 2015 (the expiration date if Forest obtained another six-month extension for pediatric exclusivity, which it did). Thus, the agreements effectively "locked in" the date of generic entry to be July 11, 2015.

---

[1] In a patent litigation, "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

Each agreement also provided that if Forest or Merz permitted a third-party to launch a generic of Namenda IR earlier than the date provided in the agreement, or if Forest lost its ANDA patent-infringement suit in court, then the settling manufacturer could launch its generic at the same time as the first launching generic. These "Most Favored Nation" ("MFN") or "acceleration" clauses made it such that once one generic entered the market, they all could. IPPs claim that these clauses greatly reduced the incentive that any individual generic manufacturer had of continuing to pursue their Paragraph IV challenge against the '703 Patent, effecting deterring any substantive challenge to patent validity.

### E.  The Lexapro Amendment

By April 2010, Mylan was the only remaining generic manufacturer that had yet to settle with Forest. But its situation was different from that of the other generics, in that Mylan and Forest had a pre-existing relationship related to another brand-name drug – an antidepressant known as Lexapro – that they wanted to renegotiate. Negotiations over the "Lexapro Amendment" became part and parcel of the negotiations relating to Namenda. (*See* ECF 576, Exh. 20).

The original Lexapro Agreement was executed in October 2005 between Forest and Alphapharm (later acquired by Mylan), and governed the distribution and supply of an authorized generic of Lexapro ("Lexapro AG"). The terms of the original agreement provided that Forest would manufacture and supply Alphapharm's requirements of Lexapro AG for sale and distribution, and that Alphapharm would market Lexapro AG. Alphapharm agreed to pay Forest a 40% share of its "product profit" on Lexapro AG, which the agreement defined as Alphapharm's net sales less Forest's manufacturing costs. (ECF 566 at ¶ 42).

Although the term of the agreement was for five years, it also provided that Alphapharm could terminate the agreement after just one year. If Alphapharm terminated the agreement, it would no longer be able to sell an authorized generic of Lexapro, but it could have theoretically

launched its own competing generic and would have retained 100% of the profits of that version. At the time of the original agreement, both parties anticipated that Lexapro AG would launch at some point in early 2012, since that was when the patent upon which Lexapro was based ("the '712 Patent") was set to expire. *See Namenda V*, 331 F.3d at 192.

But between 2005 and 2010, legislative and administrative changes to Medicaid apparently would have increased Forest's Medicaid liability under the original agreement to more than it had expected when it first entered into it. *Id.* at 193. The Court will not go into needless detail on the changes; what is important is that, because the original Lexapro Agreement obligated Forest to "transfer" the supply of Lexapro AG that it manufactured to Alphapharm/Mylan, the price of Lexapro AG was factored into how much Forest owed in rebates back to the government. In this lawsuit, Forest asserts that its executives believed the company could reduce its Medicaid liabilities if it shifted the manufacturing of the Lexapro AG to Mylan. (ECF 566 at ¶ 46–50).

Thus, Forest proposed an amendment to the Lexapro Agreement at the same time it was trying to settle Mylan's Paragraph IV challenge. (*See* ECF 576, Exh. 20). Forest and Mylan ultimately agreed to amend the Lexapro agreement on the following terms: In exchange for a $20 million up-front payment, Mylan agreed to manufacture the Lexapro AG (instead of Forest) and also agreed to extend the minimum term of the agreement from one year to two. The parties also agreed to alter the profit-sharing percentages. Instead of 40% profit share for all sales, Forest's take was reduced to 30% on the first $100 million in profit and 35% on the next $50 million in profit; Forest would not earn the original 40% until Lexapro AG generated more than $150 million in profits. (ECF 566 at ¶¶ 61–65; ECF 570 at ¶ 80).

Forest and Mylan executed both the Lexapro Amendment and a reverse-settlement agreement to Mylan's Paragraph IV challenge on the same day: July 21, 2010. Forest agreed to

pay $2 million to Mylan to settle the patent-infringement suit – an amount in line with the rest of the reverse-payment settlements. The settlement also contained the same MFN/acceleration clause as the other agreements. But the primary dispute for resolution in this case is whether the Lexapro Amendment qualifies as a "large and unjustified" payment made to settle the Paragraph IV patent-infringement suit in violation of *Actavis*. 570 U.S. at 158.

### F.  History of Litigation

Litigation regarding Forest began in 2014. After Forest announced a plan to discontinue Namenda IR – ostensibly in an attempt to improve the prospects of Namenda XR, a new version of the drug it hoped to market – the State of New York sued Forest and Actavis to enjoin it from doing so, arguing that this "hard switch" was anticompetitive. *Namenda I*, 2014 WL 7015198, at * 1. The Honorable Judge Robert Sweet granted a preliminary injunction, and that ruling was affirmed on appeal. *Namenda II*, 787 F.3d at 663.

In August 2015, Plaintiffs filed the instant lawsuit, and in September 2015, direct purchasers of Namenda filed a similar lawsuit. (*See* Case No. 15-cv-7488 (CM)(RWL)). Both sets of plaintiffs alleged that Defendants' actions in effectuating the hard switch and the reverse-payment settlements forced them to pay supra-competitive prices for memantine. In contrast to the direct purchasers, who brought their claims under the federal Sherman Act, the IPPs in this lawsuit bring their claims under state antitrust and consumer-protection laws. (ECF 326).[2]

In September 2016, this Court denied the Defendants' consolidated motions to dismiss in both the direct purchaser action and this action. *Namenda III*, 2016 WL 4992690, at * 1. The Court then stayed the IPP litigation until a resolution of the federal claims from the direct purchasers'

---

[2] SBA brings state, rather than federal, claims because "Under the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977), indirect purchasers of products sold at supra-competitive prices lack standing to sue under federal antitrust statutes" but "may still bring suit under state antitrust laws, if a state permits such claims." *Namenda VI*, 2018 WL 7197233, at *1

lawsuit. That litigation ultimately settled on the eve of trial. Following that, several of the generic defendants in this suit also settled. The only Defendants remaining in this litigation are those affiliated with the brand-name manufacturers and originators of Namenda – Forest and its parent, Actavis, and their German counterpart, Merz.

On February 11, 2021, this Court granted in part and denied in part SBA's motion for class certification. *Namenda VIII*, 2021 WL 509988. The Court certified only the "pay for delay" theory of antitrust liability and denied certification as to the hard switch theory. This means that only the only basis for liability to be found on a class-wide basis (as well as for class-wide damages) pertains to the reverse settlement of the Paragraph IV lawsuits.

Presently before the Court are seven *Daubert* motions to exclude the testimony of experts for both sides: four filed by Defendants and three by SBA. Also before the Court are three motions for summary judgment.

## II.   *DAUBERT* MOTIONS

As I did when deciding the motions for summary judgment in the direct-purchaser action, I will decide the *Daubert* motions before addressing the merits. Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . . it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury." *Ibid*.

Defendants move to exclude the opinions and proposed testimony of: (1) Michael A. Davitz (ECF 543); (2) Jacob C. Holzer (ECF 545); (3) Susan Marchetti (ECF 547); and (4) Thomas

McGuire (ECF 549). SBA moves to exclude the opinions and proposed testimony of: (1) Lona

Fowdur (ECF 560); Philip Green (ECF 571); and Sue L. Robinson (ECF 574).

The opinions of Davitz, Holzer, and Green are admitted in full. Portions of the opinions of

Marchetti, McGuire, Fowdur, and Robinson are admitted, with certain caveats.

### *Daubert Standard*

Under the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)

and Rule 702 of the Federal Rules of Evidence, the district court serves a "gatekeeping" function

in determining whether an expert witness really qualifies as one. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1)

qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.'" *In re Aluminum*

*Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)).

The party proffering the expert's opinions "has the burden to establish the [Rule 702]

admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the

'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re*

*Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506

F.3d 151, 160 (2d Cir. 2017)). The court need not "admit opinion evidence that is connected to the

existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too

great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Ultimately, the *Daubert* standard is a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

*Defendants' Motions to Exclude Plaintiff's Experts*

### A.  Defendants' motion to exclude the opinion of Dr. Michael A. Davitz is denied

SBA asked Davitz to opine about what a reasonable and competent patent attorney would have informed the parties about their likelihood of success in the Namenda Paragraph IV litigation. (Davitz Report at ¶ 6). SBA offers Davitz primarily for his view that Mylan was more likely than not to succeed in the litigation against Forest – more specifically, that "Mylan had at least a seventy (70%) percent chance of prevailing." (*Id*. at ¶ 9).

Davitz is a patent attorney with extensive experience and impressive expertise in advising clients on the likelihood of whether they will prevail in patent litigation, including especially the type of patent litigation in which Mylan and Forest were engaged: Paragraph IV Hatch-Waxman litigation. He has been a registered patent attorney for twenty-three years. Of particular relevance is his six years as the Vice President of Intellectual Property at Taro Pharmaceuticals – a

manufacturer of generic pharmaceuticals. During his time at Taro, Davitz directed the company's Paragraph IV ANDA litigation, which included advising executives on the probability of success on such litigation. He is thus more than qualified to offer his opinion on Mylan's likelihood of success on its Paragraph IV challenge. He is also a trained physician (hence, "Dr. Davitz").

It is wise that Defendants do not ask the Court to preclude Davitz from opining that Mylan was substantially likely to win its challenge or any of his other opinions, as any such motion would have failed. Instead, Defendants focus on the "70% chance of prevailing" statement, arguing that it improperly attempts to quantify an unquantifiable evaluation and that Davitz's methodology to arrive at that number was unreliable. The motion is denied.

The Court has carefully reviewed Davitz's exceptionally well written and highly readable (especially for this type of litigation) 193-page report, in which he lays out in great detail the reasons why he believes that Mylan was "substantially likely" to prevail in its Paragraph IV challenge to the '703 Patent.

His conclusion is based on his experience as a patent attorney and a variety of factors, including the statistical likelihood of success in ANDA litigation generally (success rate of generic challengers versus brand-name patent holders); his assessment of the history of the '703 Patent and its approval by the Patent and Trademark Office ("PTO"); and his assessment of the merits of the claims and defenses of the parties involved. Ultimately, Davitz arrived at his 70% number because it was his view that "Mylan had at least a seventy (70%) percent chance of prevailing in the Namenda ANDA Litigation *on at least one of its defenses to Forest's allegations of infringement*." (*Id*. at ¶ 427 (emphasis added)). Since Mylan only needed to win on any one of its arguments to prevail, Davitz concluded that a reasonable and competent patent attorney would

have advised the parties that it was more likely than not that Mylan would have won given the merits of the arguments both sides advanced.

Dr. Davitz's 70% number was chosen carefully and with due regard for precision. He began by observing that challengers to patent validity prevail in approximately 75–76% of cases, and challengers in Paragraph IV litigation specifically prevail about 73% percent of the time. (*Id*. at ¶¶153–156). Mylan, however, prevails in only 64% of its Paragraph IV lawsuits – around 2 times in 3, but not 3 times in 4 – so Davitz decided to incorporate a "Mylan discount" of shorts into his assessment.[3] Davitz used these statistics as a "benchmark for the probability of a generic manufacturer to prevail in a Paragraph IV litigation." (*Id*. at ¶ 157). He then factored in his assessment of the strengths and weaknesses of Mylan's and Forest's positions relative to other Paragraph IV cases to arrive at his ultimate number.

The key question, thus, is whether his assessment of the '703 Patent case is reliable. A trier of fact could find it so.

Davitz carefully examines the factors that an experienced patent litigator would consider if asked to advise Mylan or Forest about their possibility of success in the Paragraph IV litigation. Some of these factors (such as the success-rate percentages described above) are quantifiable; some of them (such as the assessment of whether the PTO granted the patent without fully addressing issues relating to validity) consider both quantifiable and non-quantifiable factors; and some (like the importance of *Markman* rulings to the underlying infringement case, or a lawyer's evaluation of the merits of particular legal arguments in light of the evidence) are non-quantifiable.

---

[3] I use the word "assessment" advisedly. Dr. Davitz did not purport to "calculate" anything, but sought to quantify, to the extent he could do so, his conclusion that Mylan was "substantially likely" to prevail in the '703 patent lawsuit.

But importantly, Dr. Davitz explains the importance of each factor he considered – or why he did not consider a factor to be of much importance – bringing to bear his experience in conducting precisely this sort of evaluation for real clients who want hard advice from their lawyers about whether to bring, settle, or try a Paragraph IV case.

Davitz pointed to reasons why he felt that each of Mylan's challenges, whether to patent validity or to infringement, were stronger than Forest's counterarguments – even with the presumption of validity accorded to patents that have already been granted. He observed that Mylan only needed to prevail on one of these challenges to win, whereas Forest had to win every single one if it were to succeed. Davitz also noted that the patent had been invalidated abroad, albeit under law not identical to U.S. patent law. To that he added reviews of academic research about the work of particular patent examiners (including specifically the examiners in this case), the correlations between the granting of patents and length of time on the job, and personal experience from his involvement in the patent-prosecution process (which allowed him to identify some oddities in the process used to grant the '703 Patent).

In short, Dr. Davitz gathered a huge set of information, which he assessed in light of his own considerable experience in doing precisely what SBA asked him to do – assess the likelihood that one side or the other would have prevailed in the Mylan Paragraph IV challenge to the '703 Patent. This is exactly what an experienced patent litigator would be expected to do for clients.

But the Court was once a lawyer, so I know that clients want more. Being told that you are "substantially likely" to prevail is never enough; it inevitably leads to the question, "Just how much is "substantial?" Every client wants a number. Dr. Davitz opines that Mylan was at least 70% likely to prevail. That estimate is admissible. Lawyers are not engineers, and much of what they are asked to predict cannot be based on anything that reduces to numbers and mathematics. That does not

make it any less valuable to clients, or any less the product of expertise on the part of the advising attorneys. Nor does it mean that Dr. Davitz did not employ any ascertainable or reliable methodology in reaching his conclusions. On the contrary, he employed a very precise methodology, which involved a complete review of the patent's file wrapper, the entire record in the Paragraph IV lawsuit, and the body of patent law in effect at the time the litigation was scheduled for trial. He does not offer legal opinions, but clearly articulates his view of the strengths and weaknesses of each side's arguments in light of the case law at the time.

Given all of the above, I can understand why Davitz concluded that Mylan had a greater chance of winning this particular patent challenge than its overall record, and that "substantially likely" was about halfway between (i) Mylan's customary success rate when taking such lawsuits to trial, and (ii) the overall trend in the industry, which favors generics over patent holders. It is for a jury to decide whether his arguments are persuasive.

Defendants argue that another court has rejected a quantification of a party's litigation success rate. *See In re Intuniv Antitrust Litig*., No. 16-cv-12653-ADB, 2020 WL 5995326, at *11 (D. Mass. Oct. 9, 2020). But *Intuniv* observed that the expert in that case had not "provided a methodology for how he arrived at [his] 95% figure." *Id*. at *12. Here, Dr. Davitz has provided a methodology, one that I consider to be perfectly sound. It is exactly what lawyers do when counseling clients on such matters – not firmly grounded in statistical probabilities, but far from *ipse dixit*. Dr. Davitz appears to me to have considered all of the data that should be considered in evaluating the likelihood of Mylan's success. Notably, Forest points to nothing that he overlooked or left out of his analysis. It argues only that the number should be excluded. But Davitz's number is not a number he pulled out of thin air; he thoroughly explains how he arrived at it. If Defendants wish to challenge his conclusions at trial, that is their right. But I will allow his testimony.

