UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/15/2022

IN RE NAMENDA INDIRECT PURCHASER
ANTITRUST LITIGATION

No. 1:15-cv-6549 (CM) (RWL)

## DECISION AND ORDER ON THE MOTIONS *IN LIMINE* AND DEFENDANTS' MOTION FOR "CLARIFICATION"

McMahon, J.:

The court, for its rulings *in limine:*

**A.  Plaintiffs' Motions *in Limine*:**

1.  <u>First Motion *in Limine*</u>

The Plaintiff Class ("Plaintiffs") moves *in limine* to preclude Defendants from presenting evidence and argument regarding reputation, social and political issues. (*See* Docket No. 746). Specifically, they seek to preclude Defendants from introducing any of the following at trial: (i) evidence about socially valuable research and development efforts, efforts to increase access to pharmaceutical drugs or other forms of healthcare, or charitable works on the part of the Defendants; and (ii) evidence concerning the "bad character" of the Sergeants Benevolent Association Health & Welfare Fund.

It appears that Plaintiffs are specifically concerned that Defendants may seek to introduce evidence about COVID-19 related issues. I cannot imagine why they should; COVID-19 did not exist when the events in suit took place, and with their limited time for presenting relevant evidence Defendants will not have time to discuss matters that are irrelevant. The same thing is true of Plaintiffs. Questions about the police and their relationship to Black Lives Matter protests have nothing to do with this case, so in the highly unlikely event that Defendants would try to inject such issues into the case, I would of course sustain an objection on relevance grounds.

Basically, Plaintiffs can rest assured that I will sustain objections to irrelevant evidence. I cannot anticipate every irrelevant question that Defendants may choose to ask, and I don't intend to waste a lot of time doing that.

However, I can and do deny the motion insofar as it seeks to bar the introduction of evidence about Namenda. Questions concerning drug development and innovation simply cannot be ruled out at this juncture. Patent infringement issues will play a major role in this case and patents involve innovation.  And to the extent that discount programs for drugs lower the price of Namenda, they are relevant to damages. The jurors will be told that this information is being offered for a specific purpose, and not to give them a favorable opinion of Forest.

2.  Second Motion *in Limine*

Plaintiffs move *in limine* for an order prohibiting Defendants' expert, Sue Robinson, from being referred to as Judge Robinson.  (*See* Docket No. 748). The rule in my courtroom is that there is only one judge, and it is I. Therefore, the motion is granted; the witness will be addressed as Ms. Robinson during her testimony. However, the fact that she was at one time a judge is a basis for her proffered expertise, and that fact will not be kept secret from the jury; it will be revealed when her credentials are discussed at the outset of her testimony, and it may come up in her answers to

specific questions. Nothing in this ruling is meant to suggest that Ms. Robinson's prior career is irrelevant to her testimony; nothing could be further from the truth.

3. <u>Third Motion *in Limine*</u>

Plaintiffs move *in limine* to bar Defendants from introducing evidence or argument denigrating generic drugs or touting the qualify or benefits of brand drugs.  (Docket No. 750).  The motion is denied for the reasons articulated in Forest's brief in opposition thereto.

4. <u>Fourth Motion *in Limine*</u>

Plaintiffs move *in limine* to bar Defendants from arguing that a large judgment would negatively impact their current businesses, adversely affect the pharmaceutical industry generally, or force Defendants to increase drug prices.  (Docket No. 752).  Defendants respond that they have "no present intention" of making such arguments. That is good, because they will not be allowed to make them, even if their "present intention" changes.

Defendants are, however, correct that what's good for the goose is good for the gander; Plaintiffs will not be permitted to argue that damages or other relief in this case could affect the business of the members of the Plaintiff Class, the healthcare industry, health insurance, or related costs or prices.

5. <u>Fifth Motion *in Limine*</u>

Plaintiffs move *in limine* for an order allowing them to refer to themselves as "payors" while prohibiting Defendants from using the term "insurers" to refer to the Plaintiff Class. (Docket No. 754).  The motion is granted to the extent that Plaintiffs may refer to themselves as "payors" if they like. But Defendants may refer to the members of the Plaintiff Class in any way that is accurate – they need not use the term that is preferred by the class members. I can see no reason to keep from the jurors the fact that the Plaintiff Class includes insurers as well as self-insured entities.

6.  Sixth Motion *in Limine*

Plaintiffs move *in limine* for an order precluding Defendants from referring to any investigation or allegation of wrongdoing against the Fund, the Sergeants Benevolent Association, or the past or present officers, trustees,  or member of either.  (Docket No. 756).  Defendants oppose the motion.

Let's start with the obvious: this case is NOT about police brutality, police misconduct or any pending federal investigation into the union known as the Sergeants Benevolent Association. Therefore, efforts to inject those issues into this case will be met with a MOST harsh and disapproving rejection. What that means is that if Defendants believe that there is some relevant question relating to any of the above that they need to ask – a question this court does not presently anticipate – they need to raise the issue with the court by asking me for permission to put the question and obtaining a question-specific ruling prior to putting that question to any witness.

7.  Seventh Motion *in Limine*

Plaintiffs move *in limine* to exclude certain testimony from Richard Zimmerer, one of Defendants' experts.  (Docket No. 759).  The motion is denied, for substantially the reasons set forth in Defendants' brief in opposition thereto.

8.  Eighth Motion *in Limine*

Plaintiffs move *in limine* to exclude evidence that Defendants' reverse payment to Mylan was not large.  (Docket No. 761).

I sometimes cannot believe the things that lawyers do.  This is not a motion *in limine.* It is a thinly – and not at all cleverly – disguised motion for summary judgment on the central issue in this case.

We are going to trial in order to decide whether the reverse payment to Mylan was large. I will not preclude Defendants from introducing evidence in support of their position that the reverse payment to Mylan in fact not a large payment.  I will not prohibit Defendants from arguing that the value of their patented drug franchise is a legitimate benchmark for evaluating whether the $34.5 million reverse payment to Mylan was "large."  I dealt with this issue prior to the settlement of the Direct Purchaser Plaintiffs' case.  Everything that was admissible in that case on the *Actavis*[1] issue is admissible in this case on the *Actavis* issue.  (*See* August 2, 2019, Order on the Motions *in Limine* in DPP Case, Case No. 1:15-cv-07488 (CM)(RWL), Docket No. 859 ("DPP Order on the Motions *in Limine*") at page 3). I have no intention of changing my mind on that score.