Defendants' motion to exclude is denied.

**B.  Defendants' motion to exclude the opinions of Susan Marchetti is granted in part and denied in part**

Ms. Marchetti, a former pharmaceutical executive, was asked to opine on the following three questions:

1.  Does the evidence support the fact that in the years 2010–11, Forest had sufficient manufacturing capacity to produce Lexapro and did not require the resources of a third-party manufacturer to meet sales and inventory requirement?

2.  Does the evidence show that Forest anticipated it would obtain cost savings as a result of subcontracting Mylan to manufacture Lexapro?

3.  Did the compensation Mylan received from Forest under the terms of the 2010 Lexapro Amendment to the 2005 Lexapro Agreement represent "fair value" for the services Forest contracted Mylan to provide?

Marchetti answered the first question "yes," and the second and third questions "no." As to the third question, Marchetti opined that Forest received virtually nothing of value from the Lexapro Amendment, while Mylan obtained net benefits worth between $30.5 million and $31.3 million; thus, the Amendment did not constitute "fair value." (Marchetti Report at ¶ 30).

Ms. Marchetti has over 35 years' experience in the pharmaceutical industry, working at both major branded drug manufacturers and generics. She has extensive experience leading supply chain operations at these companies and had responsibility for sales forecasting, budgeting and product planning. (*Id*. at ¶ 5). She has worked on product launches of both authorized generics (generics approved by the company that held the patent on the branded drug) and competing generics. She is also intimately familiar with the manufacturing processes for solid dose (tablet and capsule) products at U.S. sites and abroad. (*Id*. at ¶ 9). Defendants do not contest Marchetti's expertise in the pharmaceutical supply chain field, but they do contest opinions which they believe are outside of her field of expertise – namely, her assessment that the Lexapro Amendment was not a "fair value" agreement.

Marchetti's report begins by recounting the background of the Lexapro Agreement and Amendment. The original agreement stipulated that Alphapharm/Mylan would be responsible for marketing and distributing Lexapro AG (but not manufacturing), and for paying royalties of 40% of its "Product Profit" to Forest. It also permitted Alphapharm/Mylan to terminate the agreement after one year. (*Id.* at ¶ 44). The Lexapro Amendment reduced the royalty rate Mylan had to pay Forest. Instead of 40%, Mylan needed only to pay 30% on the first $100 million in profit and $35% on the next $50 million, with the original 40% in place for any profit above $150 million. Mylan also agreed to extend the term of the contract by one year, and to manufacture Lexapro AG. In exchange, Forest paid Mylan an upfront payment of $20 million.

Marchetti's opinions focus on calculating the "cost" of the Lexapro Amendment to Forest in order to determine whether Forest's payments were "large and unjustified" in violation of *Actavis*. By her calculation, the original Lexapro Agreement would have netted Forest $60 million on the first $150 million of Lexapro AG's profits (40% of $150 million). (*Id.* at ¶ 121) In contrast, the Lexapro Amendment required Forest to *pay* a $20 million upfront fee *and* to accept reduced royalties – with royalties of only $47.5 million on the first $150 million in profit (a $12.5 million decrease from the original agreement). Thus, when compared to the original agreement, the "cost" of the Amendment to Forest totaled between $30.5 million and $31.3 million: the $20 million upfront payment plus the $12.5 million in reduced royalties, minus estimated "technical transfer costs" for moving the manufacturing of the product from Forest to Mylan. (*Id.* at ¶ 30).

Marchetti then explored whether Forest expected to recoup the "costs" it paid Mylan; but she focused primarily on whether Forest saved money *by offloading manufacturing costs*. She concluded that Forest did not anticipate recouping manufacturing costs that were anywhere close to the amount it paid as part of the settlement. By her calculation, Forest was saving only $1.2

million to $2 million by transferring the manufacturing of Lexapro to Mylan. (*Id.* at ¶¶ 59–60). In her view, these minimal "saved" costs did not justify the payments made to Mylan and thus the Amendment did not constitute "fair value."

Forest primarily moves to exclude this opinion on "fair value." It notes that Marchetti has no training or experience in "business valuation" – a fact that SBA concedes – and argues that she has never before offered an expert opinion on valuation of any sort, let alone the fair value of a business transaction involving intellectual property rights. Forest's expert, Philip Green – who does have considerable business valuation experience – observes that, in making her cost/benefit calculations, Marchetti focused only on possible manufacturing savings from the Lexapro Amendment but completely ignored certain other anticipated benefits to Forest. These included a large reduction in anticipated Medicaid liabilities by offloading the manufacture of Lexapro AG to Mylan, *see* Section I.E, *supra*, as well as Forest's expectation of what it could earn during a second year of profit sharing from the Amendment's one-year extension.

In short, Forest argues that Marchetti's conclusion on "fair value" does not encompass all that should be considered – from a legal standpoint – when evaluating whether a reverse payment was "large" and "unexplained." I agree.

In an opinion that has long bedeviled district courts, the Supreme Court's *Actavis* decision held that reverse-payment settlements could be challenged as violative of the antitrust laws, but also explained that there could be justifications for reverse payments other than buying off potential competitors. Therefore, the Court declined to hold that reverse-payment settlements were *per se* unlawful – only "large and unjustified" payments were subject to antitrust scrutiny. *Actavis*, 570 U.S. at 158.

In this case, the payment to Mylan (inclusive of the Lexapro amounts) is sufficiently large, on its face and in the absence of any explanation, to trigger *Actavis* scrutiny. Indeed, when compared to the rest of the reverse-payment settlements Forest entered into to stave off challenges to the '703 Patent – all of which settled for between $150,000 and $2 million – the Lexapro Amendment's payment of upwards of $30 million to Mylan appears to be inexplicably large. But where, as here, the payor (Forest) offers justifications for the payment aside from suppressing competition, there exists a question of fact as to whether the payment is "unjustified." As *Actavis* put it, while "parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is: What are those reasons? If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the anti-trust laws are likely to forbid the arrangement." *Ibid*. Put otherwise, if the reasons proffered by the parties are not persuasive to the trier of fact to justify the payment, then a large reverse payment likely means there has been an antitrust violation.

But contrary to Marchetti's assertion, the issue is not whether Forest's payment is "unjustified" in relation to "the services Mylan agreed to deliver." (*Id*. at ¶ 31), Rather, the question is whether, weighing the costs and benefits to both parties, the payment can be explained for reasons other than solely keeping Mylan out of the market. Nothing from *Actavis* limits the acceptable "reasons" for making a reverse payment to only compensating for "services" a payor receives – in this instance, to saved manufacturing costs. Savings from elsewhere could also be an economically rational factor in deciding to settle. If Marchetti's formulation were correct, anticipated litigation cost savings – a well-known reason why parties who believe they are likely to win lawsuits choose to settle – could never be invoked as a justification for settling a patent case with a reverse payment. Nor could anticipated Medicaid savings. I do not read *Actavis* so narrowly.

This Court is already on record, in the direct-purchasers' case, stating that any value Forest obtained from the Lexapro Amendment, whatever its source, must be factored into an *Actavis* analysis. *See In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488 (CM), 2019 WL 6242128, at *10 (S.D.N.Y. Aug. 2, 2019) ("The jury will be allowed to consider evidence of the value of the Lexapro Amendment to Forest – whatever the 'source' of that value – in its evaluation of whether the settlement payment was 'large' or 'for fair value.' "). The jury in this case will be similarly instructed, and it will be for the jury to decide whether the benefits Forest claims to have received from its deal with Mylan really were benefits as claimed.

The core flaw of Marchetti's report is her assumption that the value of the Lexapro Amendment to Forest must be measured only by the cost of shifting the manufacture of Lexapro AG to Mylan. Forest disclaims that manufacturing cost savings were its only consideration, and Marchetti has essentially given no opinion about some of Forest's other stated sources of "benefit" (i.e., Medicaid savings). In the view of this Court, she cannot simply dismiss them out of hand – *Actavis* recognized that it was possible to settle litigation for various things of value. *See* 570 U.S. at 158 ("The fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit; they may, as in other industries, settle in other ways.").

I thus conclude that Marchetti's opinion on what is essentially the ultimate issue in the case – that the "Amended Lexapro Agreement did not represent 'fair value' to Forest since effectively all of the gains from the agreement benefitted Mylan – not Forest" (*Id*. at ¶ 121) – is unlikely to be of assistance to the trier of fact, because that is not based on the proper standard for measuring benefits to a reverse payor when applying *Actavis*. Marchetti's opinion that the Lexapro Amendment was not "fair value" thus cannot be accepted into evidence.

But that does not mean that the rest of Marchetti's opinions must also be excluded.

I reject Defendants' argument that Marchetti's testimony should be stricken in its entirety because she lacks training or experience in business valuation. As Forest's own expert, Philip Green, attested in his report, "*The fairness of a transaction is not the same as a business valuation for transaction purposes.* Fairness considers the relative payments and benefits to both parties to a transaction." (Green Rep. at ¶ 26 (emphasis added)). It thus seems to me beside the point that Marchetti has no formal training or experience in business valuation. Marchetti is not being asked to value a business. She is being asked her views on the value of what Forest got for conferring over $30 million in benefits on Mylan. Although she cannot opine that the value was "fair" or not, she can provide her assessment of the value of what Forest received in return. After 35 years in the pharmaceutical industry, including stints as the Chief Operation Officer at one pharmaceutical company and managing the product life cycle and product launches at others, Marchetti's extensive practical experience qualifies her to opine on the value of what Forest was getting in exchange for what it paid – including the amount that it saved in manufacturing costs. It is simply the ultimate conclusion that I will not allow, because Marchetti's ultimate conclusion is predicated on a misreading of *Actavis*.

That being so, to the extent that Marchetti's testimony (especially in her rebuttal report) takes issue with Forest's assertions of value received as a result of the Lexapro Amendment, her expert testimony is admissible, because it would help the jury decide whether Forest's claimed benefits are legitimately worth what Forest contends they are worth. For instance, Marchetti takes issue with the way Forest values both what it got from Mylan and what it got from other sources, including cost savings. She opines that the Lexapro Amendment's one-year extension of the term of the contract was essentially worthless because it would not have been financially sensible for Mylan to stop selling Lexapro AG after just one year. (Marchetti Rebuttal at ¶¶ 16–17). In other

words, the "value" of the extended year of the contract to Forest was zero because Mylan would have continued the agreement into a second year regardless of whether it had been contractually obligated to do so.

This conclusion contrasts with that of Forest's experts, who opine that there was considerable value (from royalties) in the additional year. But Marchetti gives perfectly sensible reasons for her opinion – testimony that she is qualified to give. The fact that Marchetti's opinion differs from the opinions of Forest's experts is not a reason to exclude her testimony; and her extensive experience in the pharmaceutical business qualifies her to criticize Forest's reasoning. Such disputes are the stuff that expert battles are made of; disagreements between experts rarely if ever justify *Daubert* exclusions (although they are too often the basis for *Daubert* motions). In particular, there is no reason to strike Marchetti's opinion that the payment of $20 million is well in excess of what is common "in the pharmaceutical industry for the transfer of technology and manufacturing responsibilities," especially since she offers cogent reasons why the benefits Forest received for that $20 million was less. (*Id*. at ¶ 40).

Marchetti is also indubitably qualified to opine on the first two questions she was asked; her long experience in supply chain management so qualifies her. Recognizing this, Forest asks that the Court exclude her testimony relating to saved manufacturing costs and manufacturing capacity on the ground that Forest has never asserted that these things were the "primary reason" it entered into the Lexapro Amendment. I assume that Forest chose to insert the word "primary" in that sentence (which I take directly from its brief) advisedly. I will respond in kind: As long as saved manufacturing costs and/or manufacturing capacity were *any part* of the reason why Forest entered into the Lexapro Amendment – primary, secondary, tertiary, or even the last reason – those things are fair game for the sort of analysis that Marchetti provides.

Thus, except to the extent that Marchetti opines on the ultimate question in the case – that Forest did not receive "fair value" for its reverse payment – her report will not be stricken from the summary judgment record, and the Court will consider her testimony in deciding the motion.

Defendants' motion to exclude is granted in part and denied in part consistent with this opinion.

### C. Defendants' motion to exclude the opinions of Thomas McGuire is granted in part and denied in part

Defendants move to exclude the opinions of SBA's economist Thomas McGuire, on largely the same grounds as they sought to exclude Marchetti's opinions on "fair value." For the same reasons, Defendants' motion is granted in part and denied in part.

McGuire is a professor of Health Economics in the Department of Health Care Policy at Harvard Medical School. The parties do not dispute that he is eminently qualified to offer opinions on economics, but – as discussed below – he is not qualified to offer legal opinions or to base certain ultimate conclusions on a legal opinion that differs from the law as the Court will give it to the jury.

McGuire was asked to "conduct an economic analysis of the settlement between Forest and Mylan . . . in order to address the question of whether or not the [Lexapro Amendment] included an anticompetitive reverse payment." (McGuire Report at ¶ 2). He was also asked whether – if the Amendment was anticompetitive – there nonetheless were "any procompetitive justifications . . . that outweigh the anticompetitive impacts." (*Ibid.*). He concluded that the Amendment was anticompetitive, and that there was "no explanation for Forest's reverse payment well in excess of its avoided litigation costs." (*Ibid.*). Defendants seek to exclude this opinion.

Like Ms. Marchetti, McGuire analyzes whether the benefits Forest expected to receive from the Amendment justified the roughly $30 million payment it made to Mylan. But instead of

focusing on the manufacturing and transfer "services" that Mylan provided (Marchetti's focus), McGuire opines on the expected costs and benefits associated with the litigation surrounding the '703 Patent.

McGuire believes that for Forest, settling the lawsuit offset certain litigation costs it expected to incur for continuing to defend the '703 Patent. These offset litigation costs totaled only around $3 million. (*Id*. at ¶ 103). For Mylan, a settlement would necessarily preclude the ability to earn profits from winning its Paragraph IV challenge – but these expected profits totaled only around $0.9 million spread over four years. (*Id*. at ¶ 106). McGuire thus concludes that Forest's expected saved litigation costs did not justify its payments to Mylan, but instead indicated "a large, unexplained reverse payment," which was a "means to induce Mylan to delay generic entry." (*Id*. at ¶¶ 103, 114).

Most critically for purposes of this *Daubert* motion, McGuire spills considerable ink opining on what he believes constitutes a "large and unjustified" reverse payment. He interprets *Actavis*, which he views as standing for the proposition that "If the reverse payment exceeds any avoided litigation costs, we can infer that the brand must be getting higher profits from the settlement than it would with litigation (because if the brand expected higher profits with litigation, it would litigate)." (*Id*. at ¶ 76). In other words, McGuire believes that a reverse payment is anticompetitive if the payment exceeds the anticipated future litigation costs of continued defense against the Paragraph IV challenge. Most of Section V.A in his opening report is dedicated to supporting this view. While other justifications – like the ones proffered by Forest (i.e., reduced Medicaid liability) also matter – McGuire's calculations ignored them.