The motion is denied for substantially the reasons set forth in the Defendants' brief in opposition thereto.

9. <u>Ninth Motion *in Limine*</u>

Plaintiffs move *in limine* to preclude argument about Plaintiffs' settlements with the Settling Generics or argument that Plaintiffs did not sue certain generic challengers.  (Docket No. 763).

Fed. R. Civ. P. 408 precludes the use of settlement to prove the validity or amount of a claim or to impeach by prior inconsistent statement. As long as Defendants do not run afoul of that rule they may argue, at the time of trial, that asking a specific question of a particular witness from a settling generic would be probative of bias – which is the only issue Defendants identify on which the settlements would be relevant, and which is specifically permitted by Rule 408.

I can't rule on whether a particular question has a tendency to prove bias until I hear the question in the context of the examination.  Should this issue arise, it must be dealt with before the

---

[1] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 133 S. Ct. 2223, 186 L. Ed. 2d 343 (2013) ("*Actavis*").

question is put to the witness, out of the hearing of the jury. The parties are advised that where limiting instructions may prove useful, I am open to delivering them.

All questions about Mylan are fair game in this lawsuit, subject to a showing at the time of trial that a particular question is not.   Whehter Mylan's patent settlement agreement was anticompetitive is the issue we are trying.  If the fact that Plaintiffs chose not to sue Mylan ends up being probative of witness bias, then questions about that decision may be asked. But again, I cannot rule on questions I have not heard, shorn of whatever context might impact their relevance. So – game time decision.

10. Tenth Motion *in Limine*

Plaintiffs move *in limine* to preclude argument or evidence about past or present litigation involving the Plaintiff Class or its counsel.  (Docket No. 765).  As Defendants point out, the court ruled on this issue in the DPP litigation. Same ruling here.

11. Eleventh Motion *in Limine*

Plaintiffs move *in limine* to preclude Defendants and their experts from using the DRL Deal Memo as evidence at trial.  (Docket No. 768).  Unlike the rest of the Plaintiffs' motions *in limine*, this raises a significant issue, on which the court has not previously ruled.

The motion is granted.

The DRL Deal Memo is hearsay. In fact, if the well-worn phrase "rank hearsay" can be said to apply to any document, it applies to this document. The DRL Deal Memo was an internal memorandum circulated among what appears to be a group of Dr. Reddy's executives who were tasked with deciding whether or not to settle the '703 patent case with Forest. The author of the memo is not identified on the document. It contains the author's out of court statements outlining issues to be taken into account by Dr. Reddy's in deciding whether to settle the case. Among those

6

statements is an assessment by the unknown author concerning the claim construction decision and its impact on the likelihood of success in the lawsuit.

Defendants – who, by virtue of having refused to waive attorney-client privilege, are barred from testifying about their subjective views of the merits of the settlement (an issue that happens to be central to the resolution of this case) – argue that this memo constitutes "objective" evidence that the patent lawsuit was likely to end in Forest's favor, because Dr. Reddy's and Mylan were both potential generic competitors who were co-defendants in the '703 lawsuit, and so stood in the same shoes.

I disagree with Defendants' argument that this internal DRL memo constitutes "objective" evidence of the merit of the '703 lawsuit. Rather, it seems to me to be subjective evidence about what Dr. Reddy's executives had in their minds when they made their own independent decision that Dr. Reddy's should settle the '703 case. The jury will know that other generic manufacturers settled the '703 case; they are not being told why any other generic chose to settle.

But whether this is "objective" or "subjective" evidence is ultimately of no moment because the document is hearsay.  Defendants wish to offer the DRL Deal Memo to prove the truth of statements contained in that memo – including specifically, that Forest received a favorable claim construction in the '703 litigation, and that this ruling negatively impacted Dr. Reddy's (and so Mylan's) chance of prevailing in that lawsuit, which counseled in favor of a settlement. No one has pointed to any exception to the hearsay rule that would overcome the inadmissibility of this document for that purpose.  In fact, no one (including Plaintiffs) has discussed the hearsay rule at all – which means that no one has established that this memo falls within any of the exceptions to the hearsay rule. This includes the business records rule; I have not been directed to any testimony from Dr. Reddy's indicating that this document was prepared in the ordinary course of business

(as opposed to for a special and unique purpose) by a person under a duty to report the information being recorded. In fact, the author of the document has not been identified; it is certainly not apparent from the face of the document. Therefore, the document does not come in.  End of story.

Defendants cannot get around the hearsay nature of this document by offering it to prove the state of mind of anyone at Forest or Mylan at the time they entered into the settlement whose validity is being litigated here, because there is no evidence that anyone at Forest or Mylan saw it until the document was produced in discovery in this lawsuit. The DRL Deal Memo was an internal memorandum that circulated at Dr. Reddy's; it reflects only the "state of mind" of the people at Dr. Reddy's. Therefore, it cannot be received as probative of the understanding of the key players that Forest had a strong position or that Mylan had a weak position in the patent litigation.

Additionally, to the extent that Forest seeks to introduce the DRL Deal Memo in order to place before the jury the views of someone at Dr. Reddy's about the potential merit or lack of merit of the '703 lawsuit – a subject not within the ken of the average juror – it would be offering what is essentially expert testimony, but without having disclosed the name and qualifications of the person giving the relevant opinion or filing a timely expert report or subjecting that expert to cross examination, all as required by the Federal Rules of Civil Procedure. For this reason, too, I would not allow this document to come into evidence.

Finally, Dr. Reddy's may have had its own reasons for settling the '703 lawsuit (which, as I understand the facts, it did, or at least arguably did, for substantially less consideration than Mylan was given) that differ from the reasons that prompted Mylan to settle with Forest. For that reason, Plaintiffs are correct when they argue that the probative value of the DRL Deal Memo is vastly outweighed by the very high probability that the jury would be confused about its relevance to the issues it must decide. Its admission would, therefore, violate Fed. R. Civ. P. 403.