Defendants thus argue that the McGuire's opinions on the fair value of the Lexapro Amendment should be excluded because it does not conform to the relevant legal principles. I

agree. McGuire's opinions regarding the ultimate issue in the case – whether the Lexapro Amendment was a "large and unjustified" payment – are excluded for the same reason that Marchetti's opinions on such matters are excluded.

McGuire's conclusions rest on an erroneous reading of *Actavis*. He ignores the fact that Forest justifies the payment on the ground that the new Lexapro arrangement would result in several benefits to its financial position *in addition to* saved litigation costs, which – from Forest's point of view – "justified" a "large" payment to settle the Paragraph IV lawsuit. For example, Forest claims that it expected to save at least $26.5 million in reduced Medicaid liabilities from the arrangement, but McGuire ignores these benefits in his analysis.

SBA is free to argue that these claimed savings did not in fact result in the economic benefits that Forest ascribes to them, and the trier of fact will ultimately conclude whether Forest's purported justifications were the real reason for settling the lawsuit on the terms chosen, or whether the real reason was suppression of competition. But the jury will not be instructed that the "justification" for a large payment must be limited in the way that McGuire has chosen to limit it. It will not be told that *Actavis* limits the justification for a reverse payment to saved litigation costs, or that saved litigation costs are the only quantitative measure of the size of the payment. In fact, the jury will be told exactly the opposite – that nothing in *Actavis* as this Court reads the case limits reverse payments to saved litigation costs. For Dr. McGuire, this eliminates the portion of his testimony that is summarized in Section "V.A" of his report.

McGuire also opines that the agreement was not a "competitive compromise," and that the Lexapro Amendment was designed to delay competition because Mylan would never have made as much money by winning the Paragraph IV lawsuit as it made via the reverse payment. To the extent that McGuire opines that Mylan stood to make more by settling than by winning the lawsuit

(which seems a self-evident proposition), he can explain that to the jury; such testimony does not run afoul of the Court's reading of *Actavis* because it goes to the value of the payment to one of the parties. It may, therefore, be evaluated by the jury for what it is worth. That is, McGuire may say that the best case scenario for Mylan in the absence of a reverse payment, was "a win in the patent litigation allowing them, along with the other first filers with final approval, to sell generic Namenda beginning around October 1, 2011, and for 180 days thereafter, before other generics could enter." (*Id*. at ¶ 104). And he may say that the reverse payment left Mylan better off than the best-case litigation scenario.

McGuire may also offer opinions about the expected value of the settlement to Mylan. For example, he states that – had Mylan prevailed in its Paragraph IV challenge – its "expected profits from selling generic Namenda [would have been] small, $0.9 million in profit over a period of approximately four years and negative thereafter." (*Id*. at ¶ 101). This low amount of expected profit is due in part to the fact that the MFN/acceleration clauses contained in the reverse settlements permitted all of the generic manufacturers to launch its generic whenever any other generic manufacturer launched its version. Thus, the expected profits from generic Namenda IR would have been split among many different companies. McGuire is eminently qualified to explain this to the jury and offer his opinion of how that number compares to the economic value of the Lexapro Amendment.

However, he may not offer the ultimate conclusory opinion that "no compromise has been made, rather, Mylan has been paid to induce it to accept a delayed entry date." (*Ibid*.). The reason is that this conclusion rests on SBA's unsound reading of *Actavis* – specifically on the argument that only the value of the settlement to the settling generic (Mylan) can be considered under the reasoning of the Supreme Court (*see* Section III.B.2, *infra*). It will be left to the jury to make the

decision about the value of the settlement to the settling parties (assuming, of course, that the Paragraph IV settlement and Lexapro Amendment constitute an integrated deal, *see* Section III.C, *infra*). McGuire's view of the situation adds nothing to the jury's ability to evaluate the evidence; his ultimate opinion rests in significant part on SBA's misreading of *Actavis* and on Marchetti's calculations, to which he tries to add an economist's gloss.

For these reasons, Defendants' motion to exclude McGuire's opinions is granted in part and denied in part consistent with this opinion.

### D.  Defendants' motion to exclude the opinions of Jacob Holzer is denied

SBA offers Holzer as a prior art witness. He was asked to opine on whether "as a person of ordinary skill in the art, it is [his] opinion that prior art references establish that memantine was used to treat Organic Brain Syndrome and Alzheimer's Disease Prior to April 14, 1989" – the date when Merz first filed the application that ultimately led to the '703 Patent. (Holzer Report at ¶¶ 15, 41).

Dr. Holzer has over thirty years' experience as a practicing psychiatrist. He has completed fellowships in neuropsychiatry and behavioral neurology at Yale and Harvard, and he has an appointment as an instructor at Harvard Medical School. He has also served as a consultant for Eli Lilly, a pharmaceutical company. Dr. Holzer currently serves as a Clinical Staff Associate of Geriatric Psychiatry Outpatient Services at McLean Hospital, and as a Staff Psychiatrist at Spaulding Rehab Hospital. As part of his work, Dr. Holzer treats patients suffering from a broad range of neurological disorders, including Alzheimer's.

In total, Holzer reviewed six clinical studies dating prior to April 14, 1989 that relate to the effects of memantine on patients with brain disease. These studies involved different patient sizes and timelines, but all focus on the effects of memantine and whether it could be used to treat certain brain conditions. Holzer goes into detail about how the studies were conducted, the characteristics

of the patients involved, and the studies' conclusions. His review of the literature led him to conclude that "prior art references establish that memantine was used to treat . . . Alzheimer's Disease prior to April 14, 1989." (*Id*. at ¶ 87). Forest seeks to exclude this opinion.

Holzer is not a lawyer and does not purport to give legal conclusions. But his opinions on prior art are probative of the strength of Mylan's Paragraph IV challenge to the '703 Patent. A conclusion that memantine was used to treat Alzheimer's prior to 1989 means that the knowledge contained within the '703 Patent arguably already existed in the public domain prior to its being patented – which might have strengthened Mylan's Paragraph IV challenge. *See, e.g., Papyrus Tech. Corp. v. New York Stock Exchange, LLC*, 653 F. Supp. 2d 402, 414 (S.D.N.Y. 2009) ("A patent claim may be held invalid if it is anticipated or made obvious by prior art.").

Dr. Holzer easily qualifies as a "Person of Ordinary Skill in the Art (POSA)" of treating Alzheimer's, and he is qualified to opine about what a POSA would have understood about using memantine to treat Alzheimer's prior to 1989 through his review of the pre-1989 studies.

Forest objects to Holzer's testimony on the ground that the studies he reviewed do not focus exclusively on Alzheimer's patients, but rather on persons suffering from both Alzheimer's *and* Organic Brain Syndrome more generally. Forest argues that this renders Holzer's opinions too broad and contravenes the *Markman* ruling from the Delaware District Court, which it argues rejected Mylan's proposal to define "Alzheimer's" as extending to OBS.

This characterization is inaccurate. As Dr. Holzer notes, Alzheimer's is just one form of OBS, and so if the studies referenced a potential benefit of memantine to patients suffering from OBS generally, the natural implication is that it would necessarily be beneficial to Alzheimer's patients as well. (Holzer Rebuttal at ¶ 8). Regardless, his opinions on Alzheimer's and OBS do not contradict the Delaware court's claim construction; in fact, they do not address the claim

construction at all, and there is absolutely no reason why he needed to have read the *Markman* decision to form his opinions. He opines only about what a POSA in 1989 would have understood from the prior art – nothing more. He believes that a POSA would have understood that using memantine to treat OBS encompassed the treatment of Alzheimer's prior to 1989 because Alzheimer's is and at that time was one of the most prevalent forms of OBS. Holzer offers no opinion about the scope of the '703 Patent's claims or the validity of the patent. His opinion is limited to what a POSA would have understood, from the literature in existence at the time Merz filed for what became the '703 Patent, about the use of memantine to treat Alzheimer's. He is eminently qualified to offer that opinion.

The fact that the subjects in the studies were not, or may not have been, limited to persons who definitively had Alzheimer's – as opposed to some other form of OBS – is a matter to be taken up on cross examination and goes to the weight of Dr. Holzer's opinion, not to his ability to offer it. However, it is the Court's understanding that, even today, it is not possible to diagnose Alzheimer's definitively over other forms of OBS until after the patient's death, when the brain can be autopsied – and that was certainly the case prior to 1989, which is the relevant period for our purposes. If my understanding is correct (and that statement comes from the National Institutes of Health[4]), the fact that a POSA cannot be absolutely certain that a person suffering from dementia has Alzheimer's, as opposed to some other form of OBS, might well affect how a POSA interprets studies in which patients were not classified by the form of OBS from which they suffered. Such matters are appropriate for exploration at trial; they are not a basis to exclude under *Daubert*.

The motion to exclude is denied.

---

[4] *See* How is Alzheimer's Disease Diagnosed, National Institute on Aging, https://www.nia.nih.gov/health/how-alzheimers-disease-diagnosed (last visited June 10, 2021) ("It's important to note that Alzheimer's disease can be *definitively* diagnosed only after death, by linking clinical measures with an examination of brain tissue in an autopsy.").

*Plaintiff's Motions to Exclude Defendants' Experts*

### E.  SBA's motion to exclude the opinions of Philip Green is denied

Defendants' expert Philip Green is a foil to SBA's expert Susan Marchetti in that he offers views on the "fair value" of the Lexapro Amendment that directly contradict hers. Since October 1996, Green has served as a founding principal of the consulting firm Hoffman Alvary & Company LLC, where he is regularly involved in the valuation and licensing of intellectual property, including patents related to pharmaceuticals. His work encompasses the valuation of intellectual property transactions and providing opinions on the fairness of the compensation provided.

Defendants asked Green to "evaluate financial aspects" of the Lexapro Amendment and to "respond as necessary" to the reports of SBA experts Susan Marchetti and Thomas McGuire. (Green Report at ¶¶ 1, 2). Green supplied a substantially similar expert report as part of the direct-purchaser litigation. The Plaintiffs in that case did not file a *Daubert* challenge to Green's report.

Green's report is like Marchetti's in that he attempts to calculate the value of the Lexapro Amendment to Forest. But his analysis is broader. Instead of determining only the value of the services that Mylan provided Forest, Green itemizes the specific benefits/costs that each party expected to receive to see if the Amendment was "fair" for both sides. For example, Green, like Marchetti, calculates that the Lexapro Amendment decreased the amount of profit-sharing royalties that Forest expected to receive from Mylan by $12.5 million (*Id.* at ¶ 49); but unlike Marchetti, he concluded that Forest also "reasonably expected to gain $21.1 million in net profit share in the second year of the agreement due to the minimum term extension included in the amendment." (*Id.* at ¶ 55). Green thus believes that Forest's expected profit share benefits *increased* as part of the Lexapro Amendment – to a net of $8.6 million over the first two years of the new arrangement ($21.1 million minus $12.5 million). (*Id.* at ¶ 91). The additional profit share

from year two differs from Marchetti's conclusion that there was no "reasonable expectation that sales of the Lexapro AG could have been sold at a profit by year two." (Marchetti Report at ¶ 113).

Green also calculates another net benefit to Forest that Marchetti does not – the expected effect on Medicaid liabilities. As discussed, legislative and administrative changes to Medicaid altered the regulatory landscape underpinning the original Lexapro Agreement. Green observes that by shifting the manufacturing of Lexapro AG to Mylan, "Forest forecast $26.5 million in Medicaid best price liability savings." (Green Report at ¶ 75). Thus, in his opinion, the total net benefits that Forest expected to receive from the Lexapro Amendment – without any consideration of saved litigation costs – would have been around $15.1 million ($26.5 million in reduced Medicaid liabilities plus $21.1 million in second-year profit, minus the $20 million upfront payment, minus the $12.5 million in decreased first-year profit share). (*Id*. at ¶ 83).

Green performs a similar analysis for Mylan, concluding that – despite it receiving an additional $12.5 million in net profit from the renegotiated agreement – its potential loss of 100% profit (if it terminated the agreement) in the second year due to the extension resulted in a total net loss from the Amendment of $19.2 million. However, this was offset by the $20 million upfront payment such that the total expected net benefits to Mylan as a result of the Lexapro Amendment was a net gain of $0.8 million. (*Id*. at ¶ 83).

These calculations led Green to conclude that – because the net benefits to each side exceeded the costs – the Lexapro Amendment "constitutes fair value." (*Id*. at ¶ 33). It is this opinion and the calculations leading to this opinion that SBA seeks to exclude.

SBA seeks to exclude Green's opinions on the basis that he incorrectly included anticipated benefits from reduced Medicaid liabilities as part of his analysis. SBA insists – as it does with its defense against Defendants' *Daubert* motions against Marchetti and McGuire – that the relevant

*Actavis* question is what *Mylan* stood to profit from the deal, rather than what benefits Forest anticipated from the deal.

This motion can be disposed of quickly. It is denied because SBA's motion is predicated on an incorrect premise. Mr. Green does not run afoul of the Court's prior ruling on what can be considered in assessing the value of the settlement to Forest and Mylan – the error that renders Marchetti's and McGuire's ultimate conclusions inadmissible. It is SBA, not Green, who runs afoul of *Actavis* by insisting that any analysis must be limited to the "services rendered" by Mylan to Forest – a concept that appears nowhere in the *Actavis* decision.

Moreover, SBA's arguments are a classic example of the "his expert doesn't agree with my expert, so we must exclude his expert's testimony" school of *Daubert* motions. Mr. Green – whose credentials as an expert in valuation are unchallenged – offers his opinion about what value Forest obtained by entering into the Lexapro Amendment as part of that settlement. In the admissible portions of her testimony, Ms. Marchetti takes issue with a number of Green's conclusions about the "value" of specific items to a patent holder in Forest's position. She will be allowed to testify that Green's opinion is not worth the paper on which it is written. But the "errors" to which SBA points in its motion to exclude are really nothing more than differences of opinion that undergird any battle of the experts. The trier of fact can decide whether Ms. Marchetti's objections to Mr. Green's opinions are valid and whether his ultimate conclusion is to be accepted or not. Green's opinions are admissible, SBA's motion is denied.

## F.  SBA's motion to exclude the opinions of Lona Fowdur is granted in part but principally denied

Lona Fowdur is an economist. Her areas of specialization include antitrust analyses and industrial organization. Her work consists of analyzing market definition and the competitive effects of mergers and other corporate transactions.

SBA does not contest that Fowdur is qualified as an economist but criticizes her conclusions, again based on its misinterpretations of *Actavis*.

Fowdur was asked to address the potential harms and possible damages associated with SBA's claims. Her report largely responds to the opinions of Plaintiff witnesses, including Marchetti and McGuire as well as those of Dr. Russell Lamb and William Vogt (whose opinions were key in determining class certification). Most of her analysis focuses on the class-wide impacts of the hard switch. Since the hard switch theory was not certified for class treatment, those opinions are now irrelevant and need not be addressed.