This court has already ruled as much; I held months ago that Ms. Robinson could not rely on the DRL Memo to determine how Forest or Mylan viewed their respective litigation positions. (*See* Docket No. X at page 41).  In case Forest did not think this ruling applied to any other expert, Dr. Fowdur will also not be allowed to testify that Forest and/or Mylan were justified in drawing conclusions about the '703 litigation in light of the DRL Memo, either. All mention of the DRL Memo must be eliminated from her testimony. The document has no role to play in the resolution of this case.

Forest made a strategic decision long ago not to produce the attorney-client privileged materials on which it relied in deciding to settle the '703 lawsuit.  As this court noted in its *in limine* rulings in the DPP litigation, "Forrest has refused to waive attorney-client privilege and has indicated that it will not rely on its subjective belief about the strength of its case in the patent action."  (*See* DPP Order on the Motions *in Limine* at 14-18).  It cannot get around that decision because it recently found, in the files of Dr. Reddy's, a memo addressed to Dr. Reddy's, that tends to support Forest's entirely subjective (and therefore inadmissible) belief that its position in the '703 patent suit was strong. The admissibility of that memo remains subject to all the Federal Rules of Evidence, and all the applicable  rules counsel against admissibility.

Plaintiffs' eleventh motion *in limine* is GRANTED.

12. Twelfth Motion *in Limine*

Plaintiffs move *in limine* to preclude references to the word "unexplained" in the context of discussing the standard for legality articulated in *Actavi*s.  (*See* Docket No. 772).  Since "unexplained" is the word that Justice Breyer used, the motion is DENIED.  Precisely what "unexplained" means is, as Plaintiffs recognize, a subject for another day.

13. Thirteenth Motion *in Limine*

Plaintiffs move *in limine* to exclude "non-cognizable procompetitive justifications" – an utterly incomprehensible phrase that apparently means they want to prohibit Defendants from arguing that the reverse payments were justified by "litigation uncertainty."  (Docket No. 774). That motion is absurd on its face.  It is DENIED for the reasons outlined by Defendants in their brief in opposition, as well as this court's decisions in the prior DPP lawsuit. However, Forest is reminded that it cannot make "litigation risk" arguments as a justification if the argument relies on undisclosed attorney-client information or on the subjective belief of Forest executives that the company faced significant litigation risk. They are limited to objective evidence on the point – which is, more or less, expert testimony that every lawsuit carries some degree of risk.

14. <u>Fourteenth Motion *in Limine*</u>

Plaintiffs move *in limine* for a blanket exclusion on any mention of double or treble damages, attorneys fees or costs. (Docket No. 776).

Frankly, this motion has opened the court's eyes to the very real possibility that the damages portion of this case cannot be tried as a class action. Unlike the DPP case, which implicated federal (nationwide) antitrust laws, the IPP claims are brought under various state antitrust and consumer protection statutes.  If there are claims brought under state laws pursuant to which the jury enhances damages, then the jury must be allowed to know that it has the right to enhance damages and be given an opportunity to enhance damages.  But that is a decision that must be made on a state-by-state basis, and not all class members will have suffered damages in any particular state – and to the extent that damages were suffered in more than one state, they would have to be parceled out among the relevant states by class members in order to allow the jury (or the court, for that matter) to engage in doubling or trebling.  In light of recent class action

jurisprudence, it seems highly unlikely that we can proceed past a finding on liability that would pertain to all class members on a class-wide basis.

I have asked my deputy clerk to arrange a conference for next week so that we can discuss this issue. I can say that the issue of punitive damages or double or treble damages will not be mentioned during the liability phase of the trial, except insofar as the jury needs to know about Mylan's threatened antitrust complaint against Defendants in connection with the underlying patent litigation. That is the ruling I made in connection with the DPP litigation. Same ruling here.

15. Fifteenth Motion *in Limine*

Plaintiffs move *in limine* for an order precluding Defendants from introducing evidence or argument concerning the purported pass on of overcharges by End Payors, in the form of higher insurance premiums or Government subsidies due to Medicare Part D.  (Docket No. 778).  The motion is denied, for substantially the reasons set for in Defendants' brief in opposition thereto.

16. Sixteenth Motion *in Limine*

Finally, Plaintiffs move for an order precluding Defendants from offering evidence or argument at trial about their own, Plaintiffs', or any class member's size or financial condition. (Docket No. 781).

I do not read this motion as asking that information about Forest's or Merz's or Mylan's size or financial condition be altogether barred – such a motion would be absurd. As Defendants point out, such matter bear on the issue of why the patent was licensed and why the '703 lawsuit was settled.

Moreover, the motion must be denied as to evidence about the size or financial status of class members provided Defendants can make a showing (not just a proffer) that the size or financial status of a particular class member is relevant to the issue of damages. However, the

motion is granted to the extent of barring Defendants from introducing evidence of any class member's size or financial condition during the liability phase of the trial, because that evidence is relevant to nothing at issue in the liability phase of the lawsuit.  As was the case in the DPP Action, such evidence may be admissible during the damages phase of the trial (assuming we get there). The parties appear to be under a misapprehension that the trial is not going to be bifurcated; it most certainly is.

## B.  Defendants' Motions *in Limine*

### 1.  <u>First Motion *in Limine*</u>

Defendants move *in limine* to exclude evidence relating to the "hard switch" theory. (Docket No. 707).  The motion is granted in part and denied in part.

For the reasons set forth in the moving brief, evidence about the hard switch strategy pursued by Forest in the 2013-2015 period is irrelevant and will not be admitted. Nor will evidence created contemporaneously with the hard switch period – even if Plaintiffs think that such evidence somehow establishes what Defendants' state of mind was at the earlier point in time when the patent case was settled, and the Lexapro Amendment signed.  I ruled in the DPP case that the "hard switch" evidence was not relevant to intent or state of mind in connection with the reverse payment claims, and I have no intention of changing my mind now. The issue of Defendants' "specific intent to monopolize" in 2010, when the reverse payments settlement was reached, cannot be proved by documents or testimony relating to an effort to monopolize in 2013-2015, the period of the hard switch. Frankly, this case is complicated enough without reintroducing issues that have been removed.