As to the reverse payment theory, Fowdur first offers her opinions on the *Actavis* decision, and how the decision is "consistent" with the principle that "there is no reasonable economic basis to infer an anticompetitive settlement when payments to the generic manufacturer approximate or are less than the brand's likely avoided litigation costs." (Fowdur Report at ¶ 36). She then uses these conclusions to critique how Marchetti's and McGuire's opinions misapply the decision and are therefore unreliable. For example, she claims that McGuire "inappropriately narrow[s] the elements considered to be traditional settlement considerations under his interpretation of [] *Actavis*." (*Id*. at ¶ 47).

Apart from these legal opinions, Fowdur also draws on her economics background to evaluate the economic rationality of Forest's payments. She bases her opinions from the calculations performed by Philip Green. Based on her expertise, Fowdur concludes that "Forest's payment for the Lexapro Amendment was economically rational and fully explained by the benefits that it expected to receive," and that "Forest would expect the Lexapro Amendment to make economic sense." (*Id*. at ¶¶ 69–71). Fowdur also criticizes the claims of Marchetti and

McGuire – for example, by taking issue with Marchetti's conclusion that the additional second year extension from the Lexapro Amendment was practically worthless. (*Id.* at ¶¶ 72–87).

Fowdur's testimony is admissible insofar as it contests and criticizes specific opinions propounded by Forest's experts. Her views antithetical to Marchetti's and McGuire's provide a classic battle of experts, and SBA does not appear to contest Dr. Fowdur's ability to do this.

What SBA seeks to preclude are Fowdur's interpretations of *Actavis*, and the conclusions (principally contained in Sections VII.B, C) that rely on that interpretation. That aspect of the motion is granted – but not for the reason argued by SBA.

SBA's motion is predicated on the notion that *Actavis* limited the value of reverse payments to "avoided litigation costs or the fair value of services" rendered by Mylan to Forest. *Actavis*, 570 U.S. at 156. It did not. As this Court has now repeatedly noted, *Actavis* did not limit the allowable economic effects of reverse payments to those two items; rather, it used them as illustrations of considerations that might impel settlement (hence its use of the phrase "such as" before mentioning those two items). *Ibid.* As far as I am concerned, it is SBA whose interpretation of *Actavis* is legally erroneous.

Nonetheless, this aspect of the motion is granted, but only because no expert, for either side, will be allowed to explain *Actavis* to the jury. The Court will interpret the case for the jury. To the extent any expert's testimony contradicts that interpretation, it will be disallowed. But the rest of Fowdur's opinions are admissible. SBA's motion is granted in part but principally denied.

### G.  SBA's motion to exclude the opinions of Sue L. Robinson is granted in part and denied in part

Ms. Robinson is a retired judge who served for more than twenty-five years on the United States District Court in the District of Delaware, where she presided over many a patent trial. She served as Chief Judge of that district from 2000 to 2007.

37

Robinson was asked by Defendants to provide background on how patent trials are conducted in the District of Delaware, where Mylan's Paragraph IV challenge took place. She reviewed the record from the Paragraph IV litigation and the merits of the claims and defenses from each side to evaluate the strengths and weaknesses of Forest's and Mylan's positions. She also responded to the opinions of Plaintiff expert Michael A. Davitz, who similarly opined on the merits of the litigation for each side. (Robinson Report at ¶ 13).

SBA argues that Robinson lacks the unique knowledge to opine as an expert on patent litigation, claiming that she has never practiced as a patent attorney before becoming a judge. SBA also criticizes Robinson for offering opinions about how Forest or Mylan would have litigated the case if it had gone to trial, and also how the judge presiding over the case, Judge Sleet, would have ruled on certain evidentiary issues or would have perceived certain arguments. SBA claims that these opinions are outside her scope of expertise.

SBA's motion is granted in part and denied in part.

This Court is second to none in its acknowledgement of Judge Robinson's expertise where patent law is concerned, as well as her expertise in how patent cases are tried. But we do not need an expert in patent law or patent trial procedure in this case. So, the first thing that I must make clear is that Judge Robinson will not be allowed to express any opinions about *Actavis* or her understanding of it. Fortunately, in her report, she disclaims any such intent.

I also do not see the need for extensive testimony about how a trial that never happened would have been conducted by another judge of Judge Robinson's court, who may or may not have followed the procedures or reached the conclusions that Judge Robinson would have reached had she been the presiding judge in the Mylan Paragraph IV case. These are, however, matters for another day.

As for her other opinions, Robinson is well qualified to criticize Dr. Davitz's methodology and conclusions, and I will allow her to do so. For example, she notes that the judges of the District of Delaware are exceedingly well qualified to try patent cases – because they try so many of them – and points out that generics succeeded just 36% of the time in courts with large patent dockets (i.e., Delaware, New Jersey and the Southern District of New York). (*Id*. at ¶ 45). She also observes that Davitz's statistics include settlements as "wins" for generics, a conclusion with which she understandably disagrees. (*Id*. at ¶ 47). She notes that Davitz's opinions give great weight to witness testimony from the Paragraph IV litigation that is amenable to cross examination on identifiable grounds, and that the testimony appears to be internally contradictory.[5] As long as she is responding to Davitz's opinions by criticizing the factors he considers in reaching his "70% success rate" conclusion, her testimony is admissible.

As the former Chief Judge in Delaware, Robinson is familiar with the practices of her colleagues in conducting Paragraph IV cases.[6] She is thus also in a position to criticize Davitz's conclusions about the timing of the Paragraph IV case. Indeed, in that regard, she is arguably not testifying as an expert at all, but as a fact witness. Her testimony on this subject is perfectly acceptable.

But the critical part of Robinson's testimony is her assessment of the strength of Forest's and Mylan's case on the merits, which she bases principally on her review of the pre-trial record in the Paragraph IV litigation. However, part of her conclusions come from her views of how Judge

---

[5] Of course, since the witnesses never actually testified, we cannot know whether a seeming internal contradiction was not a contradiction at all, or whether it could be explained in a way that would appeal to the common sense of the trier of fact.

[6] That is because Chief Judges get statistics about their colleagues' work, not because Chief Judges have any power to control their colleagues' dockets, to assign them work, to supervise their work, or to require that they complete their work in a timely manner—all points that I, as a former Chief Judge, would insist be made if the jury were to become aware that Ms. Robinson had been Chief Judge. The title "Chief United States District Judge," as I learned during my term, is highly misleading to the uninitiated – especially since Chief Judges in the several states tend to have a great deal of power over the conduct of business in their respective courts. Chief United States District Judges do not.

Sleet – the judge presiding over the litigation – would have ruled on certain motions, or how he would have viewed certain arguments. (*E.g., Id*. at ¶¶ 47, 107, 109). Robinson cannot predict how Judge Sleet would have ruled; such testimony is off limits, from anyone, including especially a former colleague. Therefore, statements such as, "Judge Sleet would likely not have found this or that credible" cannot and will not be permitted. (*See, e.g., Id*. at ¶ 109).

Part of her assessment is based on Judge Sleet's "track record" in patent cases. For example, Robinson notes that, as of 2010, Judge Sleet ruled against generic drug manufacturers in two cases and had not ruled in favor of any. (*Id*. at ¶ 47). But this has absolutely no bearing on the likelihood of whether he would have ruled against Mylan in a totally different case. Thus, to the extent that Judge Robinson's views about the likelihood of Mylan's success are predicated on her consideration of Judge Sleet's "track record" in patent cases, her opinions may not be offered or considered. I am certain that Judge Robinson did not mean to suggest that Judge Sleet was not entirely open-minded about each new case that came before him, or that he had some sort of predisposition to rule against generic drug manufacturers. Unfortunately, her testimony about a former colleague could easily be interpreted in that way, so I will not allow a jury to consider it.

But other aspects of her testimony are admissible. Robinson reviewed an extensive evidentiary record – depositions, documents produced, papers filed, and decisions and orders of the court – that was available to the parties and to any lawyer who would have been advising Forest or Mylan on its chances of winning the case. It would have been malpractice to not be familiar with that record; and a patent lawyer (Davitz) or judge (Robinson) are both well-positioned to opine on the strength of the evidence supporting particular arguments. And while neither Judge Robinson nor anyone else (Davitz, for example) can employ the word "credible" when discussing a witness's testimony – because no one can assess credibility without seeing the witness and

listening to both direct and cross examination – she is perfectly free to point out things in the record as it existed at the time of the Forest-Mylan settlement that would have provided fodder for cross examination at a trial – even though we cannot know how that cross examination would have played out (*see* n.5, *supra*).

But the only things on which expert testimony about the relative merits of each party's case can be based are those that Forest and Mylan were able to consider when evaluating whether to settle the lawsuit. Ergo, Robinson cannot factor into her assessment things that Forest and Mylan did not know about in 2010 and could not possibly have known in 2010 – like the contents of internal documents of another generic manufacturer (Dr. Reddy's) discussing *its* decision to settle. (*Id*. at ¶¶ 75–76). Those items did not come to light until discovery in this litigation, so a reasonable patent attorney advising a client in 2010 could not possibly have factored them into his or her equation. The fact that generics other than Mylan settled soon after the *Markman* decision is an objective fact that existed in 2010, and that an expert might well believe was suggestive of Forest's having a strong case in light of claim construction.[7] But the internal discussions about settlement at another firm – discussions to which Forest and Mylan were not privy – are not factors that a competent patent attorney advising Forest or Mylan in 2010 could have considered, and are not indicative of what Forest or Mylan would have considered or viewed. How other generic manufacturers viewed the relative strength of their position is not indicative of how *Forest* or *Mylan* viewed their positions. I will not allow such factors to serve as the basis for expert testimony on the only subject in which the trier of fact in this case is interested: did *Forest* and *Mylan* have

---

[7] It is my understanding that the Court of Appeals for the Federal Circuit reverses district court claim construction decisions about 50% of the time. It could of course be that reversal is less likely for Delaware judges; that datum is not in the record. But the nationwide reversal rate is quite well known among district court judges. And a 50% reversal rate makes it a coin toss whether such interesting constructions as the one adopted by Judges Stark and Sleet about "cerebral ischemia" (a common medical term for the interruption of blood flow to the brain, a/k/a stroke) would have withstood an appeal.

a reason other than suppression of competition to settle their Paragraph IV lawsuit on the terms they reached in 2010.

In sum, Robinson will be permitted to testify about: (1) critiques to Davitz's methodology insofar as they pertain to the procedural aspects of the District of Delaware and; (2) her views on the strengths and weaknesses of the merits of Mylan's Paragraph IV challenge based off of her experience as a patent judge.

She will not be permitted to testify about: (1) the "credibility" of witnesses; (2) facts that neither Forest or Mylan would have been aware of in 2010; and (3) Judge Sleet's views or "track record" on patent cases, or how he would or would not have ruled on certain motions or how he would have viewed certain arguments. SBA's motion to exclude is granted in part and denied in part in accordance with this opinion.

### III.   SUMMARY JUDGMENT MOTIONS

SBA alleges four[8] substantive state-law claims against Forest and Merz. Count I alleges unlawful monopolization and maintenance of monopoly power through the reverse payments to generics (focusing on the Lexapro Amendment) and the hard switch theory, as to which no class has been certified. Count II alleges conspiracy-to-monopolize and restraint-of-trade claims based on the reverse payments. Count III alleges state consumer-protection and unfair-competition claims, and Count IV alleges claims under state common law principles of unjust enrichment.

There are three motions for summary judgment before the Court: (1) Forest's motion for summary judgment on all counts against it; (2) Merz's motion for summary judgment on all counts against it; and (3) SBA's motion for partial summary judgment on Count I against Forest.

---

[8] There is also a fifth count for declaratory relief, seeking the Court to declare that "Defendants' conduct seeking to prevent competition" constituted illegal monopolization. (ECF 326 at ¶ 246). Its fate hinges on the fate of the other claims and it is probably not a form of relief the Court will be inclined to award.

### A.  Legal standards

Summary judgment is appropriate if the moving party can demonstrate that there is no "genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In deciding a summary judgment motion, "The court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998). Whether any disputes of fact remain after the evidence is considered is a matter for the court. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

While SBA's claims are brought under a variety of state laws, liability under each of the claims fundamentally hinges on whether SBA can prove that Defendants' actions – i.e., the reverse payments – were anticompetitive. This is because SBA's consumer-protection and unjust-enrichment claims all depend on injuries suffered from there being higher prices following the allegedly anticompetitive conduct. (*See* Second Amended Compl., ECF 326 at ¶¶ 223–243). Thus, at this point in the litigation the parties primarily focus on the key aspect of the case: whether the reverse-payment settlements – and specifically the Lexapro Amendment – were anticompetitive.

Although IPPs' claims arise under state antitrust statutes, each of the statutes in question contain "harmonization" provisions that make the analysis of whether all elements have been met the same as if the claim were brought under federal antitrust law. *See Namenda VIII*, 2021 WL 509988, at *34–36. To prove that there was unlawful monopoly maintenance, there must be evidence that a defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384

U.S. 563, 570-71 (1966). To have a demonstrable restraint-of-trade claim, a plaintiff must prove "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restraints trade." *Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).

## B. Forest's and SBA's cross-motions for summary judgment as to Counts I and II are denied

Forest moves for summary judgment on all four of SBA's counts against it. The IPPs moves for summary judgment on Count I's unlawful maintenance of monopoly power issue. Fundamentally, the parties dispute whether the reverse-payment settlements were anticompetitive and – if they were anticompetitive – whether they caused a delay in generic competition. But since there are disputes of fact including, but not necessarily limited to, the issues of the "fair value" of the Lexapro Amendment and causation, these cross-motions for summary judgment are denied – just as they were in the direct-purchaser case.

### 1. Preliminary issues

First, one must note that there is no dispute that Forest possessed monopoly power in the memantine market during the relevant period. This issue has already been litigated, and Forest is estopped from arguing to the contrary. *See, e.g., Namenda VI*, 2018 WL 7197233, at *13.

Second, Forest purports not to "concede" that the Lexapro Amendment was "linked" to Mylan's decision to settle, but it also does not move for summary judgment on the ground that the Lexapro Amendment was not part and parcel of the Mylan settlement. (ECF 565 at 16 n.6). I thus assume that Forest takes the position – as it did in the DPP lawsuit – that whether the Lexapro Amendment was part and parcel of the Mylan settlement is a disputed issue of fact. It takes this position notwithstanding the fact that almost all of the reverse-settlement agreements between Forest/Merz and a generic manufacturer *except* Mylan contained a clause stating that the payments

44

included in the settlement were the "sole consideration" being exchanged for ending the generic's Paragraph IV challenge. (ECF 606 at ¶¶ 232–34). Only the Mylan reverse-settlement agreement – and another settlement not at issue in this litigation[9] – did *not* contain the "sole consideration" representation. That fact is enough to get the question of whether the Paragraph IV settlement and the Lexapro Amendment were part of one deal to the jury. *See Namenda V*, 331 F.3d at 199 (noting that, in the DPP case, "Plaintiffs have presented enough evidence to allow a rational juror to conclude that the Lexapro Agreement was a part of the Forest-Mylan patent settlement" thereby precluding summary judgment on the issue of whether these were two separate settlements).