However, Plaintiffs argue that specific documents they seek to introduce were created contemporaneously with or prior to the Namenda patent settlements and the execution of the Lexapro Amendment.  Obviously, such documents are not really "hard switch" evidence and may

not be excluded as "hard switch" evidence – even if they anticipate or discuss some aspects of the strategy that Forest eventually pursued years after the execution of the patent settlement and the Lexapro Amendment. Evidence created contemporaneously with the events that are in suit here will not lead to any frolics or detours. However, I will not allow documents from the subsequent time period to be introduced. For that reason, Exhibits 1, 2, 3 and 4 to the Miller Declaration filed in opposition to this motion may be introduced into evidence.  Exhibit 5, which post-dates the events in suit by two years, may not be.

2.  Second Motion *in Limine*

Defendants move *in limine* to "confirm" the admissibility of evidence bearing on the likely outcome of the patent litigation.  (Docket No. 709).

I have already ruled that the Dr. Reddy's Lab Deal Memo cannot be received into evidence or alluded to by any party or witness. Nothing in the ruling that follows should be read to alter that conclusion.

And I have already ruled that the jury must assess what the chances were that Mylan would have won the Paragraph IV challenge, because it is relevant to causation – would Mylan's generic launch have been legal. To support both causation and damages Plaintiffs must submit proof that the generic could (not would, but *could*) have won the patent litigation. *See United Food and Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1155 (N.D.C.A. 2017).  For that reason, in the court's *Daubert* ruling I stated that expert testimony about the relative merits of each party's case – based only on things that Forest and Mylan were able to consider at the time they were evaluating whether to settle the '703 patent suit[2]  –  would be admitted.

---

[2] Since they did not know and could not have known about the Dr. Reddy's memo, that memo cannot be mentioned in any expert testimony. Period. End of story.

What Defendants want is to be able to introduce the assessments of third-party generic manufacturers (*i.e.*, Dr. Reddy's) on the issue of causation. They may not do so, either directly or *via* cross examination of any witness.  In particular, they may not introduce rank hearsay evidence to support their claim that this side or that side would have prevailed in the patent litigation.

In this regard, Defendants' citation to *Apotex v. Cephalon*, 255 F. Supp. 3d 604, 614 (E.D. Pa 2017) is completely off the mark.  In that case, the court held that post-settlement events that were known to the parties (the subsequent invalidation of the patent) could be introduced on the issue of causation. The *Apotex* court did not address whether contemporaneous information that was NOT known to the parties (a third-party's assessment of the risk of litigation) was relevant to causation – nor did that court address whether the hearsay rule was somehow overcome by the fortuitous fact that, years after all the events in suit, discovery turned up a document like the DRL Deal Memo.

I find it particularly galling that nowhere in its brief in support of the motion is the DRL Deal Memo mentioned, even though getting it before the jury, by hook or by crook, is the obvious goal of the motion.  I am not so easily fooled.

3.  <u>Third Motion *in Limine*</u>

Defendants move *in limine* for an order precluding testimony regarding "undisclosed damages opinions."  (Docket No. 712).  This, I gather, relates to evidence from Dr. Vogt that assumes several proposed dates of generic entry other than the dates that were disclosed in Dr. Vogt's expert report. Defendants sought and obtained such an order in the related DPP litigation, but that aspect of its motion in the DPP case was unopposed.  Here it is opposed. The motion must be denied for the reasons articulated in Plaintiffs' brief in opposition to the motion, as well as the

reasons articulated in the court's *Daubert* ruling denying Defendants' motion to exclude Dr. Vogt's opinions (Docket No. 656).

4. Fourth Motion *in Limine*

Defendants move *in limine* to preclude evidence of "speculative alternative agreements" to the Lexapro Amendment as part of the fair value analysis.  (Docket No. 715).  This argument should have been made as a *Daubert* motion; it is not properly considered as a motion *in limine*. It is denied because I see nothing in Ms. Marchetti's testimony about possible alternate sources of Medicaid savings that is irrelevant to the issues in suit. If alternative sources of Medicaid savings are, as she opines, more economical, that would logically affect the value of entering into an agreement that provides for a less economical way of achieving more or less the same result.

5. Fifth Motion *in Limine*

Defendants move *in limine* to exclude evidence and argument that disparages the Patent Office, its examiners, or the examination process.  (Docket No. 718).  This motion is more properly styled a motion to preclude one of Plaintiff's expert witnesses, Dr. Michael Davitz, from testifying that the Patent Office Examiners who reviewed the application for the '703 patent had a higher rate of allowance than did other patent examiners, that they spent less than the average amount of time reviewing the application, and that they had worked longer in the Patent Office than other examiners (which, I read as a euphemism for "they were old").

Such testimony would not be proper in a patent infringement case, because it might undermine the presumption of patent validity that is operative in such cases. But as Justice Breyer has taught us in *Actavis,* this reverse payment antitrust case is not a patent infringement case – even though we are going to end up effectively trying that case by evaluating the likelihood that

Forest (or Mylan) would have succeeded on Mylan's Paragraph IV challenge to Forest's patent. Therefore, the rule on which Defendants rely simply does not apply here.

Dr. Davitz is testifying as an expert on what a reasonable patent lawyer would have taken into consideration in evaluating the likely outcome of the patent lawsuit. If it is his opinion that a reasonable patent lawyer would have taken into account the amount of time spent reviewing an application vis a vis other, similar patents – or relative allowance rates – or the tenure of a patent examiner (which strikes this court as a factor in favor of concluding that the patent was correctly allowed) – he can so testify, provided his testimony is otherwise relevant and admissible. That is what I concluded when I certified him as an expert in the *Daubert* round of motions.

Nothing about this *Daubert*-like ruling runs counter to my ruling that a former federal judge could not testify about her colleague Judge Sleet's "track record" in patent cases. We are talking about an entirely different line of testimony from Judge Robinson's.