### 2. Disputes of fact remain as to the value of the Lexapro Amendment

If indeed the Lexapro Amendment was part of the consideration for the settlement of the Paragraph IV lawsuit, then the question that arises is whether the payments Forest made to Mylan constituted "large and unjustified" payments that were anticompetitive.[10] Forest and SBA dispute whether the payments can be justified by benefits unrelated to the desire to delay generic competition – whether the payments constituted fair value for what Mylan gave up or for what Forest expected to receive. As should be obvious from the decisions on the *Daubert* motions, there are hotly disputed issues of fact concerning whether the Amendment constituted a fair bargain.

SBA argues, as a matter of law, that the trier of fact can consider only the generic's perspective, and that the Lexapro Amendment was anticompetitive if it "induced Mylan to settle rather than continue its challenge to the '703 Patent." (ECF 569 at 14). For SBA, it does not matter

---

[9] The other agreement was with the generic manufacturer, Orchid. Orchid was the last generic manufacturer to settle before Mylan. Although Forest/Merz sued Orchid along with the other generics in the District of Delaware, the case was transferred to the District of New Jersey. Orchid settled on March 23, 2010, four months before Mylan settled on July 21, 2010. (ECF 570 at ¶ 27). The record does not indicate if there was any other possible consideration associated with the Orchid agreement.

[10] If the jury decides that there were two separate settlements – which would mean that the Paragraph IV lawsuit was settled for $2 million, not upwards of $32 million – the Court may well direct a verdict on the issue of "large and unjustified," although we will hash this out fully at trial.

if Forest expected to save money in the long run by agreeing to the Amendment. "[T]he 'net benefits' that 'Forest expected to receive' . . . are immaterial" because they are not probative of "whether the reverse payment induced Mylan not to compete." (ECF 599 at 16). All that a factfinder can consider is whether the generic manufacturer received a payoff greater than the profits it expected to earn from winning the Paragraph IV litigation. Whatever benefits the branded manufacturer expected to gain from settling (other than saved litigation costs) are irrelevant.

As has been stated repeatedly, (*see, e.g.*, Section II.B–F, *supra*), the Court disagrees with this position. It is predicated on what I view to be a misreading of *Actavis*. We will not go to the jury on that theory. SBA's "generic inducement test" improperly narrows the scope of analysis. A factfinder must also be allowed to consider the net benefits to the branded manufacturer, which could include, among other things, reduced Medicaid liabilities and saved manufacturing costs – all in addition to the saved litigation costs from settling. The only prohibited "benefit" for which a reverse payment cannot pay are profits that a branded manufacturer could expect to earn by delaying generic competition.

Forest thus argues that the Lexapro Amendment was not a net loss for it, but a net gain. Despite paying upwards of $32.5 million to Mylan, it argues that it saved at least $3 million in litigation costs; $26.5 million in reduced Medicaid liabilities; and another $21.1 million in additional profit-sharing royalties from extending the term of the Agreement by another year. (ECF 565 at 17). Forest claims that it would have netted around $18.1 million from the Lexapro Amendment if all factors are considered.

Forest has the correct view of the law. Nothing from *Actavis* justifies SBA's interpretation. The Supreme Court held that, while a large payment may "provide strong evidence that the patentee seeks to induce the generic challenger to abandon its claim," 570 U.S. at 154, there are

other considerations for evaluating whether a reverse payment was anticompetitive, such as whether the payment was "a rough approximation of the litigation expenses saved through the settlement" or "reflect[ed] compensation for other services that the generic has promised to perform," *id*. at 156. Importantly, these considerations were not exhaustive; by using the phrase "such as," the Court made it clear that there were other things that could render a reverse settlement not anticompetitive. If SBA's reading of *Actavis* were correct, then all reverse-payment settlements would be illegal, because one of the effects of such a settlement is always delayed generic entry. But that is precisely what the Supreme Court refused to hold in *Actavis*, "because the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, *and the lack of any other convincing justification*." *Id*. at 159 (emphasis added). The only consideration that cannot factor into whether the reverse settlement was made are the expected profits from delayed competition.

Here, Forest has provided several reasons for why it agreed to the Lexapro Amendment with Mylan. But disputes remain as to whether the benefits it claims to have received from the deal (upwards of $50 million) were actually as valuable as Forest insists.

First, a dispute exists over the value of the one-year extension on the deal. The original Lexapro Agreement was for a term of five years, but Mylan could terminate the deal after one year, after which it could develop and market its own Lexapro generic, earning 100% of the profits. The Lexapro Amendment was also for five years, but Mylan could not terminate the deal for two years. The parties disagree about the value of that second year of "locked-in" royalties. Forest's expert, Philip Green, opines that Forest's internal documents forecast a total of $508.7 million in profit from Lexapro AG the first year it was on the market, and a total profit of $79.3 million in

year two. (Green Report at ¶ 54). The Lexapro Amendment entitled Forest to 40% of the $79.3 million second-year projection, for a total of around $31.7 million. After accounting for other royalties that Forest owed to other companies, Green concluded that Forest expected to net approximately $21.1 million from the one-year extension. (*Id*. at ¶ 55).

SBA disputes this conclusion. Its expert, Susan Marchetti, states that the $21.1 million figure is "inconsistent with the evidence" she reviewed. (Marchetti Report at ¶ 113). Marchetti claims that there is no indication that Mylan ever intended to terminate the deal after just one year, and that it would have been economically irrational for it to have done so. (Marchetti Rebuttal at ¶¶ 17–19). This is because authorized generics (generics marketed in conjunction with the branded manufacturer) "retain a stronger market share than competing generic" companies and so Mylan could have expected to earn more profit by continuing to sell the Lexapro AG rather than by switching to its own generic. (*Id*. at ¶ 19). She critiques Green's methodology for failing to calculate how much Mylan would have expected to earn by making and selling its own version of generic Lexapro. For it to have been economically rational for Mylan to cancel the original agreement after just one year, Mylan needed to expect to make just as much if not more by selling its own generic, but this analysis was completely lacking from Green's opinions. (*Id*. at ¶ 29). If it would not have been economically rational for Mylan to cancel the Agreement after one year, then the "additional" benefits that Forest assigns to the second year of the Agreement are nothing more than a mirage – inflated numbers that both sides knew would not have materialized, but which provide great cover against antitrust scrutiny.

Summary judgment is inappropriate "when there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute." *Realtime Data, LLC v. Stanley*, 897 F. Supp.2d 146, 153

(S.D.N.Y. 2012). Given that the Court has already determined that both Green's and Marchetti's pure calculations of the Lexapro Amendment are admissible, this is a classic battle-of-the-experts that precludes summary judgment for either side.

Second, a dispute remains as to whether the amount Forest claims it expected to save from reducing Medicaid liabilities ($26.5 million) by shifting the manufacturing of Lexapro AG to Mylan was pretextual. SBA does not appear to quibble with Forest's calculations to arrive at the $26.5 million figure, but it argues that internal Forest documents show that its executives in 2007 – when evaluating the Medicaid changes – viewed that "Having [Lexapro] AG on market still makes sense under this scenario" given the profits that Forest still expected to receive under the original agreement. (ECF 572, Exh. 66 at 6). SBA claims this indicates that there was no need for Forest to renegotiate the Agreement, and that the Lexapro Amendment – and the payments contained within it – was a pretextual reason to hide the fact that Forest was just trying to share monopoly profits with Mylan. That, too, presents a question for the jury.

These are just two examples of the myriad factual disputes concerning whether the Lexapro Amendment constituted a "large and unjustified" reverse settlement that is subject to antitrust scrutiny. This issue will be decided by a factfinder.

### 3. Disputes of fact remain as to causation

Disputes of fact also remain as to causation – whether Forest's actions actually caused delayed generic competition such that it resulted in higher prices for memantine. Plaintiffs bear the burden of proof on causation. To survive a summary judgment motion, "An antitrust plaintiff must show that a defendant's anticompetitive act was a 'material' and 'but-for' cause of plaintiff's injury, although not necessarily the sole cause." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017); *see also Argus Inc. v. Eastman Kodak Co.*, 801 F. 2d 38, 41 (2d Cir. 1986).

Forest insists that SBA cannot carry this burden because it cannot show that, absent the Lexapro Amendment, Mylan would have both won its challenge to the '703 Patent and then launched a competing version of generic Namenda IR.

If Mylan had won the challenge, it could have launched its version of generic Namenda IR earlier than when generics launched in the real world – July 11, 2015. But if Mylan lost the patent challenge, then the date of its generic entry in the but-for world would have been the same as in the real world. The market for generic memantine would have been in the same position as it is now – meaning that Forest's actions did not depress competition.

So it is important to assess whether Mylan would have won its Paragraph IV challenge, and more specifically to assess how each side *perceived* its chances of succeeding (and thus the desirability of settling). A second "battle of the experts" will queue that issue up for the jury. SBA's expert, Michael Davitz, opines that Mylan had a 70% chance of success. Forest's expert, Sue Robinson, disagrees. This disputed issue of fact precludes summary judgment on the issue of causation.

The parties also disagree about whether the acceleration clauses included in all the reverse settlements (not just Mylan's) were anticompetitive. The clauses permitted each settling manufacturer to launch its version of generic Namenda IR as soon as any other generic manufacturer launched.

SBA argues that the acceleration clauses decreased the incentive for any single generic manufacturer (like Mylan) from continuing its Paragraph IV challenge, because even if it won the litigation and the '703 Patent was declared invalid or not infringed, its competitors (the generics that settled with the acceleration clause) could launch their products simultaneously. Thus, any "holdout" generics would be burdened with all of the expense, effort, and risk of the litigation,

while those that settled could simply wait and take advantage if a court ultimately found that the patent was invalid or was not infringed. By July 2010, Mylan was of course, the lone holdout.

Moreover, whenever any generic settled with an acceleration provision, it arguably further disincentivized any non-settling holdout from continuing its Paragraph IV challenge, because the holdout knew that it would have had to share the market with yet another competitor even if it prevailed in the litigation. The more generics that settled, the greater the pressure on remaining holdouts to settle – the expected profit "pie" would be split into smaller and smaller pieces. SBA's expert Thomas McGuire opines that, by the time Mylan ended its Paragraph IV challenge to the '703 Patent, its expected profits from prevailing in the patent lawsuit was only around $0.9 million over four years – because it would have had to share the generic market with all of the rest of the settling generics. (McGuire Report at ¶ 106). SBA claims that these clauses are anticompetitive because they deterred generic challenges to branded patents.

Forest counters by arguing that the acceleration clauses did not change the generic market at all, and arguably increased competition. Because there were originally fourteen ANDA "first-filers," Forest argues that, even if there had been no Paragraph IV litigation, the profit "pie" for generics would still have been split into small pieces. If all fourteen "first-filers" were allowed to launch their generics on the same day (as was their right under law), the scenario was identical to having all the generics sue and settle with an acceleration clause that merely allowed the generics to do what they otherwise would have done – enter the market on the same day. Forest insists that the clauses actually increased generic competition by averting a scenario in which one generic manufacturer (the last holdout) would have dominated the market for generic Namenda IR if it had succeeded in its Paragraph IV challenge. Forest argues that the "harm" that SBA assigns to the

51

acceleration clauses is actually just increased competition among generics, which cannot be a factor in declaring any deal anticompetitive.

Whether Forest's rather appealing argument entitles it to summary judgment on this point presents a close question, but as the motion is being otherwise denied there is no need to resolve it now. At present, I am inclined to let the jury make this decision. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 321 (D.R.I. 2019). But I may change my mind after hearing further argument at trial.

### C.  Merz's motion for summary judgment dismissing Count II is denied

Merz originally moved for summary judgment on all the counts against it on the ground that it was not involved in any of Forest's allegedly unlawful acts. In particular, Merz was not party to the Lexapro Amendment; it argues that it cannot be held liable for any anticompetitive effects that may have stemmed from the agreement.

In its opposition to Merz's motion for summary judgment, SBA "requests to voluntarily dismiss its Count I – Monopolization Under State Law, Unlawful Maintenance of Monopoly Power – claims against the Merz Defendants." (ECF 599 at 51 n.20). SBA and Merz then entered a joint stipulation whereby SBA voluntarily dismissed Count I against Merz. (ECF 612). This leaves Merz as a defendant on Count II – the restraint-of-trade claim – and the various state-law unfair-competition and unjust-enrichment claims, which will be discussed separately.

The special argument that Merz raises for dismissing Count II as against it is that Merz was not a party to the Lexapro Amendment and did not make any payments to Mylan pursuant to the Amendment – which is the allegedly "large and unjustified" portion of the settlement. SBA does not dispute this fact. (*E.g.*, ECF 570 at ¶¶ 78–82).

If Defendants convince the jury that the Lexapro Amendment and the Mylan reverse settlement were two separate agreements here, not just one, then Merz will be dismissed as a

defendant. But unless and until that happens, the fact that Merz was not a formal party to the Lexapro Amendment is not reason enough to dismiss Count II against it.

It is undisputed that Merz stood to benefit from keeping generics out of the market for memantine for as long as possible, since Forest had to pay Merz 20% of its net revenues on sales of memantine in the U.S. As the Supreme Court has noted, "acquiescence in an illegal scheme is as much a violation of the [antitrust laws] as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948).

There is, admittedly, nothing in the record that evidences Merz's participation in discussions about or the drafting of the Lexapro Amendment, either its terms or as part of an overall settlement between Forest and Mylan. SBA points to two other pieces of evidence of Merz's "acquiescence" in the allegedly illegal scheme cooked up between Forest and Mylan – a scheme that had the potential to confer a great financial benefit on Merz.

First, as was mentioned previously (*see* Section III.B.1, *supra*), nearly all of the reverse-settlement agreements between Forest/Merz and the other generic manufacturers contained a clause stating that the payments included in the settlement were the "sole consideration" being exchanged for dropping the patent challenge. (ECF 606 at ¶¶ 232–34). But the Mylan reverse-settlement agreement – which Merz signed, and toward which it contributed 50% of the stated financial consideration – did *not* contain the a "sole consideration" representation. That curious and highly significant omission suggests that Merz was well aware that Mylan was receiving additional consideration for settling the Paragraph IV lawsuit – which could only have come in the form of the simultaneously executed Lexapro Amendment – and acquiesced in the overall scheme by playing its part in the settlement of the patent lawsuit, to which it was a necessary party.[11]

---

[11] As the owner of the '703 Patent, Merz was a necessary party to any lawsuit that alleged the infringement of that patent. "Traditionally, when the interest transferred is deemed a license" – as was the case with Merz's licensing of

Second, the record also shows that Merz and Forest jointly submitted both the Mylan reverse-settlement agreement *and* the Lexapro Amendment to FTC authorities as part of the disclosures mandated under Section 1112(a) of the Medicare Modernization Act, which requires all brand-generic agreements regarding any ANDA lawsuit to be transmitted to the FTC. (ECF 606 at ¶ 203).