But Forest argues that there is not a scintilla of evidence in the record that Forest or Mylan ever considered any data like that about which Dr. Davitz plans to testify prior to deciding to enter into the settlement that is challenged in this lawsuit.  And that is a different kettle of fish altogether.

Expert evidence about what a reasonable patent attorney would advise his client about when settlement is under consideration is the sort of "objective" evidence from which one could argue the pros and cons of Forest's decision to settle with Mylan for $34 million. But the probative value of that expert evidence (an issue on which this court has yet to opine) is nil unless there is evidence that Forest was actually aware of the matters the expert took into account and considered those factors in formulating its decision to settle.

For example: Forest was obviously aware of the fact that it and Merz were being accused of fraud on the patent office in connection with the '703 patent. That is an objective fact. And the

merits of such an accusation is something that any competent patent attorney would have told his client to take into account in deciding whether or not to settle a case involving such a claim. Dr. Davitz intends to so testify. There is nothing wrong with that.

But if there is no evidence that Forest was actually aware of the "track record" (to use the parties' euphemism) of the patent examiners who allowed the '703 patent – if there is no evidence that Forest knew about and considered the matters that Dr. Davitz uncovered in his "deep dive" into the patent allowance process for the '703 patent – the jury would be speculating if it were to conclude that Forest decided to settle in part because a reasonable patent attorney would have advised them about the proclivities and skills of the '703 patent examiners. This might be information that a reasonable patent attorney would want his client to know, but I am not presently aware of any evidence tending to suggest that Forest was aware of these interesting facts – if only because the proclivities and skills of patent examiners was not and could not have been an issue in the '703 litigation (for all the reasons Defendants recite in their moving papers). The jurors cannot be allowed to conclude, on the basis of sheer speculation, that the kind of information Dr. Davitz would ordinarily take into account in advising a client – a matter as to which he unquestionably an expert – played any role in Forest's consideration of whether and on what terms to settle with Mylan.

The court cannot allow a verdict predicated on speculation.[3] And if that means that Dr. Davitz's otherwise expert testimony – allowable under *Daubert* – can't come in because it would lead the jury to speculate about matters as to which there is no evidence (*i.e.*, if there is no foundation for the conclusion that Plaintiffs want to the jury to draw), then his testimony cannot come in.

---

[3] For a contrast with an "objective fact" about which Forest and Mylan clearly knew when they settled, see the court's ruling on Defendants' *in limine* motion number 7, below.

This is not like Dr. Davitz's proposed testimony about his assessment of the risk that Forest and Merz would have been found to have committed fraud on the patent office and the advice he would have given in light of that assessment. Fraud on the patent office was an issue that was actually raised in the '703 patent suit. Forest and Merz were fully familiar with the issue and would have been expected to take it into account in evaluating the pros and cons of settling that lawsuit. By contrast, the quality and competence of the patent examiners was not an issue in the '703 lawsuit. There can be no presumption that Forest was aware of the issues that Dr. Davitz uncovered in his deep dive into problems with the '703 patent. There needs to be some connective tissue from which the jury can conclude that Forest knew about the so-called problems with the patent examiners and took them into account. At the moment, I know of none. And since at this moment it appears that admission of this specific evidence would lead to such speculation, the motion must be granted.  Indeed, were the jury to hear that a reasonable patent attorney who was advising her client about whether or not to settle a patent infringement case would have told his client about the proclivities of the patent examiners who approved the patent, I would have to explain to the jury that the proclivities of the patent examiners was irrelevant and inadmissible in the patent case.

6.   Sixth Motion *in Limine*

Defendants move *in limine* to exclude mention of Mylan's unfiled and released antitrust claim. (Docket No. 720).  As should be obvious from my ruling on the previous motion, and for the reasons set forth in Plaintiffs' brief in opposition to the motion, the motion is denied. Defendants have put this claim squarely in issue through Dr. Fowdur's proposed testimony.

7.   Seventh Motion *in Limine*

Defendants move *in limine* to exclude evidence and argument that foreign courts' decisions invalidating foreign patents under foreign law show that a different U.S. patent that is invalid under

U.S. law. (Docket No. 724). For the reasons that this motion was denied when made in the DPP case, it is denied in this case. As for the hearsay argument, there is no reason why the foreign decisions themselves need to be shown to the jury. The fact that the Namenda patent was invalidated in Germany and Canada, and that the same prior art references were being used to challenge the validity of the '703 patent in the United States, are objective facts that could have been considered by a patent holder or challenger when deciding whether or not to settle a Paragraph IV challenge and on what terms. These objective facts can be put before the jury without requiring the jurors to read the underlying decisions themselves.

8.  Eighth Motion *in Limine*

Defendants move *in limine* for an order excluding the "hearsay opinions of undisclosed, non-testifying experts in the expert report of Plaintiffs' patent law expert, Michael Davitz." (Docket No. 727). In his report, Dr. Davitz – who by his own admission, in not a technical expert – relies on and "quotes extensively from" witnesses who testified on behalf of Mylan in the '703 patent lawsuit. Defendants argue that these quotations are inadmissible hearsay that amounts to late-disclosed expert evidence. They agree that Davitz can rely on this information in forming legal opinions about which he is authorized to testify – which is that, viewed from the perspective of a reasonable legal expert, Mylan had at least a 70% chance of prevailing in the underlying patent litigation – but he cannot parrot the hearsay information for the jury.

I start by reminding the parties that the expert reports themselves will NOT be received into evidence, so the fact that the reports contain quotations from technical experts who offered opinions in the '703 lawsuit does not introduce hearsay that could not otherwise get before the jury. Dr. Davitz, like Mr. Johnston in the DPP litigation, is free to testify that he relied on the reports of technical experts retained by the parties to the '703 litigation, that he reviewed those

reports as a lawyer would review them, and that the ultimate conclusion of those reports and his lawyerly assessment of their strength[4] factored into his determination that Mylan was likely to succeed in its quest to overturn the Namenda patent. The law permits an expert in one field to base his opinions on the expertise of someone in another field, and as is the case with other hearsay evidence on which the expert relies, there is no requirement that the other expert testify as well. (*See* the cases cited at page 3 of Plaintiffs' Opposition to Defendants' Motion in Limine No. 8, Docket No. 811).