However, this piece of "evidence" is not at all persuasive. The Lexapro Amendment itself represented an alteration in the terms of the settlement of an entirely different ANDA lawsuit – the one between Alphapharm and Forest concerning Forest's '712 Patent – so it arguably had to be transmitted to the FTC in any event. Moreover, as the cover letter transmitting the document to the FTC makes clear, Forest and Merz took the position that they were supplying the FTC with the Lexapro Amendment "for the sake of completeness" even though it was not required to be filed along with the Mylan settlement agreement:

> On behalf of Forest . . . and Merz . . . and pursuant to Section 1112(a) of the [MMA], I [Forest's counsel] enclose two copies of the agreement settling patent infringement litigation brought by Forest and Merz against Mylan . . . . Although we do not believe that the following documents must be submitted with this filing, for the sake of completeness we are also enclosing two copies of: (1) a Distribution and Supply Agreement between Forest . . . and Alphapharm . . . [the original Lexapro Agreement]; (2) an amendment to the Distribution and Supply Agreement between Forest. . . Mylan, and Alphapharm, dated July 21, 2010 [the Lexapro Amendment] . . . .

I do not agree with SBA that this demonstrates that Merz considered itself to have a relationship to the Lexapro Amendment; indeed, in the opinion of this Court it suggests the contrary.

---

the '703 Patent to Forest – "the patent-holder is a necessary party because the patent-holder is still the real party in interest with respect to the validity of the patent." *Refac Int'l, Ltd. v. Mastercard Int'l*, 758 F. Supp. 152, 157 (S.D.N.Y. 1991) (citation omitted.); *see also IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F. 3d 1324, 1325 (Fed. Cir. 2007). Merz's contract with Forest also required Merz to be involved in any litigation defending its intellectual property. It included a provision stating that Merz "shall be solely responsible for taking all actions, in the courts, administrative agencies, or otherwise, to prevent or enjoin any and all such infringements and other unauthorized uses of Merz' Intellectual Property Rights" and that Forest was to "take no action with respect to any such infringement or unauthorized use of Merz' Intellectual Property Rights, without the prior written authorization of Merz." (ECF 607, Exh. 24 at 20).

But even if the FTC submission fails to raise a genuine issue of fact, there is sufficient evidence in the record of Merz's financial interest in Mylan's delayed entry into the Namenda market to make it appropriate for the jury to determine whether the Lexapro Amendment was part and parcel of a settlement that involved Merz, and whether Merz, as Forest's co-conspirator or aider and abettor, knowingly acquiesced in an anticompetitive agreement in violation of *Paramount Pictures.* I note that, in analogous circumstances, my colleague in the District of Massachusetts declined to dismiss a claim against generics who entered into reverse-settlement agreements with the understanding that they could have knowingly "acquiesced" in a scheme to harm competition. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 259–60 (D. Mass. 2014).

A far more interesting question is whether the fact that Merz made no payment in connection with the Lexapro Amendment means that it cannot be liable for an antitrust violation under *Actavis*. It is undisputed that Merz paid Mylan $1 million – half the cost of the Mylan reverse settlement, and an amount that would not qualify as large or unexplained given the experts' estimates of the cost to the parties of continuing the Mylan Paragraph IV lawsuit. There is no evidence that Merz paid any portion of the $20 million upfront fee to Mylan per the Lexapro Amendment or that it reimbursed Forest for any portion of that payment. In fact, SBA concedes as much. (ECF 599 at 15–16, 52). Merz contends that this concession is fatal to SBA's claim that Merz was Forest's co-conspirator, "because there is no rational basis for Forest to bear the full cost of the alleged illegal payment if Merz was part of an alleged conspiracy." (ECF 631 at 3).

I fear I must differ with Merz on this point. If the Lexapro Amendment constituted a "large and unexplained" payment under *Actavis* that was made for the purpose of forestalling competition – competition that would have been economically harmful to Merz – then the fact that Forest

shelled out the bulk of the consideration for that agreement does not lead inexorably to the conclusion that Merz was not involved in an anticompetitive conspiracy. As long as Merz stood to benefit from the delay in generic entry – and it indisputably did – it had a reason to participate in and promote an anticompetitive settlement. It is true that there is no "smoking gun" email evidencing Merz' overt agreement to participate in an anticompetitive scheme, but there does not need to be in order for plaintiffs to overcome Merz' motion for summary judgment.  Circumstantial evidence suffices.

Merz is free to argue at trial that it had nothing to do with the "side deal" Lexapro Amendment other than being aware of it – that it was not consulted in any way about the negotiations surrounding it, that it obtained no benefit directly (or indirectly) from it, and that the only agreement to which it was a party was the $2 million reverse-settlement agreement that ended the Paragraph IV lawsuit. It is also free to argue that its financial contribution to the Mylan deal or deals (if it concedes that the Lexapro Amendment was part of the consideration for settling) was limited to half of the cost of settling the Paragraph IV lawsuit, or only $1 million, which hardly qualifies as a "large" or "unjustified" payment when solely viewed in light of anticipated litigation costs.

But the logic of Merz's participation in an anticompetitive settlement that would put money in its pocket[12] – not to mention any potential anticompetitive impact from the acceleration clause[13] – seems clear enough to get the issue to the jury, which can then decide whether there is a lack of evidence on this point. An alleged co-conspirator is not free from liability simply because it was

---

[12] Exactly how much money is not clear. SBA's damages expert, William Vogt, calculated total overcharges to the IPPs as between $1.98 and $2.21 billion, depending on the date of generic entry in the but-for world. (ECF 447, Exh. 2 at tbl. 6). Assuming that to be a rough approximation of the revenues Forest expected to earn (which appears reasonable in light of Namenda's $1.5 billion in sales in 2013, *see Namenda II*, 787 F.3d at 647), then Merz's entitlement to 20% of  Forest's revenue could have netted it between an additional $396 million and $424 million due to the delayed generic entry.

[13] Again, I am effectively "reserving" on that issue at present.

not the most active participant in the scheme. "[I]t is sufficient that [a defendant], regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F. 3d 535, 541 (4th Cir. 1998) (citing cases); *see also In re Nexium (Esomeprazole)*, 42 F. Supp. 3d at 259 (denying a motion to reconsider denial of summary judgment because "the record support[ed] the inference that [defendant generic manufacturer] knew" it was agreeing to a deal that would have delayed generic competition and "understood generic delay to be anticompetitive").

Merz's motion for summary judgment dismissing Count II as against it is denied.

### D. Forest's motions for summary judgment on Count III is granted in part and denied in part

The IPPs' claims under Count III allege violations of the consumer-protection and unfair-competition laws of thirteen states: Alabama, California, Florida, Idaho, Illinois, Massachusetts, Michigan, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and Utah.[14] Forest now moves for summary judgment on the claims arising under eight of these thirteen states.

#### 1. Alabama

Forest argues that the Alabama consumer-protection statute, Ala. Code § 8-19-10, *et seq.* only permits a "natural person" from recovering damages. This is true. The statute only provides a private right of action to a "consumer" which it defines as "any natural person who buys goods or services for personal, family, or household use." Ala. Code § 8-19-3(2). No third-party purchaser of Namenda like the IPPs would qualify as a consumer under this definition. *See EBSCO Indus. V. LMN Enters.*, 89 F. Supp. 2d 1248, 1266 (N.D. Ala. 2000) (granting summary judgment

---

[14] The Second Amended Complaint originally included claims arising under the laws of fourteen states, not thirteen. The extra state was Missouri, but SBA did not move for class certification in connection with any actions taken in or any harmed incurred in Missouri. *See Namenda VIII*, 2021 WL 509988 at *5. SBA also does not mention any Missouri claims in the summary judgment motions. Accordingly, the Court finds that the IPPs have abandoned any Missouri claims.

because the corporate plaintiff was not a "consumer"). Apparently realizing this, SBA states in its

response to Forest's summary judgment motion that it "voluntarily dismisses its Count III claim

brought under Alabama's consumer protection statute." (ECF 599 at 35).

Accordingly, Forest's motion for summary judgment is GRANTED as to Count III's claim

under Alabama's consumer-protection statute.

## 2. Michigan

M.C.L.A. § 445.903, the Michigan Consumer Protection Act ("MCPA"), prohibits "unfair,

unconscionable, or deceptive methods . . . in the conduct of trade or commerce." Michigan courts

interpret this statute as providing relief only for consumers who purchased a product for personal

use. Although the MCPA includes "corporation" under its definition of a "person" that can sue (in

contrast to the Alabama statute), Michigan courts hold that "if an item is purchased primarily for

business or commercial rather than personal purposes, the MCPA does not supply protection."

*Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999). The key question is "whether

the purchaser intends to use the product himself." *Ibid*. Items purchased for commercial, rather

than personal use, are outside the scope of the MCPA's protection. *See, e.g., In re OnStar Contract

Litig.*, 278 F.R.D. 352, 380 (E.D. Mich. 2011); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.

(No. II)*, No. 03-cv-4558, 2010 WL 2813788, at *67 (D.N.J. July 9, 2010).

Here, IPPs did not "purchase" the drug at all, and certainly not for their own use. Rather,

they r*eimbursed* their insureds, who both purchased the drug and used the memantine, presumably

for personal purposes. SBA concedes that the IPP class members only "provide[] prescription drug

benefits for *its members['] personal use*." (ECF 599 at 36 (emphasis added)). The parties have not

cited, and the Court has not located, any Michigan case in which an insurer was able to sue under

this statute because its insured purchased an item for personal use where the marketing of the item was tainted by unfair trade practices.

Additionally, the MCPA appears to only prohibit *fraud* or *fraud-related* acts in commerce. The statute includes a long list of what it defines as "unfair, unconscionable, or deceptive methods." These include things like "causing a probability of confusion or misunderstanding as to the source . . . of goods"; "using deceptive representations"; "disparaging the goods, services, . . . or reputation of another by false or misleading representation of fact"; "gross discrepancies between the oral representations of the seller and the written agreement," and etc. Mich. Code. Ann. §§ 445.903(1)(a)-(kk). None of the expressly prohibited acts pertains to any kind of antitrust violation. As a result, some courts have dismissed MCPA consumer-protection claims when brought in the antitrust context. *See, e.g., In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 785 (D. Minn. 2020) ("The MCPA is narrower than other state consumer-protection statutes because it specifically defines what constitutes unfair or unconscionable conduct."); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017) ("Plaintiffs do not point to a specific provision of the MCPA definitional section covering antitrust violations, and the Court is unable to find one.").  I find the reasoning of these cases persuasive. So, while this issue is not a basis upon which either Forest or Merz moved for summary judgment, it provides the Court with yet another reason to dismiss the MCPA claim.

Accordingly, because IPPs did not "purchase" anything at all – which Michigan courts deem to be a prerequisite for any proper plaintiff under the MCPA –  and because the conduct here complained of is not the kind of conduct reached by the MCPA, the Count III claim under Michigan law is dismissed.

Forest's summary judgment motion is GRANTED as to Count III under Michigan law.

### 3. Illinois

Forest makes the same "IPPs are not consumers" argument with regard to IPPs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). But this claim will not be dismissed. Illinois courts allow non-consumer plaintiffs to pursue relief if it "can satisfy the 'consumer nexus text,' " which requires only that the complained-of conduct " 'involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.' " *Roppo v. Travelers Companies*, 100 F. Supp. 3d 636, 651 (N.D. Ill. 2015) (quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 534 (1989)).

Here, the complained-of conduct clearly addresses the market and implicates consumer-protection concerns. If Forest's actions delayed generic entry (as IPPs allege they did), then that likely would have increased the price for memantine during the relevant period, negatively impacting consumers. This is sufficient to sustain IPPs' claim under the ICFA.

Forest's summary judgment motion dismissing this count under Illinois law is DENIED.

### 4. Florida

Forest concedes that the Florida Deceptive and Unfair Practices Act ("FDUTPA") permits third-party purchasers like the IPPs to bring a consumer-fraud claim. Instead, Forest claims that it is still entitled to summary judgment because IPPs cannot demonstrate that there was any injury or detriment to consumers.

But whether consumers were harmed by Forest's actions is an issue of fact to be decided by a factfinder. "[W]hile the claimant would have to prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim, the claimant *does not have to be a consumer* to bring the claim." *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th Dist. Ct. App. 2015). The IPPs are alleging

that Forest's actions harmed consumers by paying more for memantine than they otherwise would have. Whether there truly was any harm – and the extent of that harm – is an issue of fact to be resolved at trial.

Forest's summary judgment motion dismissing this count under Florida law is DENIED.

### 5. Massachusetts

Forest argues that the Massachusetts statute, Mass. Gen. Laws ch. 93A, *et seq*., does not provide a cause of action for indirect purchasers that are businesses.

Massachusetts has two standing provisions for consumer-protection suits. Section 11 of 93A provides a right of action to "Any person who engages in the conduct of any trade or commerce" while Section 9 provides a right of action to "Any person other than a person entitled to bring action under section eleven." Mass. Gen. L. c. 93A §§ 9, 11. This effectively splits the claims raised by "consumers" (under § 9) and those raised by "businesses" (under § 11). *See Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000). The key difference between §§ 9 and 11 is that the latter does not provide for indirect-purchaser standing; it follows the Supreme Court's holding in *Illinois Brick*. *See In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016); *Ciardi v. F. Hoffmann-La Roche, Ltd*., 436 Mass. 53, 62–63 (2002) (noting that "in any action brought under [§ 11], the court shall be guided in its interpretation of unfair methods of competition by the provisions of the [Massachusetts] Antitrust Act," which bars indirect-purchaser suits pursuant to *Illinois Brick*). Put simply, *businesses* cannot sue under § 11 for antitrust violations if they are indirect purchasers.

SBA makes a "law of the case" argument, stating that this Court held, in its decision and order denying the motions to dismiss, that "Chapter 93A [of the Massachusetts statute] . . . allows indirect purchaser claims." *Namenda VI*, 2018 WL 7197233 at *22. That statement is technically

true: Chapter 93A *does* allow indirect purchaser claims, but only if the entity is not a business and is suing under § 9, not § 11. *See Ciardi*, 436 Mass. at 63 ("[W]e cannot conclude that the application of . . . § 9, is to be guided by the provisions of the Antitrust Act, and by association, *Illinois Brick Co. v. Illinois* . . . so as to preclude indirect purchasers" from suing.) To the extent that the earlier decision may have implied that businesses like the plaintiff indirect purchasers could bring § 11 claims, the decision was wrong and I happily correct it.

SBA also argues that IPPs are not "motivated by business considerations" but are nonprofit organizations. While it may be true for some IPPs contained within the class, it certainly is not true for all class members. Moreover, many nonprofits are motivated by the commercial aspects of their enterprises. Frankly, it strains credulity to argue that third-party insurers are altruistically motivated. Moreover, I do not understand the Massachusetts Legislature to have allowed indirect purchaser businesses to bring § 11 suits if their motivation was pure.

The Court concludes that IPPs lack standing to pursue an indirect-purchaser claim under § 11 of Mass. Gen. L. c. 93A. Forest's summary judgment motion dismissing this count under Massachusetts law is GRANTED.

### 6. California

Forest argues that it is entitled to summary judgment on IPPs' California claim because, under the statute, "Prevailing plaintiffs are generally limited to injunctive relief and restitution." *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 179 (1999); *see also* Cal. Bus. & Prof. Code § 17203. The IPPs do not dispute this conclusion, but argue that there is no reason to dismiss their claim because they are seeking restitution. I agree. Just because a certain type of monetary recovery is unavailable to a plaintiff does not mean that the substantive claim itself must be dismissed. *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 377

(D.R.I. 2019). If IPPs succeed in proving liability, it is likely that they would be entitled to some form of restitution.