What Dr. Davitz cannot do is recite in detail the opinions of technical experts so that the jury can consider that evidence for its truth. I do not understand that to be the Plaintiffs' intent, and if I am wrong their efforts to place that detail in front of the jury will be swiftly cut off.

The motion is denied.

9.  Ninth Motion *in Limine*

Defendants move *in limine* for as order excluding evidence and argument concerning the profitability of the original Lexapro Agreement. (Docket No. 732).  The motion is denied, for the reasons set forth in the brief in opposition. The evidence the Defendants seek to exclude is evidence from which the Plaintiffs can argue to the trier of fact that the settlement payment (cum Lexapro Amendment) by which the '703 lawsuit was settled with Mylan is pretextual. I disagree with the argument that this evidence is irrelevant to whether the Amendment made economic sense from the perspectives of both Mylan and Forest. Furthermore, I have already decided this issue (*see Namenda*, 2021 WL 2403727, at *26), and the time for moving for reconsideration has long since passed.

---

[4] Of course, Dr. Davitz can be cross examined about whether his credentials were sufficient to allow him to make a proper assessment of the strength of the technical experts' opinions.

10. Tenth Motion *in Limine*

Defendants move *in limine* for an order precluding Dr. Vogt from offering testimony about the measure of unjust enrichment damages. (Docket No. 734).  As the parties were told when the *Daubert* motion relating to Dr. Vogt was decided (Docket No. 656), Dr. Vogt is free to offer testimony about all forms of pay-for-delay damages.  He may not offer any testimony about any form of hard switch damages.  To the extent that this report aggregated those two forms of damages, it is now outdated, and he cannot testify to the numbers contained in that report. However, I specifically said that Dr. Vogt could testify to pay for delay damages, and Plaintiffs insist that Dr. Vogt's   model can be used to disaggregate the unjust enrichment damages attributable to the hard switch from those attributable to pay for delay.

I do not understand why parties do not simply revise their expert reports to conform with the court's opinions once those opinions are handed down, but I acknowledge that it rarely if ever happens.  Plaintiffs have until August 31, 2022  (and yes, I know that it is August) to provide Defendants with a revised damages report that factors out the hard switch damages. To stave off the inevitable next motion, no additional expert deposition will be allowed. It is possible to cross examine a witness at trial without having deposed him on a specific topic.

11. Eleventh Motion *in Limine*

Defendants move *in limine* to preclude Dr. Vogt from testifying about damages to the extent that he fails to factor out government payments made for three purposes: catastrophic phase Medicare Part D subsidies, Medicare Direct Subsidies, and Medicare Employer Retiree Drug Subsidies. (Docket No. 737). In his report, Dr. Vogt calculated damages both including and excluding the catastrophic phase subsidies; however, at the instruction of counsel he did not reduce TPP damages by the amount of direct subsidies or Retiree subsidies paid to the TPP Plaintiffs.

The motion is denied.

Each of the *Illinois Brick*-repealer state statutes on which Plaintiffs base their claims limit recovery to "actual damages" or "actual damages sustained." Any benefits, including discounts or subsidies, that flowed to a plaintiff must be used to reduce the amount of damages suffered by that plaintiff. Therefore, as a matter of law, to the extent Class Members receive any form of payment that covers all of part of its memantine prescription costs, those payments must be deducted from damages. This is not even a close question – subsidies, of all forms, are a damages set off and the jury (assuming we have a jury trial on damages) will be so instructed.

Plaintiffs argue, and Dr. Vogt opines, that while the catastrophic subsidy may be properly characterized as a set off, the other two Medicare subsidies are more properly characterized as "premiums," in that they do not apply to individual prescriptions (such that one could not tease out how much of those subsidies is attributable specifically to memantine), and so are not "offsets" that reduce "actual damages." But Defendants' expert, Dr. Grabowski, concludes that because Namenda patients tend to be elderly, their drug payments tend to be covered by Medicare through a complex set of coverages and reimbursement, depending on treatment setting (inpatient or outpatient) and may be covered by additional government programs depending on income and other characteristics. Dr. Grabowski opines that Dr. Vogt has not properly taken this "complex set of coverages and reimbursements" into account in performing his damages calculations.

I personally find aspects of Dr. Grabowski's report persuasive. But I am not the trier of fact in this case. The issue is not how one characterizes a form of payment (as a "premium" or a "reimbursement"), but exactly how much of the cost of memantine to the Plaintiffs class members ends up being borne by the Government, not the class member. It may be easy to ascertain that with respect to some forms of offset (the catastrophic phase Medicare Part D subsidy appears to

22

be one such, and indeed, Dr. Vogt has calculated damages both with and without taking that program into account). Or it may be difficult to tease out what portion of some more general reimbursement (one applicable across all forms of prescription) can fairly be attributed to the cost of memantine to the TPP.

But these criticisms of Dr. Vogt's work (as I believe I said in the *Daubert* decision) do not present legal issues for the court to resolve. The court only rules of what the measure of damages is. And the measure of damages is the actual damage – the out-of-pocket cost – that is suffered by a third-party payor as a result of being overcharged for memantine. Whether Dr. Vogt has calculated that measure correctly in light of the various government reimbursement programs presents a question of fact for the trier of fact – not a ruling of law for the court to make. Whether aspects of what Plaintiffs characterize as "premiums" operate to reduce the out-of-pocket cost of memantine to a third-party payor is also a question of fact for the trier of fact – not a ruling of law for the court to make. All of this is fair game for cross examination.

12. <u>Twelfth Motion *in Limine*</u>

Defendants move *in limine* to preclude Plaintiffs from offering argument or evidence that acceleration clauses in the Namenda patent settlement agreements are independently anticompetitive or unlawful. (Docket No. 740). As Plaintiffs have no intention of making such an argument, the motion is denied as moot. The court notes that the reason given by Plaintiffs for introducing evidence about the Most Favored Nation clauses are all perfectly acceptable reasons for allowing the jury to hear about their existence.