Forest's summary judgment motion dismissing this count under California law is DENIED.

### 7. Nebraska

Forest claims that IPPs' claims under Nebraska's Consumer Protection Act ("NCPA"), Neb. Rev. Stat. §§50-1601, *et seq.*, must be dismissed because the statute requires the defendant to have engaged in "deception," which Forest claims the evidence does not support. The IPPs insist that the NCPA does not have a "deception" element. Their disagreement centers on one case – cited by both sides – from the Supreme Court of Nebraska, *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583 (Neb. 2008).

In *Stenberg*, Nebraska's Attorney General sued suppliers of food items for entering into installment contracts with customers knowing full well that the contracts could not be fulfilled, and ultimately not delivering on their terms. The Court noted that the NCPA prohibits " 'Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce' " but does not define "unfair" or "deceptive." *Id*. at 590 (quoting Neb. Rev. Stat. § 59-1602). Nevertheless, the State's allegations were more than enough for a violation of the NCPA since the record was "replete with examples of deceptive acts . . . that were unethical and unscrupulous." *Id*. at 591. This was because liability exists under the NCPA if the plaintiff proves "that the practice either '(1) fell within some common-law, statutory, *or other established concept of unfairness* or (2) was immoral, unethical, oppressive, or unscrupulous.' " *Ibid*. (quoting *Road v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003, 1014 (D. Neb. 1998)) (emphasis added).

The Court notes that *Stenberg* is a breach-of-contract case, which gives it little value in assessing claims under the NCPA for alleged antitrust violations. But I do not read *Stenberg* as

precluding liability except in cases where actual deception is alleged. For well over a century, "established concept[s] of unfairness," have included antitrust violations.

Forest's summary judgment motion dismissing this count under Nebraska law is DENIED.

### 8. Utah

Finally, Forest argues that IPPs cannot bring sue under Utah's consumer-protection statute, Utah Code Ann. § 13-11-5, which requires that the defendant have engaged in an "unconscionable act or practice." Forest contends that Utah courts interpret "unconscionable" to mean "gross bargaining power inequality or oppressive contractual terms." *Imperial Mobile Home Park, L.L.C. v. Kelsch*, No. 971591-CA, 1998 WL 1758393, at *1 (Ct. App. Utah Nov. 27, 1998).

But the *Imperial Mobile Home Park* case does not appear to have been a restraint-of-trade case, and that single short, non-precedential opinion does not persuade this Court that Utah law defines the term "unconscionable act or practice" so narrowly. Other federal courts that have evaluated Utah's statute in the antitrust context have all permitted such claims to proceed, construing the statute liberally to conclude that an antitrust violation can be unconscionable. *See, e.g., In re Packaged Seafood*, 242 F. Supp. 3d at 1087; *In re Microprocessors Antitrust Litig.*, 496 F. Supp. 2d 404, 418 (D. Del. 2007). This Court agrees.

Forest's summary judgment motion dismissing this count under Utah law is DENIED.

*****

As a result of these rulings, the only consumer-protection claims remaining against Forest under Count III are those arising under the laws of California, Florida, Idaho, Illinois, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and Utah.

### E. Merz's motion for summary judgment on Count III is granted as to all of the claims except the one arising under California law

Merz is entitled to summary judgment on the Count III claims arising under the consumer-protection statutes of Alabama, Massachusetts, and Michigan, for the same reasons that Forest was entitled to dismissal of the claims under those states' laws.

But Merz also goes further, insisting that it is entitled to summary judgment on all claims arising under Count III.

Merz notes that most of the remaining consumer-protection statutes (all but California) require that a plaintiff prove that the defendant engaged in "trade" or "commerce" within the state. Because Merz has never advertised, marketed, or sold Namenda or any other memantine product within the United States (having licensed the '703 Patent to Forest), it insists that it cannot be held liable under any of the remaining consumer-protection statutes.

Merz correctly points out that the consumer-protection statutes of Florida, Idaho, Illinois, Nevada, New Hampshire, New Mexico, and Utah all require that the allegedly "unfair" or "deceptive" practice have involved some form of advertising, purchase, sale, or distribution *by the defendant within the state*. *See, e.g.,* Fla. Stat. § 501.203 (defining "trade or commerce" to mean "the advertising, soliciting, providing, offering, or distributing . . . of any good or service"); Idaho Code § 48-602 ("advertising, offering for sale, selling, leasing, renting, collecting debts . . . or distributing goods or services"); 815 Ill. Comp. Stat. Ann. 505/1(f) ("advertising, offering for sale, sale, or distribution"); Nev. Rev. Stat. Ann. § 598.094 ("any sale, offer for sale or attempt to sell property"); N.H. Rev. Stat. Ann. § 358-A:1 ("advertising, offering for sale, sale, or distribution"); N.M. Stat. Ann. § 57-12-2(C) ("advertising, offering for sale or distribution"); Utah Code Ann. § 13-11-3 ("sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property").

The statutes of Nebraska and North Carolina contain more expansive definitions of "commerce." See Neb. Rev. Stat. Ann. § 59-1601 ("Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska"); N.C. Gen. Stat. § 75-1.1(b) ("For purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.").

It is undisputed that Merz did not advertise, buy, sell, or distribute memantine in the U.S. This, alone, is enough to dismiss the claims arising under the laws of all the states except Nebraska and North Carolina from the lawsuit. There is no evidence in the record that Merz conducted any commercial activity related to the promotion or sale of any memantine product in the United States – let alone that it did so in any of the specific states in question. Indeed, SBA alleges that Forest had *exclusive rights* to market a memantine product in the U.S., and that it was Forest, not Merz, that had 100% market share of the relevant market. (ECF 326 at ¶¶ 65, 175). A defendant cannot be liable for an unfair trade practice if it did not engage in any relevant trade in the United States.

SBA insists that these statutes should still apply to Merz because it engaged in "commerce" by licensing the '703 Patent to Forest and by initiating the patent-infringement lawsuits against the generic manufacturers. But SBA completely misses the point. The consumer-protection statutes require that the actual unfair method of competition or deceptive act be associated with the commerce in question. All of the consumer-protection statutes (including those of North Carolina and Nebraska) include language specifically prohibiting "unfair methods of competition . . . *in the conduct of any trade or commerce*." Fla. Stat. § 501.204 (emphasis added); *see also* Idaho Code § 48-603 (same); 815 Ill. Comp. Stat. Ann. 505/2 (same); Neb. Rev. Stat. Ann. § 59-1602 (same); N.H. Rev. Stat. Ann. § 358-A:2 (same); N.M. Stat. Ann. § 57-12-3 (same); Nev. Rev. Stat. Ann.

§ 598.0923(3) ("A person engages in a 'deceptive trade practice' when *in the course of his or her business* . . . he or she knowingly . . . violates a state or federal statute"); N.C. Gen. Stat. § 75-1.1(a) ("Unfair methods of competition *in or affecting commerce* . . . are declared unlawful"); Utah Code Ann. § 13-11-5 ("An unconscionable act or practice *by a supplier in connection with a consumer transaction* violates this act"). The licensing of its patent, which is the only commercial activity that Merz undertook with respect to memantine in the United States, does not fall within any of those statutes.

There is no allegation from SBA – nor any evidence in the record – that there was any unfair, deceptive, or otherwise unlawful practice when Merz licensed the '703 Patent to Forest in 2000, or when Merz filed suit against the generic challengers beginning in 2007. SBA denominates these actions as the "commerce" to try to hold Merz to account, but as there is no evidence that these actions were deceptive or otherwise unlawful in respect of the consumers in the respective states, and  so they cannot be used to sustain the consumer-protection claims against Merz.

Accordingly, the consumer-protection claims against Merz arising under the laws of Alabama, Massachusetts, Michigan, Florida, Idaho, Illinois, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and Utah are dismissed. Summary judgment dismissing Count III against Merz under the laws of those states is GRANTED.

The only remaining consumer-protection claim against Merz is the one arising under California law. Merz – for whatever reason – does not move for summary judgment on this claim on the same basis that it moved for summary judgement as to the other claims – namely, that it did not engage in "trade or commerce" in California. Instead, it argues that it is entitled to summary judgment because California's statute limits a plaintiff's recovery to injunctive relief or restitutionary relief.

But as I noted above, just because a certain type of monetary recovery is unavailable does not mean that the substantive claim must be dismissed. Since this is the only basis upon which Merz moves for summary judgment on the California claim, its motion is denied.

### F.  Forest's and Merz's motions for summary judgment on Count IV is granted in part and denied in part without prejudice

Finally, the IPPs bring claims arising under the common law doctrine of unjust enrichment of 28 states and the District of Columbia.[15] In its Second Amended Complaint, SBA acknowledged that these claims were "pled in the alternative to the other claims" in the complaint, to the extent necessary and permitted by Rule 8(a). (ECF 326 at ¶ 230).

Forest and Merz move for summary judgment on this count on the same basis: first, that the claims are duplicative of the antitrust and consumer-protection claims; and second, for various, independent reasons under certain states' unjust-enrichment jurisprudence. I will address the individualized arguments first, before addressing the generalized argument of duplicative claims.

#### 1.  Arkansas

Defendants first argue that indirect-purchaser antitrust actions under Arkansas law must be brought by the State's Attorney General and cannot be brought by a private plaintiff. *See* Ark. Code Ann. §§ 4–75–309, 310, 315.  This means that indirect purchasers lack standing to bring a claim under the statute, mirroring the doctrine enshrined under the federal antitrust statutes by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). As many courts (including this one) have held, IPPs cannot bring unjust-enrichment claims in states that do not explicitly permit indirect-

---

[15] Alabama, Arizona, Arkansas, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. IPPs also originally included claims arising under the unjust-enrichment laws of Missouri, Wyoming, and Puerto Rico, but the IPPs did not move for class certification based on any actions undertaken or any harmed incurred in those four territories. *See Namenda VIII*, 2021 WL 509988 at *5. Accordingly, the Court assumes that those claims are dropped.

purchasers to bring suit, as permitting them to do so would "constitute an impermissible 'end run' around the *Illinois Brick* prohibition on indirect purchaser actions." *Namenda VI*, 2018 WL 7197233, at *56. Defendants claim that since IPPs did not bring an antitrust claim under Arkansas law, allowing an unjust-enrichment claim to proceed in light of Arkansas's prohibition on indirect-purchaser suits would allow the impermissible "end run" around *Illinois Brick* I had referenced in the earlier decision.

In the motion-to-dismiss order in this action, I deferred deciding the Arkansas unjust-enrichment claim until "a later date on proper briefing." *Id.* at 58. That day has come. SBA does not contest that Arkansas does not permit indirect-purchaser antitrust suits, arguing only that Forest's citations were insufficient because they did not come directly from an Arkansas court. But other courts – in cases extremely similar to the present one – have dismissed indirect-purchaser claims on the basis that "Arkansas flatly outlaws indirect-purchaser antitrust claims *ab initio* unless asserted by . . . the State Attorney General." *In re Packaged Seafood*, 242 F. Supp. 3d at 1069; *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, No. 14-md-2508, 2015 WL 5166014, at *22 (E.D. Tenn. June 24, 2015); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009) ("[P]laintiffs have not cited any authority from Arkansas . . . holding that an indirect purchaser plaintiff may bring an unjust enrichment claim when that same claim would be barred under state antitrust law").

Accordingly, the unjust-enrichment claim under Arkansas law is dismissed. Defendants' motion for summary judgment dismissing this count under Arkansas law is GRANTED.

## 2. Florida

Defendants move for summary judgment on the Florida unjust-enrichment claim because they argue that Florida courts require that a plaintiff have conferred a "direct benefit" on the

defendant. Because indirect purchasers pay for Namenda that is purchased and used by their insureds, they do not confer a "direct benefit" on Forest or Merz such that an unjust-enrichment claim can be sustained.

This Court originally denied Defendants' motion to dismiss the Florida claim on this basis, noting "that while some Florida courts had not allowed plaintiffs to rely on the doctrine of unjust enrichment absent a direct benefit, other courts had allowed these claims to proceed." *Namenda VI*, 2018 WL 7197233, at *60. The Court thus denied the motion to dismiss "at this stage" of the litigation. *Ibid*.

Defendants now move for summary judgment based on a 2017 Florida Supreme Court case, which squarely held that "to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (2017). Courts following *Kopel* have dismissed indirect-purchaser claims for lack of a "direct benefit" being conferred from an indirect-purchaser plaintiff to a defendant. *See, e.g., Sandee's Catering v. Agri Stats, Inc.*, No. 20-cv-2295, 2021 WL 963812, at *4 (Mar. 15, 2021); *South Broward Hosp. Dist. v. ELAP Servs., LLC*, No. 20-cv-61007, 2020 WL 7074645, at *7 (Dec. 3, 2020); *Johnson v. Catamaran Health Solutions, LLC*, 687 F. App'x 825, 830 (11th Cir. 2017); *In re Packaged Seafood*, 242 F. Supp. 3d at 1090. The issue has now been resolved.

Defendants' motion is, therefore, GRANTED, and Count IV is dismissed insofar as it alleges a claim under Florida law.

### 3.  Utah

Defendants make the same "direct benefits" argument regarding unjust enrichment under Utah law. They cite to a 2015 Utah Supreme Court case which held that "unjust enrichment does not result if the defendant has received only an incidental benefit from the plaintiff's service[s]."

*Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (2015) (citation omitted). However, this Court does not read the Utah case the same way as the Florida directive. An "incidental benefit" is not the same as an "indirect benefit" – at least not how Utah's courts have interpreted the phrase.

Florida case law plainly precludes unjust-enrichment claims if the plaintiff only indirectly benefitted the defendant. For example, in *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Florida, N.A.*, 667 So.2d 876 (Fla. 3d Dist. Ct. App. 1996) – the principal case cited by the Florida Supreme Court in *Kopel* – the court held that a plaintiff bank did not directly confer a benefit upon several defendant banks even though the defendants had allegedly received overpayments from a third-party lender that had used some of the plaintiff's funds to make the overpayments. The court held that whatever overpayments the defendants received "could only have been conferred upon them by [the third-party lender], not [the plaintiff]." *Id*. at 879; s*ee also Extraordinary Title Services, LLC v. Florida Power & Light Co.*, 1 So.3d 400 (Fla. 3d Dist. Ct. App. Fla. 2009) (noting that a plaintiff's payments to a defendant's subsidiary did not constitute a direct benefit).

> But Utah's Supreme Court has held that
>
> While unjust enrichment does not result if the defendant has received only an incidental benefit from the plaintiff's service . . . this court has found that a large variety of items fall under the definition of "benefit," including an "interest in money, land, chattels, or choses in action; beneficial services conferred; satisfaction of a debt or duty owed by [the defendant]; or anything which adds to [the defendant's] security or advantage."

*Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 167 P.3d 1080, 1086 (2007) (quoting *Baugh v. Darley*, 184 P.2d 335, 337 (1947)).

Accordingly, courts interpreting Utah law have construed "benefit" broadly and have declined to dismiss claims when there has arguably been an *indirect* benefit conferred by the

plaintiff to the defendant. *See Johnson v. Blendtec, Inc.*, — F. Supp. 3d —, No. 19-cv-83, 2020 WL 6710432, at *14 (Nov. 16, 2020); *In re Packaged Seafood*, 242 F. Supp. 3d at 1092.