13. <u>Thirteen Motion *in Limine*</u>

Defendants move *in limine* for an order precluding the introduction of Exhibit 1965, which is a declaration from corporate representatives of settled Defendant, Teva Pharmaceuticals.

(Docket No. 743).  Teva settled this lawsuit with Plaintiffs in July 2020. The declaration is hearsay and will not be admitted. The alleged justification for its admissibility is an out of court statement from the Brian Savage, General Counsel of Teva, asserting that the declaration is based on his "personal knowledge." But Mr. Savage cannot be *voir dired* about this assertion since he is not being called as a witness. Moreover, it does not appear from the face of the document that the declaration was prepared "at or near the time" of the events that it describes; whether and when Teva was ready to enter the generic market for memantine took place years before the declaration (dated May 20, 2021) was prepared. To the extent that the General Counsel received his knowledge from other Teva employees – and he would have had to, since he himself did not work for Teva until sometime in 2015 – those employees are not identified, so there is no way to know whether those individuals were knowledgeable about whatever they told Mr. Savage. To the extent that the affidavit references "internal forecast documents," those documents (1) have not been produced, (2) appear to have been produced by a third party (IPD Analytics) which has not been identified as a witness, and (3) could not possibly have been part of the witness' "personal knowledge."

 It is not even clear to the court whether Mr. Savage's declaration – prepared pursuant to a cooperation clause in a settlement of a lawsuit – qualifies as being prepared in the "regular course of Teva's business activity." It appears to be a document that was created for the sole purpose of being introduced as testimony in this lawsuit, which is NOT a "document produced in the ordinary course of business."  Records created "in anticipation of litigation" are not kept in the regular course of a business activity and "are inadmissible under the business records exception." *United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006) (internal quotations omitted).

In short, on the showing made by Plaintiffs, this court is not prepared to admit the document as a record made in the ordinary course of business by a person having knowledge; neither do I

find it to be independently trustworthy for purposes of the residual hearsay rule, since Mr. Savage, brilliant lawyer though he be, knows nothing of any of these matters.

Plaintiffs are obviously offering this document in order to prove the truth of the matter asserted – namely, that Teva would have been ready to enter the memantine market in or about June 2012 but for the fact of its settlement with Forest in November 2009. To the extent that Plaintiffs rely on some purported "right to call additional witnesses to provide foundational testimony" for the document, as stated in the parties' joint pre-trial order, its strategy fails. First, the fact that Plaintiff seeks to produce cannot be proven from a document created for purposes of litigation (which is hearsay, not a business record) by authenticating it through a "foundational witness" who has no firsthand knowledge of the facts asserted in the document. A Teva "fact" witness with knowledge from the relevant time period could have been listed on Plaintiffs' witness list but was not. And this court makes it very clear that ALL WITNESSES (this includes foundational witnesses) must appear on the witness list in the pre-trial order, or the witness will not be permitted to be called. *See* McMahon Individual Rules, Rule IX-X.[5] Parties cannot evade the court's rules by "reserving" what are, under my rules, non-existent rights – or by creating documents that purport to be but are not business records and then trying to sneak them into evidence through "foundational" witnesses.

## C.  Defendant Merz's Motion *in Limine*

Defendant Merz Pharmaceuticals GmbH & Co. KGaA ("Merz") moves *in limine* to exclude evidence related to (1) Merz's purported involvement in the hard switch through negotiations with Forest to reduce Merz's Namenda XR royalty (the "XR Royalty Negotiations");

---

[5]      My individual rules can be found at https://www.nysd.uscourts.gov/sites/default/files/practice_documents/CM%20McMahon%20Rules%20%287-13-22%29.pdf (last accessed August 9, 2022).

and (2) the fixed-dose combination product, Namzaric, and Forest and Merz's agreements with Adamas Pharmaceuticals, Inc. regarding Namzaric.  According to Merz, such evidence has no relevance to the reverse payment claim and will serve only to confuse the jury.

The motion is granted insofar as it relates to the hard switch. The court has ruled on this issue repeatedly, in both the DPP and this lawsuit; I will not allow hard switch evidence (about a strategy that was pursued in 2013 and thereafter) to be introduced as proof of anyone's specific intent in 2009-2010. Merz's involvement in the negotiations leading to the various generic settlements of the '703 patent litigation is of course relevant evidence; but while Plaintiffs' opposition brief focuses most of its attention on that evidence, I did not read Merz's moving brief as seeking to exclude it.

As for the Namzaric issue: this is literally the first time the court has heard of Namzaric, and I have been overseeing this case for a very long time.  I gather that some documents relating to the transaction that ultimately took place well after the Mylan settlement of the '703 lawsuit were created prior to that settlement. The court will consider the admissibility of those documents on a document-by-document basis at the final pre-trial conference. Documents and testimony relating to the Namzaric deal that post-dates the Mylan settlement will not be admitted.

**D.  Defendants' Motion for Clarification**

Defendants move for an order "clarifying" the court's prior decision that Dr. Vogt, one of Plaintiffs' experts, was qualified and could opine about the economic factors at play that determine a possible date of generic entry of Namenda, as well as the resulting damages that may be attributable to an impermissibly delayed entry.  (Docket No. 863).  Defendants note that, in making his calculations, Dr. Vogt relies on the opinion of Susan Marchetti, another of Plaintiffs' experts, that the Lexapro Amendment gave Mylan $30.9 million in excess of fair value for its services

under the agreement.  On June 11, 2022, the court concluded that Ms. Marchetti could not offer this opinion, because her assessment of the gains and benefits of the Lexapro Amendment to Forest "is not based on the proper standard for measuring benefits to a reverse payor when applying *Actavis*." (Docket No. 869).  Specifically, the court excluded Ms. Marchetti's fair value opinion because her she improperly assumed that the value of the Lexapro Amendment to Forest must be measured *only* by the cost of shifting the manufacture of Lexapro AG to Mylan.  Forest, however, disclaims that manufacturing cost savings were its only consideration, and Marchetti has essentially given no testimony about some of Forest's other stated sources of "benefit" such as its Medicaid savings.