In this case, the IPPs indirectly benefitted the Defendants when they reimbursed the cost of Namenda that was purchased by their clients in Utah. For example, the record indicates that SBA paid out $351,797 in reimbursement[16] to their clients for Namenda between 2012 through 2017. (Expert Report of Laura Craft at ¶ 67). Presumably many Alzheimer's patients would not have purchased Namenda if they could not obtain insurance reimbursement for it. Put differently, if a patient would not have received reimbursement, he or she may have not been able to afford the drug and would not have made a purchase. That is enough to confer a benefit recognizable under Utah law.

The motion for summary judgment dismissing Count IV under Utah law is DENIED.

### 4. Whether unjust-enrichment claims from ten states are precluded because adequate statutory remedies exist

Defendants move for summary judgment on the unjust-enrichment claims of ten states, arguing that they prohibit unjust-enrichment claims when adequate statutory remedies already exist: Arizona, California, Hawaii, Illinois, Massachusetts, Minnesota, Mississippi, New York, North Dakota, and Utah.

Defendants cite only one unpublished case from the Eastern District of Arkansas for this proposition, and do not point to any state-specific cases to support their argument. *See Thompson v. Bayer Corp.*, No. 4:07-cv-17, 2009 WL 362982, at *6 (E.D. Ark. Feb. 12, 2009) (noting that "some states do not allow an unjust enrichment claim to survive if there is an adequate remedy at law" and citing cases from Arizona, California, Hawaii, Delaware, Idaho, Illinois, Louisiana,

---

[16] This is a nationwide number, not just a Utah number; in fact, I do not know whether it included any consumers in Utah. However, the certified class undoubtedly includes plaintiffs who reimbursed Utah consumers for Namenda.

Massachusetts, Minnesota, Mississippi, Missouri, New York, North Dakota, Oklahoma, Utah, and Washington). But the Defendants do not explain whether the cases cited in *Thompson* pertain to antitrust claims, how unjust-enrichment claims in these states should be evaluated in the context of their state's antitrust laws, or even whether the cases cited by *Thompson* in support of its proposition are still good law, as many of the cases cited are now over twenty years old.

The Court is dissatisfied with the briefing on this point, and it will not "independently undertake a review of each state's requirements, armed with only" a mere reference to inquire further into the state laws at issue. *Namenda VI*, 2018 WL 7197233, at *20. If it was not important enough for Forest to brief the issue as it should have been briefed, there is no reason why the Court should do Forest's work for it.

However, because this federal court sits in New York, it is acutely aware of New York law, under which an unjust-enrichment claim "is an equitable claim that is unavailable where an adequate remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (summary order); *see also Samiento v. World Yacht Inc.*, 10 N.Y. 3d 70, 81 (2008). "Courts in the Second Circuit have recognized that 'an unjust enrichment claim cannot survive where it simply duplicates, or replaces, a conventional contract or tort claim.' " *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015) (quoting *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014)); *see also Corsello v. Verizon New York, Inc.*, 18 N.Y. 3d 777, 790 (2012).

An adequate remedy exists under the New York antitrust statutes. IPPs acknowledge that their "unjust enrichment claims are premised on the same alleged facts, arise from an identical course of conduct by the Defendants, and will be proven using the same evidence as their antitrust and consumer protection claims." (ECF 445 at 19). There is no reason to conclude that the New

York claim will require demonstrating anything different than what IPPs need to prove for its antitrust claims. Accordingly, that claim simply "duplicates" the antitrust claims and must be dismissed as duplicative unjust-enrichment claims cannot exist under New York law.

Defendants' motion for summary judgment dismissing the New York unjust-enrichment claim is GRANTED.

### 5. Whether the remaining unjust-enrichment claims must be dismissed because they are duplicative

Defendants also argue that *all* of the unjust-enrichment claims are duplicative – whether or not a statutory remedy exists – and so need to be dismissed. Defendants make no more than a conclusory assertion on this point, in the hope that this Court will "streamlin[e] the litigation proceedings of a complex case." *In re Novartis and Par Antitrust Litig.*, No. 18-cv-4361 (AKH), 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019).

However, the question of whether an unjust-enrichment claim is duplicative is a state-law issue, and Forest has not elected to brief that issue on a state-by-state basis.  As I stated in the motion-to-dismiss order, whether these claims must be dismissed "turns on a case-by-case examination of whether each state's antitrust or consumer protection statute has 'override[n]' or 'limit[ed] ... the scope of restitutionary relief' that would normally be available to a plaintiff at equity." *Namenda VI*, 2018 WL 7197233, at *57 (quoting *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011)). For whatever reason, Defendants have elected not to present the court with the sort of analysis required to dispose of these issues on summary judgment.

For that reason, I deny Defendants' motion for summary judgment, without prejudice. "Without prejudice" should not be read as an invitation to make yet another summary judgment motion. I will not entertain another round of motion; these matters will have to be dealt with at trial. Any new motion for summary judgment will be summarily denied.

*****

In sum, each Defendant's motion for summary judgment is GRANTED as to the unjust-enrichment claims arising under Arkansas, Florida, and New York. It is DENIED without prejudice as to the rest of the states. The unjust-enrichment claims remaining under IPPs' Count IV are those arising under Alabama, Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia.

### G.  Remaining Issues

### 1.  Proof of Injury in Certain States

Forest argues that SBA cannot proceed as the class plaintiff for claims arising under the antitrust laws of twelve[17] states and the consumer-protection laws of three[18] states, because there is no evidence that SBA reimbursed for Namenda (i.e., paid overcharges) in any of those states. I assume Forest is making this motion to preserve its appellate rights – because the Court has already denied it. It is denied again.

In my order on the motions to dismiss, I noted that – per the Second Circuit's decision in *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88 (2d Cir. 2018) – the Class Action Fairness Act ("CAFA") provides Article III standing to class plaintiffs who represent out-of-state class members. *See Namenda VI*, 2018 WL 7197233 at *22. But I also observed that *Langan* did not necessarily "foreclose[] consideration of a properly made Rule 12(b)(6) motion" if the plaintiff is otherwise unable to state a claim. *Ibid*. Forest appears now to take up this line of

---

[17] Hawaii, Maine, Minnesota, Mississippi, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, West Virginia, Wisconsin, and Washington D.C. (ECF 565 at 39).
[18] Idaho, Illinois, and Nebraska. (ECF 565 at 39).

argument, asserting that because SBA would be unable to state a claim as an individual plaintiff in certain states, it cannot be a proper class representative for plaintiffs in those states and thus those claims must be dismissed. In other words, because SBA may be unable to assert an *individual* claim in any state in which it did not make a reimbursement, Defendants claim that the whole class cannot proceed for those state-law claims.

This argument fails. The statutes that Forest cite to as requiring a specific "injury-in-the-state" are not as they seem. Forest argues that the statutes require the *plaintiff* to have been injured in the state, when in fact, they simply prohibit potential *defendants* from acting "in restraint of trade or commerce" within the state. *See, e.g.,* D.C. Code § 28-4502; Haw. Rev. Stat. § 480-4; Me. Rev. Stat. tit. 10 § 1102; Minn. Stat. § 325D.54; Neb. Rev. Stat. Ann. § 59-801; N.M. Stat. Ann. § 57-1-2. This means that – contrary to Forest's assertion – the focus is on whether the *defendants'* actions affected competition in the market for memantine in that state, not whether the lead plaintiff in a class action was injured in that particular state.

In the present case, where the market for Namenda was nationwide and reached approximately $1.5 billion by 2013, it is safe to assume that Forest's products (and therefore the consequences of its allegedly illegal behavior) reached all of the states implicated. And while it may be the case that SBA did not reimburse any clients in all 50 states, that does not render it an inadequate representative of class members located in those states. SBA's injuries (paying overcharges) are the same injuries allegedly suffered by all class members regardless of in whichever state they reimbursed for Namenda. The class has already been certified, and this Court concluded that it "does not see any substantive discrepancy between the various state antitrust laws that would preclude this case's going forward as a class action." *Namenda VIII*, 2021 WL 509988, at *36. SBA's injuries are "typical" of the class and there is nothing that indicates it would be

unable to adequately represent all class members, including those who suffered the same "typical" injury but under the law of a different state.

Of course, if no members of the plaintiff class reimbursed anyone in a particular state, then claims under that state's laws must be dismissed. Forest, however, has limited its motion to the Lead Plaintiff.

I note that other courts have refused to dismiss class actions based on similar arguments. *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 158 (E.D.N.Y. 2018); *Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 166 (E.D. Pa. 2009).

## 2.   Statute of Limitations in Certain States

Forest also argues – regardless of how the Court rules on any merits-related issues – that claims arising under the laws of certain states must be dismissed as untimely under the state's statute of limitations. (ECF 565 at 39).

Forest insists that any cause of action stemming from the reverse settlements accrued on the date of the first overcharge associated with that conduct, which IPPs claim to be on June 1, 2012 (the date the class period begins). However, SBA did not file this lawsuit until August 20, 2015, which Forest argues bars the claims in states that have statutes of limitations of three years or less. These would bar the antitrust claims under Mississippi, Tennessee, and Kansas law (each have three-year statutes of limitations), and the consumer-protection claims in Illinois, New Hampshire, Utah (three years each), and Idaho (two years). [19]

All of the class' antitrust claims are timely. For federal antitrust statutes, the statute of limitations restarts whenever there is an overcharge associated with the anticompetitive conduct. The Supreme Court has held that if there are a "series of unlawfully high priced sales over a period

---

[19] Forest also raised a statute-of-limitations argument about consumer-protection claims under Alabama law, but since that claim has been dismissed, the statute-of-limitations argument is now moot.

of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again.' " *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed.1995)). Obviously, reimbursement cannot be obtained for periods that fall outside of the statute of limitations, but that does not mean that the claims as a whole are time barred.

Defendants point out that the highest courts of the states at issue – Mississippi, Tennessee, and Kansas – have not definitively decided whether such a "continuing violation" doctrine applies to their state's antitrust statute-of-limitations. But this is not a "continuing violation" rule, in that it does not permit the recovery of damages for reimbursements that were made prior to the commencement of the limitations period, as measured from the date on which this lawsuit was filed. The rule is that each reimbursement constitutes a separate injury. There is no reason for this Court to assume that these high courts would refuse to apply the doctrine when evaluating whether the present claims are time-barred. The antitrust statutes of the states in question all either contain harmonization provisions or have been interpreted in such a way that supports construing the statute conterminously with federal antitrust statutes. *See* Kan. Stat. Ann. § 50-163 ("[T]he Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States Supreme Court."); *Walker v. U-Haul Co. of Mississippi*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) (noting that claims under Mississippi's and the United States' antitrust statutes must be treated as "analytically identical"); *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W. 3d 512, 521 (Tenn. 2005) ("[T]he enforcement of the state antitrust laws should be consistent with the federal laws.").

The same logic applies to the statutes-of-limitations of the consumer-protection laws of Illinois, New Hampshire, Utah, and Idaho. These statutes also contain harmonization provisions

that require it to be construed in accordance with "the interpretation of the federal trade commission and the federal courts" relating to the FTC Act when deciding cases. Idaho Code Ann. § 48-604; *see also* 815 Ill. Comp. Stat. Ann. 505/2; N.H. Rev. Stat. Ann. § 358-A: 13; Utah Code Ann. § 13-11-2(4).

Accordingly, this Court agrees with others that have concluded that claims in indirect-purchaser actions are timely because there are allegations of overcharges within the class period that are within the statute of limitations. *See, e.g., In re Loestrin 24 FE*, 433 F. Supp. 3d at 333; *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2020 WL 1066934, at *11 (N.D. Cal. Mar. 5, 2020); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004).

### H. The Motion for Summary Judgment on the Hard Switch Theory Must Be Re-briefed

One last piece of housekeeping. Forest moves for summary judgment on the hard switch theory of liability. Forest filed its motion and its memorandum of law in support before this Court issued its decision declining to certify a class as to the hard switch theory, and so its arguments are all generalized at the class-wide level and are not specific to SBA. The same is true of SBA's responses.

No class having been certified as to the theory, SBA must demonstrate that it was personally harmed by the hard switch. It has not done this. It points to no evidence showing the harm that it and it alone suffered as a result of the hard switch.  In her expert report, Laura A. Craft, noted that, between 2012-2017, SBA reimbursed for 2,219 class products, paying a total of $351,797. (Craft Report at ¶ 67).  But Craft does not tie any of these reimbursements to the "hard switch," or even the period when the "hard switch" could have resulted in damage to SBA (i.e., between the February 2014 hard switch announcement and Judge Sweet's injunction in December 2014). Not a single SBA customer is identified as having switched to Namenda XR during this

period, nor is there any testimony from any single doctor that he switched his patient to XR because of the "hard switch." To have suffered injury, not only would a patient have to have switched from Namenda IR to XR as a result of the hard switch, but SBA would need to show that that patient would have opted for generic Namenda IR once it became available. *See Namenda VIII*, 2021 WL 509988, at *31 ("For the hard switch to have injured a TPP, that TPP must have reimbursed for Namenda XR, and the XR reimbursement must have been for a prescription *that would otherwise have been a generic but for the hard switch*.").

Once the Court declined to certify a hard switch class, SBA needed to prove *its own* case, with evidence relating to *its own* customers, and *its own* reimbursements. SBA cannot rely on class-wide evidence to proves its individual claims. Therefore, SBA has not raised a genuine issue of fact in relation to its hard switch claim. Nor has it sought to supplement the record in opposition to Forest's motion to take account of this new reality since the class certification decision was announced almost four months ago.

Fairness, however, compels me to give SBA one last chance to oppose Forest's motion with evidence that is pertinent to it and it alone. SBA has twenty days from today's date to supply the court with evidence that ties any portion of its claimed damages to the "hard switch." Forest will have ten days after that to file a reply.

## IV.   CONCLUSION

The motions to exclude the expert reports and testimony of Michael Davitz, Jacob Holzer, and Philip Green are denied. The motions to exclude the expert reports and testimony of Susan Marchetti, Thomas McGuire, Lona Fowdur, and Sue Robinson are granted in part and denied in part consistent with this opinion.

As for the summary judgment motions, the cross-motions for summary judgment on Counts I and II – the antitrust claims – are denied in full. These claims will go to trial as to whether the reverse-payment settlements (including the Lexapro Amendment) were anticompetitive, and whether they caused any delay in generic competition. Defendants' motions for summary judgment as to Counts III and IV are granted in part and denied in part consistent with this opinion.

If we are still on centralized trial scheduling due to the COVID pandemic in late 2021, the Court will be applying for a trial date for this case during the first quarter of 2022. If I am back in control of my own trial calendar, I will be assigning a first quarter trial date as soon as I am authorized to do so.

The Clerk of Court is respectfully directed to close Dkt. Nos. 543, 545, 547, 549, 555, 560, 564, 568, 571, 574, and 614 and to remove them from this Court's list of open motions.


Dated:  June 11, 2021

_____
United States District Judge

BY ECF TO ALL COUNSEL