Defendants seek an order "clarifying" that Dr. Vogt may no longer based his calculations on Ms. Marchetti's excluded opinion.

On February 11, 2021, this court denied Defendants' *Daubert* motion to exclude Dr. Vogt's (i) estimate of the date of market entry of generic Namenda had there been no reverse payments' and (ii) damages calculation based on that estimated date of entry.  (*See* Order on the Motion for Class Certification, Docket No. 656 at 14-18).  The *Daubert* motion was considered in connection with the motion for class certification, which the court granted.

The court found that the Nash Equilibrium bargaining model that Dr. Vogt used to estimate that generic Namenda IR would have entered the market in November 2012 "but-for" the reverse payments (the "but-for generic entry date") was a widely recognized economic bargaining model that was sufficiently reliable to pass muster under *Daubert*.  (*Id*.).  The model incorporated a number of factors, including the estimated fair value of the Lexapro Amendment.

But Dr. Vogt did reach his conclusion about the date of entry based – in part – on Susan Marchetti's opinion that the reverse payment made to Mylan exceeded fair value by  $30.9 million

dollars. Dr. Vogt calculated the but-for entry date by plugging in Marchetti's $30.9 million overpayment calculation into his economic bargaining model.  Based on Marchetti's fair value calculation (and on other factors, such as the terms of the settlement and the companies' profit projections given different dates of generic entry),  he determined that number that Forrest achieved 97.5% of the gains from the agreement and Mylan achieved 2.5%.  He then selected a generic entry date which most closely approximates the 97.5% to 2.5% share of profits achieved in the "actual world."

At the time the *Daubert* motion was made, Defendants argued that Ms. Marchetti's fair value calculation was unreliable; however, no *Daubert* motion addressed to Ms. Marchetti was made in connection with the class certification motion, and I did not consider or pass on her credentials or the validity of her opinions at that time.

Big mistake.

Defendants' *Daubert* motion addressed to Ms. Marchetti's expert report was filed on November 23, 2020, so it was already on file when I decided the motion for class certification. But it was filed in conjunction with their motion for summary judgment, and the court considered it when deciding that motion – which I did not address until four months after the class certification motion was decided. When I finally got around to the summary judgment motions and the *Daubert* motions that accompanied them, I granted Defendants' *Daubert* motion to exclude the "fair value" opinion offered by Marchetti. (*See* the Court's June 11, 2022, Decision on the *Daubert* Motions and the Motions for Summary Judgment, Docket No. 689 at 18-26).  At the time  I did not  consider whether that decision might require me to revisit any decision that I had previously made – specifically, whether it might impact my decision concerning Dr. Vogt, on whose credentials and the admissibility of whose opinions I had ruled some months earlier.

My conclusion that Ms. Marchetti overlooked relevant factors in calculating how much Forest overpaid for the Lexapro Amendment does not affect Dr. Vogt's credentials or the fact that he used a widely recognized model of economic bargaining to reach his opinions – the issues that were principally determinative of the *Daubert* motion at the time it was decided.  But obviously, once I disallowed Ms. Marchetti's testimony on the "fair value" of the Lexapro Amendment, Dr. Vogt would have to have a different basis for using the $30.9 million overpayment estimate in his calculations.

Now Defendants effectively ask the court to revisit Dr. Vogt's opinion and to "clarify" (really reverse) the *Daubert* decision allowing his testimony, because he plugged information from a disallowed opinion into his calculation of the estimated date of entry.

One would have expected this motion to be made quite a bit earlier than it was.  It was filed on June 22, 2022,  less than two months ago, a full year after the issue arose, and more than six months after briefing concluded on the parties' *in limine* motions.  It should have been obvious to all parties fourteen months ago that my decision with regard to Ms. Marchetti might have some impact on the admissibility of Dr. Vogt's conclusions. It would have been obvious to me had I decided both motions at the same time. But I freely confess that I was not focused on Dr. Vogt's *Daubert* motion, or how Ms. Marchetti's report impacted his calculations, when I decided the motions for summary judgment and the second round of *Daubert* motions. It was the job of the parties to call this issue to my attention and to do so immediately. And when I say "the parties" I mean BOTH sides, since both sides should have recognized the impact that my decision could have on Dr. Vogt's opinion testimony.

Defendants are correct that an expert witness is not entitled to rely on another expert's unreliable opinions for support.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp.

3d 430, 494 (S.D.N.Y. 2018). Dr. Vogt is still qualified as an expert; his model is still one that is recognized in his field; and he is still able to testify about issues on which he offers opinions. What he cannot do is rely in that testimony on the opinion of Ms. Marchetti. He will either have to come up with a justification aside from Marchetti's views to justify his use of November 2012 as the date of entry in his model, or he will have to comb the record and come up with a date of entry that he can justify on some other basis – and then recalculate his damages opinion based on that new date of entry, using the Nash Equilibrium bargaining model that the court has allowed.

I am going to give Dr. Vogt the opportunity to file a revised report. He has until September 9 to do so. And I am going to allow him to be re-deposed prior to the trial. Defendants have until September 30 to take his deposition.

But those dates may change.

Plaintiffs' position *in limine* that exemplary damages will have to be calculated on a state-by-state basis – some by the court, some by the jury – means that the pursuit of exemplary damages in this action (as opposed to the DPP action) may render it impossible to try the issue of damages on a class-wide basis. This is an issue that will need to be addressed with the parties in a conference (remote) that I need to hold during the week of August 22 (next week) – well in advance of the final pre-trial conference. My deputy clerk will set it up. I am sorry that it has to be a remote conference, but I will not be in New York, and this cannot wait until September.

## CONCLUSION

This constitutes the decision and order of the Court. It is a written opinion.

The Clerk is directed to remove the following motions from the court's list of open motions: 707, 709, 712, 715, 718, 720, 724, 727, 730, 732, 734,  737, 740, 743, 746,  748, 750, 752, 754, 756, 759, 761, 763, 765, 768, 772, 774, 776, 778, 781, 863.

Dated:  August 15, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL